UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MORGAN ART FOUNDATION LIMITED, SIMON SALAMA-CARO, SHEARBROOK (US), LLC, FIGURE 5 ART LLC, AND RI CATALOGUE RAISONNE LLC<br><br>PLAINTIFFS,<br><br>-AGAINST-<br><br>JAMES W. BRANNAN AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ROBERT INDIANA,<br><br>DEFENDANT. | No. 18 Civ. ____ (__) |

## COMPLAINT

Plaintiffs Morgan Art Foundation Limited, Simon Salama-Caro, Shearbrook (US), LLC, Figure 5 Art LLC, and RI Catalogue Raisonne LLC, by their attorneys, Quinn Emanuel Urquhart & Sullivan, LLP, bring this action against Defendant James W. Brannan As Personal Representative of the Estate of Robert Indiana ("the Estate"), and for their Complaint allege as follows.

## NATURE OF THE ACTION

1.      Robert Indiana was and remains an iconic American artist.  Though he gained notoriety for his *LOVE* image, his contributions to the American canon go far beyond *LOVE*. Yet since Indiana's death in May 2018, James Brannan—who, as personal representative for the Estate of Robert Indiana, is charged with protecting Indiana's posthumous legacy and estate— has instead only acted to frustrate Indiana's living wishes.  He has repudiated the clear contractual agreements that Indiana entered into during his lifetime, and taken steps that undermine the protection of Indiana's legacy by his longtime patrons and advisors.

2.      Instead of protecting Indiana's legacy and ensuring that his will and wishes are carried out, Brannan has inexplicably imposed roadblocks at every turn, refused to cooperate with Indiana's longstanding business partners, and caused his estate to fall into disarray. Brannan, purportedly acting on behalf of the Estate, has breached and repudiated numerous agreements Indiana entered into with Simon Salama-Caro and Morgan Art Foundation Limited, one of Indiana's most committed patrons who supported his career for decades.  He has done this despite knowing that these agreements were expressly authorized by Indiana and, by their very nature, were intended to further Indiana's legacy and personal wishes.

3.      Brannan is well aware of the long history and thoughtful working relationship that Morgan Art Foundation and Salama-Caro had with Indiana before his death.  Indeed, as a result of Morgan Art Foundation's efforts to promote and revitalize Indiana's art career over the last three decades, Indiana granted Morgan Art Foundation the copyrights, trademarks, and exclusive rights to produce and sell many of his most notable works.  In exchange for these rights, Morgan Art Foundation paid Indiana millions of dollars in royalties stemming from the successful sale of these works.  These rights are memorialized in written agreements—the "License/IP Agreement" and the "Sculpture Agreement"—between Morgan Art Foundation and Indiana, which Brannan has acknowledged and accepted on behalf of the Estate.

4.      Shortly before Indiana's death in May 2018, Morgan Art Foundation brought an action in the District Court for the Southern District of New York to assert its rights under these agreements, and to protect Indiana's market and artistic legacy from the unauthorized reproduction and forging of Indiana works by art publishers Michael McKenzie and American Image Art.  As Morgan Art Foundation made clear in that complaint, and also directly to the Estate's representatives, Morgan Art Foundation's intention was to *protect* Indiana and his

artistic legacy from the low-quality forgeries flooding the market—a highly concerning situation that Morgan Art Foundation's advisors had discussed with Indiana before his death.  Morgan Art Foundation had every intention of working together with the Estate to protect and promote Indiana's legacy and foundation after his death, and had even discussed donating millions of dollars' worth of its own collection of artworks to help support the fledgling Star of Hope Foundation.

5.      Inexplicably, and to severe detriment to Indiana's legacy and estate, Brannan has rejected Morgan Art Foundation's offers of support.  Instead, through frivolous counterclaims filed on Friday in the Southern District of New York, the Estate has alleged that *Morgan Art Foundation* and *Salama-Caro* are in the wrong, and repudiated several agreements that Indiana had made with Morgan Art Foundation and Simon Salama-Caro.  But these agreements are clearly documented in writing.  They are the subject of executed contracts and written correspondence with Indiana spanning more than a decade.  And they relate to projects that Indiana was passionate about and strongly encouraged, and worked actively on with Salama-Caro and others for many years before his death.

6.      The plain language of Morgan Art Foundation's and Salama-Caro's agreements with Indiana make clear that the Estate's allegations have no basis in reality and are directly contrary to fact.  Even worse, the Estate was aware of these agreements when it made these frivolous allegations public—yet chose to ignore them.  But Brannan, as personal representative of the Estate, cannot simply pick and choose which of Indiana's living wishes and agreements he prefers to honor and which he would rather forget.

7.      *First,* the Estate baselessly alleged that Salama-Caro lacked authority to create certain marble sculptures of the image of *LOVE* and that Indiana's signature on these works is

false.  Not true.  Indiana granted Salama-Caro the express "authority to have LOVE sculptures made in marble" in certain agreed sizes and quantities, and gave Salama-Caro and Morgan Art Foundation the exclusive right to inscribe Indiana's signature on the works.  Since their production, the marble *LOVE* sculptures have been publicly exhibited, with Indiana's knowledge and approval, for years.  They were adored by Indiana, who held one of the works in his private collection at his home in Vinalhaven, Maine.  And upon the sale of one such sculpture in 2006, a significant royalty payment was duly made to Indiana.  Yet notwithstanding the clear written agreements between Indiana, Morgan Art Foundation, and Salama-Caro regarding the creation and authenticity of these sculptures—which the Estate *has* copies of in its possession—the Estate has baselessly and publicly asserted that Morgan Art Foundation and Salama-Caro *forged* these works, without even mentioning the contracts authorizing these works that the Estate knows exist.  This conduct is inexplicable, and directly contrary to the written contracts and Indiana's express wishes.  Indiana would never have repudiated these works that he so treasured.

8.      *Second*, the Estate has also repudiated Indiana's agreement with Salama-Caro to publish Indiana's Catalogue Raisonne—a comprehensive listing of his complete oeuvre.  Indiana was immensely proud that the Catalogue Raisonne was being published, and expressly authorized Salama-Caro to do so.  The Catalogue Raisonne will memorialize Indiana's significant body of work and educate the public about his artistic contributions.  Salama-Caro and RI Catalogue Raisonne LLC, the company established by Salama-Caro with Indiana's knowledge, have dedicated more than a decade and expended millions of dollars of their own resources preparing the Catalogue Raisonne for publication.  But rather than see to it that Indiana's Catalogue Raisonne is published, and honor Indiana's express agreement and wish that Salama-Caro be "responsible for the preparation of the Catalogue Raisonne of my complete

4

oeuvre," the Estate has attempted to halt its publication on the patently untrue ground that Indiana did not confer on Salama-Caro the right to prepare a Catalogue Raisonne.  This is false and contrary to the written contract signed by Indiana.

9.     *Third*, the Estate seeks to undo all of the hard work Salama-Caro and his affiliates have poured into the creation and maintenance of RobertIndiana.com, which has been in operation for years.  Again, Indiana and Salama-Caro agreed to the creation of this website many years ago, and it has served the valuable purpose of educating the public and promoting Indiana's legacy globally.    Indiana never objected to Salama-Caro's operation of RobertIndiana.com during his lifetime.  To the contrary, Indiana often offered feedback on and frequently discussed the website with Salama-Caro over the years.  In fact, Salama-Caro's creation of the website was Indiana's idea.  Nevertheless, the Estate now seeks to posthumously repudiate Indiana's express consent to the website, contrary to his wishes and to the detriment of his legacy.

10.     The Estate's conduct is unjust and clearly violates Morgan Art Foundation's, Salama-Caro's, and others' rights.  But more important than that is the effect that the Estate's actions will have on Indiana's artistic legacy.  By seeking to prevent the publication of a landmark scholarly study of Indiana's body of work in the Catalogue Raisonne, and interfere with the continued maintenance of his authorized website, the Estate is not only contravening Indiana's express wishes, but actively acting to destroy his legacy rather than promote it.  The end result of the Estate's bad-faith conduct will be to drain Indiana's Estate of valuable resources through needless litigation that would otherwise go toward supporting his Star of Hope Foundation, line the pockets of attorneys and Estate representatives, and protect the interests of the Estate's personal representative, Brannan, at the expense of Indiana's Estate and legacy itself.

11.     Notwithstanding Brannan's interference, Morgan Art Foundation and Salama-Caro remain determined to do the right thing by Indiana and protect his legacy.  On September 6, 2018, Morgan Art Foundation received a call from a concerned citizen of Vinalhaven to report that Indiana's residence—the landmark Star of Hope building—was falling apart, and endangering the citizens of Vinalhaven by its disrepair.  The Estate has failed to contribute money or take efforts to adequately stabilize the house—which is possibly Indiana's greatest conceptual work and which he wanted to become a study center after his death.  This irresponsible behavior is completely contrary to Indiana's wishes, and the wishes of the Vinalhaven community that knew and supported Indiana throughout his later life.  Accordingly, on September 7, Morgan Art Foundation told the Estate that it would be willing to step in to protect Indiana's historical residence for Vinalhaven.  Morgan Art Foundation proposed donating upwards of $5 million of art from its own collection to be auctioned off, the proceeds of which would go to the Star of Hope Foundation to repair the house and fund operations.  Morgan Art Foundation also offered to lend major works—such as a monumental *LOVE* sculpture—for display in Vinalhaven.  This is because Indiana's personal collection did not contain the most important artistic creations that would draw public interest.

12.     In response to Morgan Art Foundation's generosity, the Estate thumbed its nose at Vinalhaven, thumbed its nose at history, thumbed its nose at the patron of Robert Indiana that spent tens of millions of dollars and decades funding and supporting Indiana's artistic career, and thumbed its nose at Indiana's living wishes themselves.

## PARTIES

13.     Plaintiff Morgan Art Foundation Limited is a Bahamas limited liability company.

14.     Plaintiff Simon Salama-Caro is an advisor to Morgan Art Foundation.  He resides at 45 East 80th Street, New York, NY 10075.

15.     Plaintiff Shearbrook (US), LLC is a New York limited liability company.

16.     Plaintiff Figure 5 Art LLC is a New York limited liability company.

17.     Plaintiff RI Catalogue Raisonne LLC is a New York limited liability company.

18.     Robert Indiana was an American artist.  From 1978 until the day he died, Indiana resided at Star of Hope, Vinalhaven, Maine.  After he died, pursuant to his will, James W. Brannan was made the personal representative of the Estate of Robert Indiana.

<u>JURISDICTION AND VENUE</u>

19.     None of the members of Plaintiff Morgan Art Foundation Limited are residents of Maine.

20.     Plaintiff Simon Salama-Caro is a New York resident.

21.     None of the members of Plaintiff Shearbrook (US), LLC are residents of Maine.

22.     None of the members of Plaintiff Figure 5 Art LLC are residents of Maine.

23.     None of the members of Plaintiff RI Catalogue Raisonne LLC are residents of Maine.

24.     Robert Indiana was a resident of Maine for the last 40 years of his life and when he died.  James W. Brannan, as personal representative to the Estate of Robert Indiana, is therefore deemed to be a resident of Maine pursuant to 28 U.S.C. § 1332(c)(2).

25.     The value of Plaintiffs' claims exceeds $75,000.00.

26.     The Court therefore has subject matter jurisdiction under 28 U.S.C. § 1332.

27.     The Court has personal jurisdiction over Indiana, and now the Estate, because Indiana consented to the jurisdiction of this Court in the December 22, 1999 agreement.  The

Court also has personal jurisdiction over Indiana, and now the Estate, because Indiana has transacted business and contracted to supply goods or services in New York.

28.     Venue is proper in this District because the December 22, 1999 Agreement (the "Sculpture Agreement") states that all claims, disputes, and controversies related to or arising under or involving the terms and provisions of the agreement must be resolved in the federal courts located in New York County.

29.     Venue is also proper in this District under 28 U.S.C. § 1391 and 28 U.S.C. § 1400 because a substantial part of the events giving rise to the claims occurred in this District and because, upon information and belief, Indiana could often be found in this District and regularly did or solicited business in this District.

<u>FACTUAL ALLEGATIONS</u>

I.     ROBERT INDIANA'S ARTISTIC CAREER AND RELATIONSHIP WITH MORGAN ART FOUNDATION AND SIMON SALAMA-CARO.

30.     Robert Indiana is an American artist born in 1928 in New Castle, Indiana.  He achieved abrupt fame in the 1960s, when he created the image called *LOVE* that was featured on the annual Christmas Card published by the Museum of Modern Art in 1965.  The image contained four letters, L-O-V-E, and is depicted here:



31.     The image was an instant success and made Indiana world-famous.  It was made into sculptures by the artist that have prominently appeared in public spaces around the world, and featured on 330 million postage stamps issued by the United States Postal Service.

32.     Despite the global fame he achieved in the 1960s and 1970s in connection with *LOVE*, Robert Indiana's initial fame subsided, and he encountered hard financial times. People began ripping off the *LOVE* image without the artist's consent; they made cheap souvenirs and flooded the market with countless commercial products featuring the image. The endless exposure of *LOVE*, in low-quality forms, stunted Indiana's rising career as an artist.  He retreated from his New York City life to the isolated and hard-to-reach town of Vinalhaven, Maine, where he resided in the Star of Hope.  Though he continued creating new works, there was little interest or market for those works.

33.     By the early 1990s, Morgan Art Foundation, through its advisor Simon Salama-Caro, had recognized Robert Indiana's talent and the value of his works beyond *LOVE,* and endeavored to rebuild his art market and get him the artistic recognition he deserved.  Salama-Caro traveled to Vinalhaven for numerous meetings with Indiana to discuss his strategy and his plan for repairing Indiana's career.  Indiana eagerly agreed to Salama-Caro's career-changing

plans, and he asked Salama-Caro to represent him.   Ultimately, through a series of agreements, Indiana granted Morgan Art Foundation all "copyright, trademark, and other rights" in many of his works, including *LOVE,* and the exclusive right to "produce and fabricate" and sell these works worldwide.

34.     In 1999, Indiana and Morgan Art Foundation entered into agreements to govern their relationship.  On April 9, 1999, Indiana and Morgan Art Foundation entered into a contract (together with any amendments, the "License/IP Agreement") under which Indiana conveyed to Morgan Art Foundation his rights in several works.  The Agreement was made effective as of June 28, 1998, and states:

> I [Robert Indiana] hereby transfer and assign [to Morgan Art Foundation] all of my trademarks, copyrights and all other rights that I now have or may hereafter acquire, including the right to sue for past infringement, in and to the *LOVE*, *AHAVA* (in Hebrew letters), *AMOR*, *Numbers* and *YALE* Images and in and to any and all paintings, sculptures, constructions and other art work, (hereinafter called the 'Images'), copies of which Images appear in the 1998 Catalogue of my art work prepared for my 1958-1998 Retrospective Exhibition at Museum of Modern and Contemporary Art in Nice, France and/or in the Catalogue Raisonne, 1951-1991, of my prints published by the Susan Sheehan Gallery, New York, except for the image of the *LOVE* postage stamp as illustrated on page 50.

> (Attached as Exh. A.)

35.     The License/IP Agreement further stated that Indiana's transfer of rights included the "exclusive right throughout the world in perpetuity to reproduce, promote and sell the Images in such forms and sizes, singularly or in any combination, in such manner, at such time, for such price and subject to such terms and conditions as Morgan Art Foundation in its sole discretion shall determine."

36.     In exchange for these transfers, Morgan Art Foundation agreed to pay Indiana 50% of the net income Morgan Art Foundation received from selling the Images.  Morgan Art

Foundation initially agreed to provide Indiana a quarter-annual accounting, but the parties agreed in a November 25, 2001 amendment that Morgan Art Foundation would do so annually. (Attached as Exh. B.)

37.     In another agreement (the "Signature Agreement"),, the License/IP Agreement was further modified to grant to Morgan Art Foundation "the exclusive right to inscribe or set forth my signature and the copyright date on all reproductions of each Image reproduced by Morgan as authorized by the [License/IP] Agreement."  In the Signature Agreement, Indiana confirmed that "[i]n all other respects, I hereto ratify, confirm and approve the [License/IP] Agreement."  (Attached as Exh. C.)

38.     The License/IP Agreement was also later amended to extend to all paintings and sculptures conceived by Indiana from 1960 to April 2004, the date of amendment.

39.     On December 22, 1999, Indiana entered into a contract with Morgan Art Foundation, referred to herein as the "Sculpture Agreement."   The Sculpture Agreement conveyed to Morgan Art Foundation the right to produce and fabricate sculptures of *LOVE*, *AHAVA*, *AMOR*, *NUMBERS* (*ONE* through *ZERO*), *ART*, and *2000*.  It also granted Morgan Art Foundation the exclusive right to market and sell the sculptures.  Specifically, the Agreement states:

> I [Robert Indiana] hereby authorize, permit and grant to [Morgan Art Foundation] the exclusive right, in perpetuity, to produce and fabricate the LOVE sculptures, the AHAVA sculptures, the AMOR sculptures, the Numbers sculptures (One, Two, Three, Four, Five, Six, Seven, Eight, Nine, Zero), the ART sculptures and the 2000 sculptures (the "Sculptures") in the colors, dimensions and edition sizes set forth [in the attached schedule] . . . .

> (Attached as Exh. D.)

40.     Indiana further agreed that "Morgan [Art Foundation] shall have the exclusive right throughout the world, in perpetuity, to promote and sell the Sculptures in such manner, at

such time, for such price and subject to such terms and conditions as Morgan in its sole discretion shall determine."

41.     Indiana agreed that he would not authorize any party other than Morgan Art Foundation to fabricate the Sculptures, and that the rights transferred to Morgan Art Foundation had not been transferred to any third parties.

42.     Indiana agreed that "Morgan's exclusive authority to fabricate the Sculptures shall continue in perpetuity without interruption or abatement when I am no longer living" and that "[t]his Agreement shall be binding upon and shall inure to the benefit of the undersigned and their respective successors, assigns, heirs, next of kin and representatives."  In exchange, Morgan Art Foundation initially agreed to pay Indiana a sum equal to 20% of the receipts from the sale of the Sculptures, with the accounting to be provided on an annual basis.  The parties then agreed in January 2000 that Morgan Art Foundation would pay Indiana 20% of the "net income received by Morgan Art Foundation from the sale of the sculptures after deduction of Permissible Deductible Expenses as listed in the April 9, 1999 Agreement."  (Attached as Exh. E.)

43.     Indiana and Morgan Art Foundation also executed separate Bills of Sale dated December 22, 1999, in connection with the License/IP Agreement and Sculpture Agreement. (Attached as Exhs. F, G.)  Through these Bills of Sale, Indiana conveyed and sold to Morgan Art Foundation certain works and the sculptures that had been or would be fabricated of *LOVE*, *AHAVA*, *AMOR*, *NUMBERS (ONE* through *ZERO*), *ART*, and *2000*.  Indiana agreed to "warrant and defend the sale" of these works, as well as the rights conveyed to Morgan Art Foundation in the License/IP Agreement and Sculpture Agreement, "against all and every person and persons whomever."

44.    On July 12, 2001, Indiana entered into an agreement (the "Authentication Agreement") with Morgan Art Foundation, in which he agreed, in writing, to "irrevocably grant unto Simon Salama-Caro, as agent for Morgan Art Foundation Limited, the exclusive right and authority throughout the term of the [Sculpture Agreement] to execute on behalf of [Indiana], Certificates of Authenticity of and for the artwork described in said Agreement."  (Attached as Exh. H.)

45.    In recognition of Salama-Caro's dedicated and successful work on his behalf, Indiana also authorized Salama-Caro to act as his agent in the art market, and often referred to Salama-Caro as such.  For example, in September 2000, Indiana confirmed to Salama-Caro in writing that Salama-Caro was Indiana's "exclusive agent," and had Indiana's "full authority to represent [him] in the search for a gallery in New York and to deal on all matters regarding an exhibition at such gallery."  (Attached as Exh. I.)

46.    It was widely recognized that Salama-Caro functioned, with Indiana's express authorization, as his agent in the art market.  For example, in connection with the 2013 landmark retrospective exhibition of Indiana's work at the Whitney Museum of American Art in New York City, the exhibition catalogue stated that the exhibition would not have been possible without the participation and support of Indiana's "long-time agent" Simon Salama-Caro.  The curator of the retrospective wrote in her acknowledgements that "[n]o Indiana project can be realized at the highest degree of quality without the cooperation of Simon Salama-Caro, Indiana's longtime agent."  That catalogue essay was written after the author personally interviewed Robert Indiana.

47.    Brannan himself also recognized and referred to Salama-Caro as Indiana's agent.  In an April 2012 email from the director of a prominent Maine museum to Brannan and Salama-

13

Caro, referencing a discussion from the previous day, the museum director memorialized a statement from Brannan that "confirmed that Bob Indiana has authorized you to contact his agent Simon Salama[-][C]aro, to obtain information regarding Bob's agreements with the Morgan Art Foundation."

II.   **ROBERT INDIANA AUTHORIZED SIMON SALAMA-CARO TO FABRICATE MARBLE SCULPTURES OF *LOVE*, WHICH INDIANA CHERISHED.**

48.   Indiana also authorized Salama-Caro to create sculptures of the *LOVE* image in semi-precious stone (the "Marble *LOVE* Sculptures").  Indiana's express approval of the project is evidenced by a series of agreements (the "Marble Sculpture Agreements") between him and Salama-Caro detailing the production of these sculptures.

49.   On September 15, 2000, Indiana signed a letter agreement addressed to Simon Salama-Caro that gave Salama-Caro the express "authority to have LOVE sculptures made in marble" in certain agreed dimensions and numbers (attached as Exh. J):

**ROBERT INDIANA**
**Star of Hope Lodge**
**Vinalhaven**
**Maine 04863**

Simon Salama-Caro
45 East 80th Street
New York NY 10021

15th September, 2000

Dear Simon,

I hereby give you authority to have LOVE sculptures made in marble in the following
sizes:  18 x 18 x 9 inches, 24 x 24 x 12 inches, 36 x 36 x 18 inches and 72 x 72 x 36
inches.   Six  of each size should be made in each of the five types of marble to be
selected.

The base should be incorporated in each  sculpture.



Robert Indiana

50.     On April 26, 2001, Indiana gave written authorization that these sculptures could be fabricated in additional sizes, stating marble sculptures would "be made . . . in the following three sizes: 50x50x25 cm plus base, 100x100x50 cm plus base and 183x183x91.5cm plus base." (Attached as Exh. K.)

51.     On August 6, 2003, Indiana again amended the dimensions of the Marble *LOVE* Sculptures Salama-Caro was to make, informing Salama-Caro in writing that "[t]he dimensions

have been changed . . . as follows: 50 cm plus base[,] 100 cm plus base[,] 150 cm plus base."
(Attached as Exh. L.)

52.    Far from being "unauthorized," these Marble *LOVE* Sculptures were done at the express behest of Indiana, subject to his repeated written approval and discussions between Indiana and Salama-Caro.  With Indiana's unwavering support, Salama-Caro fabricated several marble sculptures of the *LOVE* image.  The first of these was created in 2000.  Indiana treasured it so much that he asked to keep it for himself.  For years, it was prominently displayed in Indiana's private collection at the Star of Hope.  A photograph of the Marble *LOVE* Sculpture on display inside Indiana's home can be found below:



53.     Another photograph of Robert Indiana with a Marble *LOVE* Sculpture can be found below:



54.     A photograph of Indiana examining a series of photographs depicting a Marble *LOVE* Sculpture is shown below:



55.     The Marble *LOVE* Sculptures have been exhibited, with Indiana's knowledge and approval, at the Waddington Galleries in London, the Milan Museum of Contemporary Art, the Farnsworth Art Museum in Rockland, Maine, and currently at the Albright-Knox Art Gallery.

56.     It was well known that Indiana particularly cared for the Marble *LOVE* Sculptures.  At one point, Indiana drew a rendering of a Marble *LOVE* Sculpture situated in the sculpture garden at the Museum of Modern Art in New York City.  He showed Salama-Caro the drawing and told him this was his next project—to suggest to MoMA to consider acquiring the work for its sculpture garden.

57.     Only one of the Marble *LOVE* Sculptures was ever offered for sale.  In 2006, a single Marble *LOVE* Sculpture was sold, and the appropriate royalties were paid to Indiana as a result of the sale.

### III.     AT ROBERT INDIANA'S REQUEST, SIMON SALAMA-CARO PROMOTED INDIANA THROUGH ROBERTINDIANA.COM AND A CATALOGUE RAISONNE.

58.     As Morgan Art Foundation and Indiana achieved mutual success, Salama-Caro and Indiana agreed that Salama-Caro should undertake even broader responsibility for preserving Indiana's legacy and market.

59.     In 1999, after a museum director gifted Robert Indiana a computer, Indiana became fascinated with the world wide web.  Indiana discussed with Salama-Caro the prospect of creating a website to promote his art and history.

60.     At Indiana's request, Salama-Caro registered the domain name Robertindiana.com in 1999.  (Attached as Exh. M.)  While Indiana considered engaging a public relations firm to handle his website, he was pleased with Salama-Caro's hard work, and was excited that Salama-Caro was willing to take on the project of creating a website.  Indiana agreed with Salama-Caro that he should establish the website.

61.     As early as 2001, Salama-Caro kept Indiana apprised of the website's progress, writing in an email to Indiana: "Tomorrow I am having lunch with the owner of Artnet to discuss the details of setting up a web site."  (Attached as Exh. N.)

62.     Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC expended significant amounts of time and resources to make Indiana's wish for a website a reality.  Indiana was kept apprised of the website's progress and operations.

63.     After tireless efforts by Salama-Caro and his affiliates, Robertindiana.com went public in 2010.  The site presented a comprehensive tool to educate the public about Robert Indiana's works and history.  The website continued to expand, with Indiana's full knowledge and approval.

64.     Indiana benefitted significantly from the website.  It promoted his legacy, his works, and his history.  It enhanced the market for his works, and in turn bolstered the royalties he received.

65.     Another significant project that Indiana entrusted to Salama-Caro was the preparation of a Catalogue Raisonne, comprising a comprehensive collection of all his authentic works.

66.     In August 2003, Indiana confirmed in a letter (the "Catalogue Raisonne Letter") that "Simon Salama-Caro is currently working on the Catalogue Raisonne of my work to be published by the Whitney Museum of American Art.  In this capacity he will authenticate my works whenever necessary."  (Attached as Exh. O.)

67.     Indiana later reiterated this in a written and signed agreement (the "Catalogue Raisonne Agreement," attached as Exh. P) in which he wrote to Simon Salama-Caro, "[t]his is to

confirm that we have agreed that you are responsible for the preparation of the Catalogue

Raisonne of my complete oeuvre":

ROBERT  INDIANA
Star of Hope
Vinalhaven
Maine 04863

2 December 2006

Simon Salama-Caro
45 East 80th Street
New York, N.Y.10021

Dear Simon,

This is to confirm that we have agreed that you are responsible for the preparation
of the Catalogue Raisonne of my complete oeuvre.

Sincerely,

Robert Indiana

Simon Salama-Caro

68.     Indiana had already endowed Salama-Caro with the responsibility to authenticate

his works "whenever necessary," to issue certificates of authenticity for his sculptures, and to

inscribe his signature when fabricating his works, including sculptures.   (*See* Exhs. C, O.)

Indiana trusted Salama-Caro to include only authentic works in the Catalogue Raisonne.

20

69.     Indiana was extremely proud that the Catalogue Raisonne would be published. The Catalogue Raisonne was a topic of frequent discussion between Indiana and Salama-Caro.

70.     Over the ensuing decade, Salama-Caro and RI Catalogue Raisonne LLC poured millions of dollars worth of resources into the creation of the Catalogue Raisonne.  All the while, Salama-Caro kept Indiana informed of how it was progressing.

71.     After more than ten years of work, the Catalogue Raisonne is now near completion and ready to be published this fall.  It comprises a compendium of Indiana's works, from a certain period, many of which Morgan Art Foundation already owns the rights to, and all of which Indiana authorized Salama-Caro to authenticate and publish in connection with the Catalogue Raisonne project.  It will be published in association with a major museum, lending further credibility to the project, and will be a pivotal record in the public education and discourse of Indiana works.

72.     The Catalogue Raisonne is an educational, scholarly project.  It is not a profit-making enterprise and is not intended to be a profit-making enterprise.  However, Salama-Caro and RI Catalogue Raisonne LLC's preparation of the Catalogue Raisonne has created certainty and stability in the market for his artworks.  This stability has supported the prices at which Indiana's works have sold, and in turn, the amount of royalties Indiana and his Estate have been able to collect.  Indiana has therefore financially benefitted from the project.

## IV.     AFTER ROBERT INDIANA DIED, JAMES BRANNAN UNDERMINED HIS AGREEMENTS AND HIS LIVING WISHES.

73.     On May 19, 2018, Robert Indiana unexpectedly passed away.

74.     One day prior, Morgan Art Foundation had filed a lawsuit ("AIA Litigation") in this District against American Image Art, Michael McKenzie, and Jamie Thomas.  The AIA

Litigation remains pending, and bears the Case Number 18-cv-04438 (AT).  (Attached as Exh. Q.)

75.     Robert Indiana was also named a defendant in that lawsuit, because his inclusion was necessary to preserve Morgan Art Foundation's contractual rights and to hold Jamie Thomas responsible for any actions he may have taken "on behalf of" Indiana pursuant to a purported power of attorney for Indiana.  Morgan Art Foundation has made clear in the AIA Litigation that it is interested only in protecting Indiana and his legacy (at a time when Indiana was unable to protect himself), and is acting consistently with Indiana's living wishes and the ultimate interests of his Estate.

76.     After Indiana died, James Brannan was named as the personal representative to the Estate, and a case was opened in Maine Probate Court (the "Probate Litigation") to give effect to Indiana's last will and testament.

77.     Brannan has requested numerous categories of documents from Morgan Art Foundation and Simon Salama-Caro in the Probate Litigation.  Morgan Art Foundation and Salama-Caro have actively cooperated with Brannan and provided him with hundreds of pages of documents responsive to his requests.  These documents include written agreements and correspondence with Indiana concerning the Marble *LOVE* Sculptures, the Catalogue Raisonne, and the website, and also include an accounting and independent audit by a leading international accounting and auditing firm of royalties paid by Morgan Art Foundation to Indiana pursuant to its various agreements.

78.     On September 7, 2018, Brannan filed his Answer to the First Amended Complaint of Morgan Art Foundation Limited and Counterclaims in the AIA Litigation ("Estate

Counterclaims"). The Estate Counterclaims include numerous allegations that Brannan knows to be untrue.

79.     *First,* in this public pleading, Brannan accuses Morgan Art Foundation, Salama-Caro, and their affiliates of "fabricat[ing] reproductions of Indiana's artworks in colors, dimensions and/or sizes that are not authorized …." (Estate Counterclaims ¶ 194.)  In particular, Brannan takes issue with Salama-Caro's production of "certain LOVE Sculptures fabricated from semi-precious stones."   (*Id.* ¶ 198.)   Brannan proclaims "[e]ach of the works has an inscription that purports to be Mr. Indiana's signature, but is in fact neither his signature nor an authorized facsimile thereof."  (*Id.*)  What Brannan conceals from this allegation—and from his entire pleading—is that the Marble Sculpture Agreements explicitly gave Salama-Caro the authority "to have LOVE sculptures made in marble," and that the Signature Agreement plainly authorizes Morgan Art Foundation to "inscribe or set forth [Robert Indiana's] signature . . . on all reproductions of [any *LOVE* sculptures]."  Brannan knows this.  He has the documents that prove it.  But he concealed these agreements and filed the baseless Estate Counterclaims anyway.

80.     *Second*, Brannan had the gall to publicly proclaim that Indiana never "consented to the publication of the Catalogue Raisonne by [Simon Salama-Caro]."  (*Id.* ¶ 208.)  This statement is *directly* contradicted by the Catalogue Raisonne Agreement, signed by Indiana, in which Indiana writes to Salama-Caro: "[T]his is to confirm that we have agreed that *you* are responsible for the preparation of the Catalogue Raisonne *of my complete oeuvre*" (emphasis added).  It is also contradicted by the open letter Indiana wrote and signed in 2003, confirming that: "*Simon Salama-Caro* is currently working on the Catalogue Raisonne of my work…. [and] [i]n this capacity he will authenticate my works whenever necessary" (emphasis added). Brannan has the Catalogue Raisonne Agreement, but filed his baseless Counterclaim anyway.

81.     *Third*, Brannan accuses Morgan Art Foundation, Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC of improperly operating Robertindiana.com without Indiana's authorization.  (*See* Estate Counterclaims ¶¶ 201–03.)  But Brannan also knows this is false, as he was provided with the written correspondence between Salama-Caro and Indiana concerning the creation of the website—evidencing the fact that Indiana knew about the website for over a decade and was actively kept apprised of its progress.

82.     In addition to filing the Estate Counterclaims, Brannan also repudiated the Marble Sculpture Agreements, the Catalogue Raisonne Agreement, and Indiana's agreement with Salama-Caro regarding Robertindiana.com in a letter to Plaintiffs' counsel dated August 30, 2018.

83.     The Estate Counterclaims are rife with evidence of bad faith and carelessness. For example, in Paragraph 186, in discussing Morgan Art Foundation's purported failure to provide Indiana with a sufficient accounting of its sales of Indiana's work, Brannan notes that the License/IP Agreement requires Morgan Art Foundation to furnish an accounting to Indiana "on a quarterannual basis."  (Estate Counterclaims ¶ 186.)  Brannan neglects to mention, however, that the License/IP Agreement was amended to require *annual* accountings.  Similarly, in Paragraph 187, in discussing Morgan Art Foundation's alleged failure to pay royalties, Brannan alleges that it was agreed in the Sculpture Agreement that Morgan Art Foundation would "pay a sum equal to 20% of the receipts by Morgan from the sale of the sculptures."  He again neglects to mention that this was later amended to require Morgan Art Foundation to pay Indiana 20% of the "*net income* received by Morgan Art Foundation from the sale of the sculptures after deduction of Permissible Deductible Expenses as listed in the April 9, 1999 Agreement" (emphasis added).

Brannan is aware of each of these amendments; Morgan Art Foundation produced them to him in the Probate Litigation.

84.     Brannan is also aware of the extensive financial accounting and independent audit that Morgan Art Foundation produced in the Probate Litigation, which was also voluntarily sent to Brannan's counsel months earlier.  These records evidence the history of royalty payments made by Morgan Art Foundation to Indiana over several years in accordance with their agreements.  To the extent that Brannan has any questions about these accounting records, sworn testimony is to be taken this week in the Probate Litigation to answer any remaining questions. But rather than wait for these answers, Brannan instead filed Counterclaims alleging "[o]n information and belief" that Morgan Art Foundation has failed to make required royalty payments to Indiana.  There is *no* evidence supporting this allegation.  *None*.  And Brannan knows this—or would know it, had he waited to confirm these records in the Probate Litigation hearing scheduled for this week.  (*See BDO Audit,* attached as Exh. R.)

85.     The Estate's bad faith is also evidenced by its glaring failure to mention the Marble Sculpture Agreements or the Signature Agreement anywhere in the Estate Counterclaims.  Instead, Brannan frivolously accuses Morgan Art Foundation and Salama-Caro of forging the Marble *LOVE* Sculptures, as though these agreements did not exist.  But they do exist.  These are agreements that Brannan has, but chose to conceal from the Court.

86.     Brannan is no stranger to bad faith tactics to protect his privileged position.  The week before Indiana died, Brannan contacted Indiana's longtime assistant, Sean Hillgrove, and asked him to sign a non-disclosure agreement.  Hillgrove had known and worked with Indiana for close to 30 years.  Upon information and belief, Brannan knew Hillgrove had witnessed the scheme concocted by Michael McKenzie and American Image Art, among others, to forge

Indiana's artworks for their own profit and to isolate Indiana at the end of his life. Hillgrove refused to sign Brannan's proposed agreement. The day before Indiana died, Brannan called Hillgrove four more times, and, unable to get in touch with him, resorted to contacting Hillgrove's mother. Upon information and belief, Brannan requested that Hillgrove "name his price" for signing the non-disclosure agreement. Hillgrove did not sign.

87.     Shortly after Morgan Art Foundation filed the AIA Litigation, and shortly after Indiana's death, counsel for Morgan Art Foundation received a lengthy email from a local resident warning Morgan Art Foundation that Brannan may try these precise tactics and drain Indiana's Estate to preserve his own position. She had known Brannan for years and described how, as executor of a family member's will, Brannan "took the opportunity to probate the estate for the full five years." She reported that Brannan had sold the estate properties "for 40% of assessed value" to local residents who had insinuated themselves into her family member's life in his waning years—instead of conducting a true public auction for value to the highest bidder. The trust that had been left to the estate, in her view, "was established as a spendthrift trust" by Brannan, and the heirs of the estate were ultimately left with close to nothing after years of meaningless and unnecessary probate proceedings. She believed that the heirs of the estate had been "'hometowned' as they say in Maine" by Brannan. She stated that "it is a cottage industry in Maine to befriend the elderly in hopes of receiving much in return. It has always been a poor state with many 'kindhearted' predators."

88.     Morgan Art Foundation has received reports that Brannan has hired an unqualified appraiser to appraise the art in Indiana's Estate—a man with whom Brannan has worked closely for years, but who does not have the requisite experience to appraise significant fine works of art. Morgan Art Foundation has also heard reports that art works have been moved

out of the Star of Hope without the use of gloves or other protective measures, leaving oil, dirt, and fingerprints on these valuable works.  This is a major breach of protocol and was confirmed in photographs published by a significant newspaper.  Brannan has also failed to secure certain works in a fine art storage warehouse, in further breach of his obligations to protect Estate property in which Morgan Art Foundation has an interest.

89.    While Brannan has been freely using the Estate's resources to retain several law firms to represent his interests and to pursue frivolous litigation in Indiana's name, he has neglected even the most basic upkeep of the Star of Hope residence—the place that Indiana lived and worked, and that Indiana intended to form the cornerstone of his Star of Hope Foundation and study center.  This monumental property has been described by some as perhaps the most significant of Indiana's works during his lifetime, and is a remarkable and unique living memory to a remarkable and unique artist.

90.    But the house is falling apart.  Literally.  The day before Brannan filed the baseless Estate Counterclaims against Morgan Art Foundation and others, it was Simon Salama-Caro that received an urgent phone call from a concerned Vinalhaven citizen reporting that a plexiglass window had fallen out of the Star of Hope onto Main Street in Vinalhaven, narrowly missing passers by.  Brannan has made no adequate effort nor expended resources to secure and conserve this property since Indiana's death—preferring instead to waste Estate resources on frivolous litigation, against Indiana's express wishes.

91.    These frivolous and reckless expenditures put dollars that should have been transferred to a Maine non-profit into the pockets of Brannan and his lawyers.  This is not only a violation of rights held by the Star of Hope Foundation—which should legally conflict Brannan from taking any action on behalf of that non-profit—it is also a violation of his fiduciary

obligations to the Estate.  Morgan Art Foundation has, therefore, taken the necessary step of notifying the Maine Attorney General of Brannan's conflict of interest and misconduct in an effort to protect the non-profit and Indiana's legacy from further destruction.  (Attached as Exh. S.)

92.     Brannan's actions on behalf of the Estate are flatly counterproductive to the Estate's mission.  His efforts to stop Morgan Art Foundation, Salama-Caro, and their affiliates from performing their agreements with Indiana will only diminish sales of Indiana's works, and as a result, royalty payments to the Estate.  Shutting down the Catalogue Raisonne and website that Indiana specifically requested Salama-Caro to create will only impair Indiana's market and legacy.  Moreover, repudiating Indiana's authorization for some of his most cherished works— the Marble *LOVE* Sculptures—contravenes not only Indiana's written agreements with Plaintiffs, but Indiana's express wishes.  Brannan's misconduct has caused and will cause the Plaintiffs substantial damages and constitutes an egregious violation of his obligations to the Estate and his duty to protect and advance Robert Indiana's wishes.

## COUNT I
### BREACH OF CONTRACT
**By Morgan Art Foundation Limited and Simon Salama-Caro Against the Estate**

93.     Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth here.

94.     The License/IP Agreement, the Sculpture Agreement, and the Signature Agreement are valid and binding contracts between Morgan Art Foundation and Robert Indiana.

95.     The Marble Sculpture Agreements are valid and binding contracts between Simon Salama-Caro and Robert Indiana.

96.     Morgan Art Foundation has complied with the License/IP Agreement, the Sculpture Agreement, and the Signature Agreement.

97.     Simon Salama-Caro has complied with the Marble Sculpture Agreements by fabricating Marble *LOVE* Sculptures pursuant to Indiana's requested specifications.

98.     The Estate has repudiated and breached the License/IP Agreement, the Sculpture Agreement, the Signature Agreement, and the Marble Sculpture Agreements by falsely and publicly asserting that Morgan Art Foundation and Simon Salama-Caro's production of certain *LOVE* Sculptures fabricated from semi-precious stones and inscription of Robert Indiana's signature on these sculptures was not authorized by Robert Indiana, despite the fact that such authority was conferred to Morgan Art Foundation and Simon Salama-Caro through these agreements.

99.     As a direct and proximate result of this conduct, Morgan Art Foundation and Simon Salama-Caro have suffered damages in an amount to be determined at trial.

100.    The Estate's conduct was wanton, willful, and malicious and in known contravention of written and express agreements between one or more of the Plaintiffs and Robert Indiana.  As a result, the Estate must pay punitive damages.

## COUNT II
### UNJUST ENRICHMENT
**By Morgan Art Foundation Limited and Simon Salama-Caro Against the Estate**

101.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth here.

102.    The License/IP Agreement, the Sculpture Agreement, and the Signature Agreement are valid and binding contracts between Morgan Art Foundation and Robert Indiana.

103.    The Marble Sculpture Agreements are valid and binding contracts between Simon Salama-Caro and Robert Indiana.

104.    Relying on these agreements and Indiana's expressed approval for the project, Morgan Art Foundation and Simon Salama-Caro created sculptures with Robert Indiana's oversight, paid royalties to Robert Indiana for any sculptures that were sold, and publicly exhibited the sculptures for years, raising public awareness for Robert Indiana's works.

105.    Robert Indiana benefited from Morgan Art Foundation's performance under the License/IP Agreement, the Sculpture Agreement, and the Signature Agreement, and from Simon Salama-Caro's performance under the Marble Sculpture Agreements.

106.    The Estate has now repudiated the License/IP Agreement, the Sculpture Agreement, the Signature Agreement, and the Marble Sculpture Agreements by falsely and publicly asserting that Morgan Art Foundation and Simon Salama-Caro's production of certain *LOVE* Sculptures fabricated from semi-precious stones and inscription of Robert Indiana's signature on these sculptures was not authorized by Robert Indiana, despite the fact that such authority was conferred to Morgan Art Foundation and Simon Salama-Caro through these agreements and by Robert Indiana personally.

107.    Accordingly, the Estate has withheld adequate compensation for the benefits conferred on it by Morgan Art Foundation and Simon Salama-Caro and will be unjustly enriched to Morgan Art Foundation's and Simon Salama-Caro's detriment as a result.

108.    As a direct and proximate result of this conduct, Morgan Art Foundation and Simon Salama-Caro have suffered damages in an amount to be determined at trial.  Equity and good conscience require restitution.

### COUNT III
### PROMISSORY ESTOPPEL
### By Morgan Art Foundation Limited and Simon Salama-Caro Against the Estate

109.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth here.

110.    The License/IP Agreement, the Sculpture Agreement, and the Signature Agreement reflect promises made by Robert Indiana to Morgan Art Foundation in the course of their business dealings.

111.    The Marble Sculpture Agreements reflect promises made by Robert Indiana to Simon Salama-Caro in the course of their business dealings.

112.    In reliance of the promises contained in these agreements, and in reliance on Indiana's expressed approval for the project, Morgan Art Foundation and Simon Salama-Caro expended time and money creating sculptures with Robert Indiana's oversight, paid royalties to Robert Indiana for any sculptures that were sold, and publicly exhibited the sculptures for years, raising public awareness for Robert Indiana's works.

113.    The Estate has now repudiated these promises by falsely and publicly asserting that Morgan Art Foundation and Simon Salama-Caro's production of certain *LOVE* Sculptures fabricated from semi-precious stones and inscription of Robert Indiana's signature on these sculptures was not authorized by Robert Indiana, despite the fact that such authority was conferred to Morgan Art Foundation and Simon Salama-Caro through these agreements and by Robert Indiana personally.

114.    The Estate's conduct has left Morgan Art Foundation and Simon Salama-Caro in a worse position than they otherwise would be, as they spent significant time and money creating, selling, and exhibiting these sculptures, and paying Robert Indiana royalties for these sculptures, to their own detriment.

115.    Under the circumstances, it would be inequitable to allow the Estate to revoke the promises made by Robert Indiana authorizing the production of the Marble *LOVE* Sculptures fabricated from semi-precious stones.

116.    As a direct and proximate result of this conduct, Morgan Art Foundation and Simon Salama-Caro have suffered damages in an amount to be determined at trial.

117.    The Estate's conduct was wanton, willful, and malicious and in known contravention of written and express agreements between one or more of the Plaintiffs and Robert Indiana.  As a result, the Estate must pay punitive damages.

**COUNT IV**
**<u>DECLARATORY JUDGMENT</u>**
**By Morgan Art Foundation Limited and Simon Salama-Caro Against the Estate**

118.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth here.

119.    The Estate has falsely and publicly asserted that Morgan Art Foundation and Simon Salama-Caro's production of certain *LOVE* Sculptures fabricated from semi-precious stones and inscription of Robert Indiana's signature on these sculptures was not authorized by Robert Indiana, despite the fact that such authority was conferred to Morgan Art Foundation and Simon Salama-Caro through the License/IP Agreement, the Sculpture Agreement, the Signature Agreement, and the Marble Sculpture Agreements.

120.    The Court may award declaratory relief under 28 U.S.C. §§ 2201, 2202.

121.    The Court may issue any writ necessary in aid of its jurisdiction under 28 U.S.C. § 1651, the All Writs Act.

122.    The Court is authorized to enter a declaratory judgment where a justiciable controversy exists regardless of whether other relief is available.

123.    A justiciable controversy exists concerning whether the Marble *LOVE* Sculptures fabricated from semi-precious stones were authorized by Robert Indiana.

124.    Morgan Art Foundation and Simon Salama-Caro are entitled to a declaratory judgment that the Marble *LOVE* Sculptures fabricated from semi-precious stones were authorized by Robert Indiana.

**COUNT V**
**BREACH OF CONTRACT**

**By Simon Salama-Caro and RI Catalogue Raisonne LLC against the Estate**

125.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth here.

126.    The Catalogue Raisonne Agreement is a valid and binding contract between Simon Salama-Caro and Robert Indiana.

127.    Simon Salama-Caro has complied with the Catalogue Raisonne Agreement, and expended over a decade of time and millions of dollars' worth of resources into preparing a Catalogue Raisonne for Robert Indiana's works.

128.    The Catalogue Raisonne is nearly complete and Simon Salama-Caro and RI Catalogue Raisonne LLC intend to publish the Catalogue Raisonne this fall.

129.    Robert Indiana and the Estate benefited from the certainty and stability that resulted from Simon Salama-Caro and RI Catalogue Raisonne LLC's efforts to authenticate Indiana's works and to promote and publicize his legacy in connection with the production and publication of the Catalogue Raisonne.

130.    The Estate has nevertheless now repudiated and breached the Catalogue Raisonne Agreement by falsely and publicly stating that Robert Indiana did not consent to the publication of the Catalogue Raisonne by Simon Salama-Caro and by seeking to prevent the publication of the Catalogue Raisonne, despite the fact that such consent was conferred in the Catalogue Raisonne Agreement.

33

131.    Moreover, the Estate has instructed Simon Salama-Caro to cease and desist from publishing the Catalogue Raisonne.

132.    As a direct and proximate result of this conduct, Simon Salama-Caro and RI Catalogue Raisonne LLC have suffered damages in an amount to be determined at trial.

133.    The Estate's conduct was wanton, willful, and malicious and in known contravention of written and express agreements between one or more of the Plaintiffs and Robert Indiana.  As a result, the Estate must pay punitive damages.

### COUNT VI
### UNJUST ENRICHMENT
**By Simon Salama-Caro and RI Catalogue Raisonne LLC Against the Estate**

134.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth here.

135.    The Catalogue Raisonne Agreement is a valid and binding contract between Simon Salama-Caro and Robert Indiana.

136.    Relying on the Catalogue Raisonne Agreement and the Catalogue Raisonne Letter, as well as extensive discussions and agreements concerning the Catalogue Raisonne with Robert Indiana, Simon Salama-Caro and RI Catalogue Raisonne LLC poured millions of dollars of resources and over a decade of time into preparing the Catalogue Raisonne.

137.    The Catalogue Raisonne is nearly complete and Simon Salama-Caro and RI Catalogue Raisonne LLC intend to publish the Catalogue Raisonne this fall.

138.    Robert Indiana and the Estate benefited from the certainty and stability that resulted from Simon Salama-Caro and RI Catalogue Raisonne LLC's efforts to authenticate Indiana's works and to promote and publicize his legacy in connection with the production and publication of the Catalogue Raisonne.

139.    The Estate has nevertheless now repudiated and breached the Catalogue Raisonne Agreement by falsely and publicly stating that Robert Indiana did not consent to the publication of the Catalogue Raisonne by Simon Salama-Caro and by attempting to prevent the publication of the Catalogue Raisonne, despite the fact that such consent was conferred in the Catalogue Raisonne Agreement and by Robert Indiana personally.

140.    Moreover, the Estate has instructed Simon Salama-Caro to cease and desist from publishing the Catalogue Raisonne.

141.    Accordingly, the Estate has withheld adequate compensation for the benefits conferred on it by Simon Salama-Caro and RI Catalogue Raisonne LLC, and will be unjustly enriched to Simon Salama-Caro's and RI Catalogue Raisonne LLC's detriment as a result.

142.    As a direct and proximate result of this conduct, Simon Salama-Caro and RI Catalogue Raisonne LLC have suffered damages in an amount to be determined at trial.  Equity and good conscience require restitution.

### COUNT VII
### PROMISSORY ESTOPPEL
**By Simon Salama-Caro and RI Catalogue Raisonne LLC Against the Estate**

143.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth here.

144.    The Catalogue Raisonne Agreement reflects a promise made by Robert Indiana to Simon Salama-Caro in the course of their business dealings that Simon Salama-Caro is authorized to prepare a Catalogue Raisonne of Robert Indiana's complete oeuvre.

145.    This promise was reaffirmed by the Catalogue Raisonne Letter and in extensive discussions Simon Salama-Caro had with Robert Indiana over the years.

146.    In reliance of this promise, Simon Salama-Caro and RI Catalogue Raisonne LLC poured millions of dollars of resources and over a decade of time into preparing the Catalogue Raisonne.

147.    Robert Indiana and the Estate benefited from the certainty and stability that resulted from Simon Salama-Caro and RI Catalogue Raisonne LLC's efforts to authenticate Indiana's works and to promote and publicize his legacy in connection with the production and publication of the Catalogue Raisonne.

148.    The Estate has nevertheless now falsely and publicly asserted that Robert Indiana did not consent to the publication of the Catalogue Raisonne by Simon Salama-Caro and RI Catalogue Raisonne LLC and has attempted to prevent the publication of the Catalogue Raisonne.

149.    Moreover, the Estate has instructed Simon Salama-Caro to cease and desist from publishing the Catalogue Raisonne.

150.    The Estate's conduct has left Simon Salama-Caro and RI Catalogue Raisonne LLC in a worse position than they otherwise would be, as they spent significant time and money creating the Catalogue Raisonne, to their own detriment.

151.    Under the circumstances, it would be inequitable to allow the Estate to revoke the promise made by Robert Indiana that Simon Salama-Caro could prepare and publish a Catalogue Raisonne of Robert Indiana's works.

152.    As a direct and proximate result of this conduct, Simon Salama-Caro and RI Catalogue Raisonne LLC have suffered damages in an amount to be determined at trial.

153.    The Estate's conduct was wanton, willful, and malicious and in known contravention of written and express agreements between one or more of the Plaintiffs and Robert Indiana.  As a result, the Estate must pay punitive damages.

**COUNT VIII**
**DECLARATORY JUDGMENT**
**By Simon Salama-Caro and RI Catalogue Raisonne LLC Against the Estate**

154.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth here.

155.    The Estate has falsely and publicly asserted that Robert Indiana did not consent to the publication of the Catalogue Raisonne by Simon Salama-Caro and RI Catalogue Raisonne LLC, despite the fact that such consent was granted in the Catalogue Raisonne Agreement and reaffirmed in the Catalogue Raisonne Letter and in extensive discussions Simon Salama-Caro had with Robert Indiana over the years.

156.    The Court may award declaratory relief under 28 U.S.C. §§ 2201, 2202.

157.    The Court may issue any writ necessary in aid of its jurisdiction under 28 U.S.C. § 1651, the All Writs Act.

158.    The Court is authorized to enter a declaratory judgment where a justiciable controversy exists regardless of whether other relief is available.

159.    A justiciable controversy exists concerning whether Robert Indiana authorized Simon Salama-Caro and RI Catalogue Raisonne LLC to publish the Catalogue Raisonne.

160.    Simon Salama-Caro and RI Catalogue Raisonne LLC are entitled to a declaratory judgment that the Catalogue Raisonne was authorized by Robert Indiana.

**COUNT IX**
**BREACH OF CONTRACT**
**By Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC against the Estate**

161.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth here.

162.    Robert Indiana made a valid and binding agreement with Simon Salama-Caro that Simon Salama-Caro would establish and operate Robertindiana.com.

163.    Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC have complied with the agreement, and have expended time, money, and effort registering Robertindiana.com, updating the website, and maintaining the website for several years.

164.    Robert Indiana benefited significantly from the website's promotion of his artworks and legacy over the years, and never objected to Plaintiffs' operation of the website during his lifetime.

165.    The Estate has now repudiated and breached this agreement by falsely and publicly stating Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC have no right to operate or use the domain name of Robertindiana.com.

166.    As a direct and proximate result of this conduct, Simon Salama-Caro and Morgan Art Foundation have suffered damages in an amount to be determined at trial.

167.    The Estate's conduct was wanton, willful, and malicious and in known contravention of written and express agreements between one or more of the Plaintiffs and Robert Indiana.  As a result, the Estate must pay punitive damages.

**COUNT X**
**UNJUST ENRICHMENT**
**By Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC Against the Estate**

168.   Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth here.

169.   Robert Indiana made a valid and binding agreement with Simon Salama-Caro that Simon Salama-Caro would establish and operate Robertindiana.com.

170.   In reliance on this agreement, as well as numerous subsequent discussions with Robert Indiana reflecting his consent to their creation and operation of RobertIndiana.com, Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC expended time, money, and effort registering the website, updating the website, and maintaining the website for several years.

171.   Robert Indiana benefited significantly from the website's promotion of his artworks and legacy over the years, and never objected to Plaintiffs' operation of the website during his lifetime.

172.   The Estate has now repudiated this agreement by falsely and publicly stating that Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC have no right to operate or use the domain name of Robertindiana.com.

173.   Accordingly, the Estate has withheld adequate compensation for the benefits conferred on it by Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC and will be unjustly enriched to Simon Salama-Caro's, Shearbrook (US), LLC's, and Figure 5 Art LLC's detriment as a result.

174. As a direct and proximate result of this conduct, Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC have suffered damages in an amount to be determined at trial. Equity and good conscience require restitution.

### COUNT XI
### PROMISSORY ESTOPPEL
**By Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC Against the Estate**

175. Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth here.

176. Robert Indiana promised Simon Salama-Caro that he could establish and operate Robertindiana.com.

177. In reliance on this promise, as well as numerous subsequent discussions with Robert Indiana reflecting his consent to the creation and operation of RobertIndiana.com, Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC expended time, money, and effort registering the website, updating the website, and maintaining the website for several years.

178. Robert Indiana benefited significantly from the website's promotion of his artworks and legacy over the years, and never objected to Plaintiffs' operation of the website during his lifetime.

179. The Estate has now repudiated and breached this agreement by falsely and publicly stating that Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC have no right to operate or use the domain name of Robertindiana.com.

180. Estate's conduct has left Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC in a worse position than they otherwise would be, as they spent significant time and money creating, updating, and maintaining the website, to their own detriment.

181.    Under the circumstances, it would be inequitable to allow the Estate to revoke the promise made by Robert Indiana that Simon Salama-Caro could establish and operate RobertIndiana.com.

182.    As a direct and proximate result of this conduct, Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC have suffered damages in an amount to be determined at trial.

183.    The Estate's conduct was wanton, willful, and malicious and in known contravention of written and express agreements between one or more of the Plaintiffs and Robert Indiana.  As a result, the Estate must pay punitive damages.

### COUNT XII
### DECLARATORY JUDGMENT
**By Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC Against the Estate**

184.    Plaintiffs repeat and reallege each and every allegation contained in the paragraphs above as if fully set forth here.

185.    Robert Indiana made a valid and binding agreement with Simon Salama-Caro that Simon Salama-Caro would establish and run Robertindiana.com.

186.    In reliance on this agreement, as well as numerous subsequent discussions with Robert Indiana reflecting his consent to their creation and operation of RobertIndiana.com, Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC expended time, money, and effort registering the website, updating the website, and maintaining the website for nearly 20 years.

187.    Robert Indiana benefited significantly from the website's promotion of his artworks and legacy over the years, and never objected to Plaintiffs' operation of the website during his lifetime.

41

188.    The Estate has now repudiated and breached this agreement by falsely and publicly stating Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC have no right to operate or use the domain name of Robertindiana.com.

189.    The Court may award declaratory relief under 28 U.S.C. §§ 2201, 2202.

190.    The Court may issue any writ necessary in aid of its jurisdiction under 28 U.S.C. § 1651, the All Writs Act.

191.    The Court is authorized to enter a declaratory judgment where a justiciable controversy exists regardless of whether other relief is available.

192.    A justiciable controversy exists concerning whether Robert Indiana authorized Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC to register, own, and operate Robertindiana.com.

193.    Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC are entitled to a declaratory judgment that their registration, ownership, and operation of the website was authorized by Robert Indiana and that they may continue to own and operate the website Robertindiana.com.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment as follows:

a.  awarding Plaintiffs general and/or compensatory damages in an amount to be determined at trial for all injuries suffered as a result of Defendant's wrongdoing;

b.  awarding Plaintiffs nominal damages;

c.  awarding Plaintiffs punitive damages;

d.  awarding Plaintiffs pre-judgment and post-judgment interest at the maximum rate allowable by law;

e.  awarding Plaintiffs the costs of suit as incurred in this action and attorney's fees;

f.  entering a declaratory judgment that the Marble *LOVE* Sculptures fabricated from semi-precious stones were authorized by Robert Indiana;

g.  entering a declaratory judgment that Robert Indiana authorized Simon Salama-Caro and RI Catalogue Raisonne LLC to publish the Catalogue Raisonne;

h.  entering a declaratory judgment that Robert Indiana authorized Morgan Art Foundation, Simon Salama-Caro, Shearbrook (US), LLC, and Figure 5 Art LLC to register, own, and operate Robertindiana.com, and that they own and may operate Robertindiana.com;

i.  sanctioning Defendant and his lawyers for their frivolous conduct in making allegations and claims that are contradicted by documentary evidence; and

j.  all other relief as may be appropriate.

### DEMAND FOR A JURY TRIAL

Plaintiffs hereby demand a trial by jury.

Dated: September 10, 2018
New York, New York

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By:  */s/ Luke Nikas*
Luke Nikas
Maaren A. Shah
51 Madison Avenue, 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Email:  lukenikas@quinnemanuel.com

*Attorneys for Plaintiffs*

43