# Exhibit A

# James W. Brannan
## Attorney at Law

15 Limerock Street
P.O. Box 1021
Rockland, ME 04841

Tel: (207) 596-0554
Fax: (207) 596-0555
E-mail: jwb@brannanlaw.net

May 9, 2019

**Mr. Simon Salama-Caro**
**Morgan Art Foundation Limited**
**Shearbrook (US), LLC**
**Figure 5 Art LLC**
**RI Catalogue Raisonné LLC**
45 E 80th Street, Unit 7B
New York, NY 10021
*simon@salama-caro.com*

Re:   **Notice of Termination of Agreements; Cease and Desist Demand**

Dear Mr. Salama-Caro:

     I write to you in my capacity as Personal Representative of the Estate of Robert Indiana (the "Estate"). You are receiving this notice both in your individual capacity, and in your capacity as agent and representative of Morgan Art Foundation Limited ("MAF"), Shearbrook (US), LLC, Figure 5 Art LLC and RI Catalogue Raisonné LLC (together, the "Entities"). You and the Entities are collectively referred to herein as "You" and "Your."

     Although I do not think this is strictly necessary, I write to provide formal notice of termination of any and all agreements entered into between Mr. Indiana and You. For the avoidance of doubt, this includes all of the alleged agreements listed below:

1. The agreement dated April 9, 1999 (the "April 1999 Agreement") alleged in paragraph 34 of Your First Amended Complaint, No. 18 Civ. 8231, filed September 13, 2018 (the "FAC").

2. All alleged amendments to the April 1999 Agreement, including the letter from Mr. Indiana that You allege was a "Signature Agreement" in paragraph 37 of the FAC.

3. The December 22, 1999 "Sculpture Agreement" alleged in paragraph 39 of the FAC.

4. The July 12, 2001 letter from Mr. Indiana that You allege was an "Authentication Agreement" in paragraph 44 of the FAC.

5. The letters from Mr. Indiana that You allege were "Marble Sculpture Agreements" in paragraphs 48 to 51 of the FAC.

6. The oral agreement that You allege Mr. Indiana had with Mr. Salama-Caro to register the domain name robertindiana.com and to establish and operate a website connected to that domain name, as alleged in paragraph 60 of the FAC.

7. The "Catalogue Raisonné Agreement" alleged in paragraph 67 of the FAC.

In addition, MAF has alleged that the April 1999 Agreement was amended in April 2004, but has failed to produce a copy of any such amendment. The Estate has seen no evidence to suggest that such an amendment was ever executed between Mr. Indiana and MAF, and disputes its existence. Nevertheless, to avoid any doubt, to the extent that there was an April 2004 amendment to the April 1999 Agreement, it is terminated as well.

There are numerous bases for termination of these alleged agreements. These include, but are not limited to, the following:

**First**, the April 1999 Agreement is an agency/consignment agreement that terminated (together with any modifications and/or amendments) on the death of Robert Indiana, the principal.

You yourselves allege that Mr. Salama-Caro was Mr. Indiana's "agent in the art market." FAC ¶ 46. You allege that Mr. Salama-Caro was MAF's "advisor," (FAC ¶ 33) and that Mr. Indiana "entered into [agreements] with [Mr.] Salama-Caro and [MAF]." FAC ¶ 2.

You also allege that pursuant to the April 1999 Agreement, Mr. Indiana agreed that MAF would have the "exclusive right throughout the world in perpetuity to reproduce, promote and sell the Images in such forms and sizes, singularly or in any combination, in such manner, at such time, for such price and subject to such terms and conditions as Morgan Art Foundation in its sole discretion shall determine." FAC ¶ 35.

In exchange, "Morgan Art Foundation agreed to pay Indiana 50% of the net income [MAF] received from selling the Images." FAC ¶ 10. Mr. Indiana did not receive any other consideration in the April 1999 Agreement.

The April 1999 Agreement therefore constituted an agency/consignment agreement, with Mr. Salama-Caro and MAF acting as Mr. Indiana's agent. The reasons include:

1. Mr. Salama-Caro personally represented Mr. Indiana.

2. The consideration given to Mr. Indiana by Mr. Salama-Caro and MAF under the Agreement was indefinite with respect to amount and time of payment, and was contingent upon Mr. Salama-Caro and MAF selling the Images.

> 3. Mr. Salama-Caro and MAF had sole discretion over whether and at what price any such sales were made, and complete control over the timing of such sales.

The termination of the April 1999 Agreement by Mr. Indiana's death also terminated all alleged modifications of and amendments to that Agreement, including the alleged Signature Agreement and, if it exists, the April 2004 amendment. Likewise, the alleged Authentication Agreement (to the extent it was ever an agreement at all), states that it is "[i]n furtherance of" the April 1999 Agreement, and therefore terminated as well on Mr. Indiana's death.

**Second**, just like the April 1999 Agreement, the Sculpture Agreement is an agency/consignment agreement that terminated on Mr. Indiana's death. Among other things, like the April 1999 Agreement, under the Sculpture Agreement Mr. Indiana agreed that MAF would have the "exclusive right . . . to promote and sell the Sculptures in such manner, at such time, for such price and subject to such terms and conditions as [MAF] in its sole discretion shall determine." In exchange, Mr. Indiana got a percentage of MAF's receipts, contingent upon MAF selling the Sculptures.

To the extent that the Marble Sculpture Agreements were agreements at all, they were modifications of or amendments to the Sculpture Agreement, and so they also terminated on Mr. Indiana's death for the very same reasons.

**Third**, each of the alleged agreements between You and Mr. Indiana are in the nature of personal service agreements that are terminable at will and that terminated on Mr. Indiana's death.

These alleged agreements are personal services agreements because, among other things, promotion, production, exhibition, authentication, and cataloguing of artwork are all services that are highly dependent upon the particular skill, knowledge, discretion, and judgment of the person providing such services (in this case, Mr. Salama-Caro). And, there are no objective, quantitative metrics in any of these alleged agreements by which Your success or failure in performing under those agreements can be measured; instead, the means and methods of performance under the agreements was delegated to Your discretion, and any measure of the success or failure of those agreements is necessarily subjective. These are all hallmarks of personal services agreements.

Agreements for personal services are both terminable at will, and terminated by the death of either party to the agreement. Thus, each and every one of the alleged agreements identified above was terminated automatically upon the death of Mr. Indiana. And, even if any of those agreements had survived Mr. Indiana's death, the Estate has the right to terminate those services agreements, and by this letter specifically does so.

**Fourth**, to the extent that the April 1999 Agreement, the alleged April 2004 amendment, or the Sculpture Agreement constituted licenses for any copyright or other intellectual property rights belonging to Mr. Indiana, MAF's numerous and material breaches of those agreements provide abundant justification for the termination of those licenses.

The April 1999 Agreement required MAF to provide accountings to Mr. Indiana that "itemize[d] the income received, the expenses incurred, and the payments made to [Indiana] in connection with the sale or sales" of authorized reproductions covered by that agreement. Similarly the Sculpture Agreement required MAF to "furnish an accounting to [Indiana], on an annual basis." MAF has consistently failed to provide these required accountings to Indiana, and is therefore in material breach of those agreements. Over and above MAF's failure to provide the required accountings, MAF has failed to make any payments whatsoever to Mr. Indiana or the Estate since 2017.

Additionally, MAF has fabricated works that exceed the scope of those allowed by any license granted to it by any agreement. At a minimum, MAF has fabricated and offered for sale a series of stone LOVE sculptures in materials other than marble, and claimed these fabrications to be the work of Mr. Indiana. These stone sculptures were never authorized by Mr. Indiana or the Estate.

There is reason to believe that MAF has committed additional material breaches by purporting to re-license the use of Images covered by the April 1999 Agreement without authority and without payment of any kind to Mr. Indiana. Because of MAF's failure to provide accountings to Mr. Indiana, the precise scope of these breaches is known only to You, but includes licenses purportedly granted by MAF to Lisa Perry, Robert Blanton, Shearbrook (US), LLC, Figure 5 Art LLC and RI Catalogue Raisonné LLC.

There are also concerns that MAF has failed to comply with applicable state laws regarding certificates of authenticity and consumer protection.

**Fifth**, and finally, any and all alleged permissions gratuitously given to You, such as the authority to authenticate or catalog Mr. Indiana's works, or permission to register the robertindiana.com domain name and own and/or operate the website, are hereby revoked.

To the extent there are any ongoing operations with respect to any of the aforementioned agreements, the Estate is willing to work with You towards an orderly wind-down, provided that you cooperate in return. To that end, please promptly confirm the following in writing:

1. You have ceased any further production and/or sale of any works pursuant to any alleged agreements with Mr. Indiana, and will not continue any such production or sale without written authorization from the Estate.

2. You will provide me, within seven business days, lists describing: (a) all works in Mr. Indiana's name that You currently have on consignment to any third party, along with the name of the consignee and any pricing information; (b) all other completed works in Mr. Indiana's name that are in Your possession, custody or control; and (c) all incomplete works of Mr. Indiana that You are producing. The lists should identify the location of each work.

3. You will immediately notify in writing all fabricators, foundries, and other contractors with which You have contracts to produce Mr. Indiana's works that:

Simon Salama-Caro
May 9, 2019
Page 5

    (a) You no longer are authorized to produce works in Mr. Indiana's name;
(b) they should immediately cease work on any works in Mr. Indiana's name;
(c) they should hold, and not deliver, all completed and incomplete works of Mr. Indiana, until receiving further joint instructions from You and me; and (d) they should promptly provide me a list of all completed and unfinished works of Mr. Indiana in their possession, along with the dates they were completed if applicable, and a description of remaining work needed to complete the unfinished works. You will copy me on these written notifications.

4. You will immediately notify all museums, galleries, dealers, and others with which You have contracts to produce or consign Mr. Indiana's works that:
(a) You no longer are authorized to produce any works in Mr. Indiana's name;
(b) they should refrain from selling any further works of Mr. Indiana on consignment from You until they receive a joint instruction from You and me; and (c) they should provide me with a list of all works of Mr. Indiana that they currently have on consignment from You, along with the asking price. You will copy me on these written notifications.

5. You will refrain from publishing any purported catalogue raisonné of Mr. Indiana's work.

6. You will take the www.robertindiana.com website offline.

7. You will immediately provide written notice of termination to Artists Rights Society ("ARS"), with the minimum notice period required by Your agreement with ARS, and inform ARS that You are no longer authorized to license any of Mr. Indiana's works. You will copy me on these written notifications.

Assuming You cooperate with the above, we may then discuss any other issues arising from the termination of these Agreements.

Please further note that the termination of these agreements does not relieve You of contractual payment and performance obligations that You would otherwise have, including but not limited to Your obligation to pay the Estate for sales of works covered by the agreements, and Your obligation to provide the Estate with accountings relating to such sales.

I appreciate Your cooperation. Nothing in this letter waives and rights or remedies of the Estate with respect to these or other matters, all of which are expressly reserved.

                Very truly yours,

                James W. Brannan

cc. Luke Nikas, Esq.