USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:____1/28/20____

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| MORGAN ART FOUNDATION LIMITED, et al., |
| Plaintiffs, |
| -against- |
| JAMES W. BRANNAN, *as personal representative of the Estate of Robert Indiana*, |
| Defendant. |

18-CV-8231 (AT) (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

Robert Indiana, a renowned American artist best known to the general public for his iconic "LOVE" images and sculptures, lived quietly in Vinalhaven, Maine for decades before his death, at age 89, on May 19, 2018. His estate, however, quickly became embroiled in competing claims concerning ownership of the late artist's works, rights to the associated intellectual property, and control of Indiana's artistic legacy. This action is one of two – both pending in this district – filed against James W. Brannan, the personal representative of the Estate of Robert Indiana (the Estate) by Morgan Art Foundation Limited (MAF or Morgan), a Bahamas limited liability company that claims to own the rights to much of Indiana's artistic output; Simon Salama-Caro, a New York resident who describes himself as Indiana's long-time "agent in the art market" and an "advisor" to MAF; and Shearbrook (US) LLC, Figure 5 Art LLC, and RI Catalogue Raisonne LLC, which are New York limited liability companies affiliated with MAF and/or Salama-Caro (collectively, the New York LLCs).

In their First Amended Complaint, filed September 13, 2018, plaintiffs assert twelve causes of action against the Estate, all arising directly or indirectly out of a series of agreements (the Agreements) that Indiana entered into with MAF and/or Salama-Caro in the late 1990s and early 2000s, and that plaintiffs seek to enforce, including contracts authorizing MAF to manufacture, market, and sell new versions or reproductions of certain Robert Indiana images and sculptures

and authorizing Salama-Caro to prepare a catalogue raisonné of the artist's "complete oeuvre." FAC (Dkt. No. 14) ¶¶ 89-189. In its Amended Answer, Defenses, and Counterclaims (Counterclaims), filed on May 29, 2019, the Estate asserts that the Agreements have all been terminated, and therefore that plaintiffs have no further right to promote or sell Indiana's art. Additionally, the Estate alleges that Salama-Caro breached the fiduciary duties that he personally owed to Indiana as his agent in the art market. Counterclaims (Dkt. No. 52) ¶¶ 232, 275.

The First Counterclaim seeks declaratory and injunctive relief against MAF and Salama-Caro, including (a) a declaration that the Agreements all terminated upon Indiana's death, or in the alternative, upon the Estate's written notice of termination, dated May 9, 2019, and (b) an injunction prohibiting MAF, Salama-Cara, and related persons or entities from reproducing, producing, promoting, marketing, or selling "works in Indiana's name." Counterclaims ¶¶ 261-73. The Second Counterclaim seeks damages and related remedies for breach of fiduciary duty against Salama-Caro. *Id*. ¶¶ 274-83. The Third Counterclaim seeks damages and related remedies for aiding and abetting breach of fiduciary duty against MAF and the New York LLCs. *Id*. ¶¶ 284-92. The Fourth Counterclaim seeks an equitable accounting from MAF and Salama-Caro "with respect to all money and property transferred to or from Morgan, Salama-Caro, or [the New York LLCs] in connection with all their purchases, sales or transfers of works produced pursuant to the Agreements." *Id*. ¶¶ 293-96.

Now before the Court is plaintiffs' motion (Dkt. No. 54) to dismiss the Estate's Counterclaims pursuant to Fed. R. Civ. P. 12(b)(6). Plaintiffs principally argue, based on the language of the Agreements, that they did not terminate at Indiana's death, that none of the breaches alleged by the Estate were material, and that Salama-Caro owed no fiduciary duty to Indiana. By

consent of the parties pursuant to 18 U.S.C. § 636(c)(1), the motion was referred to me for decision. (Dkt. No. 59.) For the reasons set forth below, it will be granted in part and denied in part.

## I.    BACKGROUND

The history of the parties' relationship spans more than two decades. This Opinion and Order summarizes only the background necessary to resolve the instant motion, assuming "all well-pleaded factual allegations to be true[.]" *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, 131 F. Supp. 3d 196, 203 (S.D.N.Y. 2015) (quoting *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011)).

Robert Indiana was "a world-renowned American artist, famous for iconic works such as the LOVE and HOPE word sculptures." Counterclaims ¶ 221. Though Indiana achieved "global fame" in the 1960s and 1970s, he encountered "financial difficulties" in the following decades, and "lived in seclusion" on the island of Vinalhaven, 15 miles off the coast of Maine. *Id.* ¶¶ 221, 233.

In the 1990s, Salama-Caro traveled to Vinalhaven for "several meetings with Indiana," Counterclaims ¶ 234, during which he "develop[ed] a relationship of trust and confidence" with the artist and became his "agent in the art market." *Id.* ¶¶ 232, 234. In that role, Salama-Caro "represented Indiana personally" for the remainder of the artist's life. *Id.* ¶¶ 232, 256.[1] In addition,

---

[1] All parties agree that Salama-Caro served as Indiana's agent in the art market. *See*, *e.g.*, FAC ¶ 45 (Indiana "authorized Salama-Caro to act as his agent in the art market"). They disagree as to whether Salama-Caro's role as the artist's agent in the art market, or any of the other facts alleged in the Counterclaims, created a relationship of trust and confidence that imposed a fiduciary duty upon Salama-Caro. *See infra* at § II(B)(2)(a).

Salama-Caro "persuaded Indiana to sign" the Agreements now at issue, which "purported to give away Indiana's rights to his life's work" to MAF. *Id.* ¶ 234.[2]

### 1.  The April 1999 Agreement and the Signature Agreement

In April 1999, Indiana and MAF (acting through Myles Stott, whose signature line does not include any title), executed a letter-agreement (the April 1999 Agreement) in which the artist transferred and assigned to MAF "all of my trademarks, copyrights and other rights that I now have or may hereafter acquire, including the right to sue for past infringement, in and to the LOVE, AHAVA (in Hebrew letters), AMOR, Numbers and YALE Images." Counterclaims ¶ 235; April 1999 Ag. (Dkt. No. 56-1) at 1.[3] In addition, Indiana transferred and assigned his rights in and to "any and all paintings, sculptures, constructions and other art work" (also called Images) that previously appeared in one of two catalogues: "the 1998 Catalogue of my art work prepared for my 1958-1998 Retrospective Exhibition at Museum of Modern and Contemporary Art in Nice, France, and/or . . . the Catalogue Raisonné, 1951-1991, of my prints published by the Susan Sheehan Gallery, New York, except for the image of the LOVE postage stamp as illustrated on page 50." *Id.* The April 1999 Agreement also provides:

> The foregoing transfer and assignment to Morgan includes the exclusive right throughout the world in perpetuity to reproduce, promote and sell the Images in such forms and sizes, singularly or in any combination, in such manner, at such

---

[2] All parties agree that MAF is a Bahamian LLC. FAC ¶ 13; Counterclaims ¶ 223. Plaintiffs do not disclose who owns or controls MAF. They identify Salama-Caro simply as MAF's "advisor." FAC ¶¶ 14, 33. Nor do they describe the relationship between MAF and the three New York LLCs that appear as co-plaintiffs in this action. *See id.* ¶¶ 15-17. The Estate, while acknowledging that it "knows very little about" MAF, Counterclaims ¶ 214, alleges on information and belief that it is "completely controlled by Salama-Caro and/or [by] persons unknown." *Id.* ¶ 230. The Estate further alleges that the New York LLCs are "at least partly owned and/or controlled by Salama-Caro, members of his family, and/or Morgan," *id.* ¶¶ 225-27, who have used their "complete control" over these entities to "carry out their schemes to take advantage of Indiana." *Id.* ¶ 228.

[3] Copies of all of the Agreements at issue on this motion are before the Court as exhibits to the Declaration of Luke Nikas in support of plaintiffs' motion to dismiss. *See* Nikas Decl. (Dkt. No. 56) Exs. 1-10.

> time, for such price and subject to such terms and conditions as Morgan in its sole discretion shall determine.

*Id*. In exchange, MAF agreed to pay Indiana 50% of the net income (after deduction of enumerated expenses) derived from MAF's sale of Images. *Id.* In addition, MAF agreed to "furnish an accounting to [Indiana], on a quarterannual basis, which accounting shall itemize the income received, the expenses incurred and the payments made to [Indiana] in connection with the sale or sales of the Images." *Id*. The April 1999 Agreement further provides:

> During my lifetime, each proposed project involving the Images which shall be addressed directly to me, shall be forwarded promptly by me to Simon Salama-Caro ("Salama-Caro"), for review, discussion, and recommendation. Thereafter, Morgan shall negotiate and, enter into an agreement with respect to each such project on such terms and conditions as Morgan shall determine.

*Id*. The contract goes on to discuss the role of Salama-Caro:

> It is understood and agreed that Salama-Caro is acting on behalf of and as representative for Morgan. If Salama-Caro can no longer act as such representative or shall resign, his designated successor shall be appointed by Morgan and such successor shall act in his place and stead, and I shall be duly advised of such appointment.

*Id.* at 1-2. The April 1999 Agreement is governed by New York law, *id*. at 2, and states that it is "binding upon and shall inure to the benefit of the undersigned, and their respective successors, assigns, heirs, next of kin and representatives." *Id.*

"Shortly" after signing the April 1999 Agreement, Counterclaims ¶ 240, Indiana signed a document (the Signature Agreement) granting MAF the "exclusive right" to "inscribe or set forth my signature and the copyright date on all reproductions of each Image reproduced by Morgan as authorized by the [April 1999] Agreement." Signature Ag. (Dkt. No. 56-6) at 1.

### 2.    The Sculpture Agreement

In December 1999, Indiana and MAF (acting through Stott) executed another letter-agreement (the Sculpture Agreement), in which Indiana granted to MAF "the exclusive right, in

perpetuity, to produce and fabricate the LOVE sculptures, the AHAVA sculptures, the AMOR

sculptures, the Numbers sculptures (One, Two, Three, Four, Five, Six, Seven, Eight, Nine, Zero),

the ART sculptures and the 2000 sculptures (the 'Sculptures')," in specified colors, dimensions and

edition sizes. Counterclaims ¶ 242; Sculpture Ag. (Dkt. No. 56-2) at 1. The Sculpture Agreement

continues:

> Morgan shall have the exclusive right throughout the world, in perpetuity, to
> promote and sell the Sculptures in such manner, at such time, for such price and
> subject to such terms and conditions as Morgan in its sole discretion shall
> determine . . . In consideration of the foregoing, Morgan hereby covenants and
> agrees to pay a sum equal to 20% of the receipts by Morgan from the sale of the
> sculptures. In addition to the foregoing, Morgan shall furnish an accounting to me,
> on an annual basis.

*Id*. at 1-2.[4] Like the April 1999 Agreement, the Sculpture Agreement recites the parties'

understanding and agreement that:

> . . . Simon Salama-Caro has and shall continue to act on behalf of and as
> representative of Morgan. If Simon Salama-Caro can no longer act as such
> representative or shall resign, his designated successor shall be appointed by
> Morgan and such successor shall act in his place and stead, and I shall be duly
> advised of such appointment.

*Id*. at 2. The Sculpture Agreement also addresses the issue of title:

> It is understood and agreed that upon the commencement of fabrication of each
> Sculpture, title to such Sculpture shall pass from me to Morgan. . . . It is understood
> and agreed that Morgan is and shall be the owner of each Sculpture which has been,
> is now being or will hereafter be fabricated pursuant to the terms of this Agreement.

*Id*. In connection with the passage of title, Indiana agreed to "execute a Bill of Sale in the form of

the Bill of Sale attached to this Agreement." *Id*. at 3; *see also* Bill of Sale, dated Dec. 22, 1999

(Dkt. No. 56-4) (stating that Indiana "has bargained and sold and by these presents does grant and

---

[4] A modification agreement dated January 5, 2000, signed only by Indiana, changed "20% of the receipts" to "20% of the net income received by Morgan" after deduction of the same expenses allowed under the April 1999 Agreement. (Dkt. No. 56-3.)

convey unto Morgan [and] it successors and assigns" all of the sculptures covered by the contract, "which sculptures have been heretofore fabricated, are now being fabricated and/or will hereafter be fabricated by Morgan, its successors and its assigns").[5] The Sculpture Agreement, like the April 1999 Agreement, is governed by New York law and expressly contemplates that it would continue in existence after the artist's death:

> Morgan's exclusive authority to fabricate the Sculptures shall continue in perpetuity without interruption or abatement when I am no longer living. This Agreement shall be binding upon and shall inure to the benefit of the undersigned and their respective successors, assigns, heirs, next of kin and representatives.

*Id.* at 4-5.

The Sculpture Agreement was modified on three occasions (Dkt. Nos. 56-7, 56-8, 56-9) to authorize the fabrication of LOVE sculptures, in certain dimensions, in marble. Counterclaims ¶¶ 246-49. Two of the three written modification agreements are addressed directly to Salama-Caro, without mentioning MAF. (Dkt. Nos. 56-7, 56-9.)

### 3.    The Catalogue Raisonné Agreement

On December 2, 2006, Indiana signed a one-sentence letter (the Catalogue Raisonné Agreement), addressed to Simon Salama-Caro, reading, in full: "This is to confirm that we have agreed that you are responsible for the preparation of the Catalogue Raisonne of my complete oeuvre." Catalogue Raisonné Ag. (Dkt. No. 56-10) at 1; Counterclaims ¶¶ 254-55. The Catalogue Raisonné Agreement is countersigned by Salama-Caro. It does not mention MAF.

---

[5] In a second Bill of Sale, also dated December 22, 1999, Indiana stated that he "has bargained and sold and by these presents does grant and convey unto Morgan, its successors and assigns," the "art work listed" on 12 invoices (none of which are before the Court) and "confirm[ed] that I have heretofore transferred and assigned to Morgan, the exclusive right throughout the world in perpetuity to reproduce, promote and sell" the Images covered by the April 1999 Agreement, "including all of my trademarks, copyrights, and other rights that I may now have or hereafter acquire" with respect to those Images. (Dkt. No. 56-5.)

B.   *Morgan Art I*

The parties appear to have operated under the terms of the Agreements, more or less, until May 2018. In that month, two events occurred which led to the present litigious state of affairs: on May 18, 2018, MAF filed a lawsuit in this Court against Robert Indiana and others, docketed as No. 1:18-CV-4438-AT-BCM (*Morgan Art I*). The following day, Robert Indiana died.

According to MAF, it filed *Morgan Art I* "to protect Indiana and his artistic legacy" from abuse by defendants Jamie L. Thomas ("a fisherman from Maine with no art expertise that Indiana had employed to run errands and do work around the house"), to whom Indiana had granted a power of attorney in 2016; American Image Art (AIA), which "marketed, exhibited, and sold" certain works that purported to be "authentic works by Robert Indiana" but in fact were "forgeries," including "unauthorized reproductions of the LOVE image"; and Michael McKenzie, AIA's founder. Compl., *Morgan Art I* (May 18, 2018), ECF No. 1 ¶¶ 1-2, 11-12, 20-22. According to MAF, these defendants "exploited" an "infirm" and "vulnerable" Indiana; "isolated" him from his friends and supporters, including Salama-Caro; exhibited the "fraudulent work" they created in his name in museums and galleries; and "defamed" those who "could expose" their "fraud," such as MAF and Salama-Caro, while violating MAF's copyright and trademark rights under the Agreements. *Id*. ¶¶ 1-2. The *Morgan Art I* Complaint also named Indiana himself as a defendant, alleging that in his dealings with AIA and McKenzie he (or Thomas, through his power of attorney) infringed MAF's copyright(s) and breached his contract(s) with MAF. *Id.* ¶¶ 106-12, 127-31. On July 23, 2018, the Estate was substituted for Indiana as a defendant. Order, *Morgan Art I* (July 23, 2018), ECF No. 35.

On September 7, 2018, the Estate filed an answer and counterclaims against MAF, Simon Salama-Caro, and the New York LLCs, and on September 20, 2018, it filed its Amended Answer

and Counterclaims, including claims for breach of the April 1999 Agreement and the Sculpture Agreement, each of which it described as "a valid and binding contract between Morgan and Robert Indiana, now the Estate." Amend. Ans. and Counterclaims, *Morgan Art I* (Sept. 20, 2018), ECF No. 78 (*Morgan Art I* Counterclaims) ¶¶ 211, 216. According to the Estate, MAF breached the April 1999 Agreement "by failing to provide accountings and royalties as required by that contract." *Id.* ¶¶ 210-13. It breached the Sculpture Agreement "by failing to provide accountings and royalties as required by that contract" and by "fabricating, displaying, licensing, and/or selling reproductions of Indiana's artworks in colors, dimensions and/or sizes not authorized by the Sculpture Agreement," including sculptures defined by the Estate as the "Unauthorized Semi-Precious Stone LOVE Sculptures." *Id.* ¶¶ 215-20. As to these claims, MAF sought an accounting and an award of damages, in an amount to be determined at trial, for "all injuries suffered as a result of" the breaches. *Id.* at 32.[6] In addition, the Estate asserted an unjust enrichment claim against MAF, *id.* ¶¶ 221-25; a claim that MAF violated the Visual Artist's Rights Act (VARA) by applying Indiana's signature to the Unauthorized Semi-Precious Stone LOVE Sculptures, *id.* ¶¶ 226-33; and claims of unfair competition, trademark infringement, unjust enrichment, and unfair competition against Salama-Caro and the New York LLCs stemming from their preparation of Indiana's catalogue raisonné and their allegedly unauthorized use of the artist's name on a website that they created using the domain name "robertindiana.com." *Id.* ¶¶ 234-64.

On November 6, 2018, MAF, Salama-Caro, and the other counterclaim-defendants in *Morgan Art I* moved to dismiss the Estate's counterclaims. Mtn. to Dismiss, *Morgan Art I* (Nov.

---

[6] The *Morgan Art I* Counterclaims discussed the Catalogue Raisonné Agreement, *see id.* ¶¶ 204-09, but did not allege that it was "valid and binding" and did not assert any claim for its breach.

6, 2018), ECF No. 105. On July 1, 2019, the Hon. Analisa Torres, United States District Judge, granted that motion in part. Order, *Morgan Art I* (July 1, 2019), ECF No. 175 (*Morgan Art I* Order). Judge Torres dismissed the Estate's First Counterclaim, for breach of the April 1999 Agreement, as insufficiently specific and (as to MAF's alleged failure to provide accountings in 1995 and between 1999 and 2008) as barred by New York's applicable six-year statute of limitations. *Id.* at 16-17. She similarly dismissed the Second Counterclaim, for breach of the Sculpture Agreement, *id.* at 18, except with respect to "that portion of the Second Counterclaim that asserts a claim for breach of the Sculpture Agreement with respect to the [Unauthorized] Semi-Precious Stone Sculptures," which "shall survive dismissal." *Id.* at 19.

Judge Torres also dismissed the Estate's unjust enrichment claim against MAF, *Morgan Art I* Order at 21, its VARA claim against MAF – except insofar as that claim was predicated on the Unauthorized Semi-Precious Stone LOVE Sculptures, *id.* at 21-22 – and its unjust enrichment claim against the other counterclaim defendants based on their preparation of the catalogue raisonné and their use of the robertindiana.com domain (due to the Estate's failure to allege that they received anything of value belonging to the Estate), but denied the motion as to the Estate's other claims concerning the catalogue raisonné and the website. *Id.* at 22-25.

By letter-motion dated August 26, 2019, the Estate sought leave to file a "Second Amended Answer and Counterclaim" (SAAC) to "address claims found to be lacking the requisite particularity" in the *Morgan Art I* Order. Letter-Motion, *Morgan Art I* (Aug. 26, 2019), ECF No. 193 at 1. According to the Estate, its proposed amended pleading "sets forth substantial additional facts" to support its claims that MAF breached the April 1999 Agreement and Sculpture Agreement within the relevant statute of limitations. *Id.* at 3. The attached proposed SAAC alleges,

among other things, that MAF breached the April 1999 Agreement and the Sculpture Agreement by failing to provide any accountings in "2017, 2018, or 2019 to date." SAAC ¶¶ 256(c), 261(a).

### C. Procedural Background

Plaintiffs filed this action on September 11, 2018 – four days after the Estate filed its counterclaims against them in *Morgan Art I* – and amended their complaint two days later. The Estate answered on November 23, 2018. (Dkt. No. 24.) On February 4, 2019, the district judge referred the case to me for general pretrial management. (Dkt. No. 26.)

On May 9 or 10, 2019 (while the motion to dismiss the Estate's counterclaims in *Morgan Art I* was pending), the Estate sent a termination letter to MAF, Salama-Caro and the New York LLCs, stating that it was providing "formal notice of the termination of any and all agreements entered into between Mr. Indiana and You." Term. Letter (Counterclaims Ex. A) at 1.[7] According to the Estate, the April 1999 Agreement and the Sculpture Agreement were "agency/consignment" agreements that "terminated on Mr. Indiana's death," along with all of their modifications and amendments. *Id*. at 2-3. Moreover, the Estate asserted, all of the Agreements were "in the nature of personal service agreements that . . . terminated on Mr. Indiana's death." *Id*. at 3. The Estate added that, even if the April 1999 Agreement and the Sculpture Agreement had not terminated automatically, "MAF's numerous and material breaches of those agreements provide abundant justification" for their termination. *Id*. The letter cited MAF's failure to furnish the required accountings to Indiana, its failure to pay any royalties since 2017, and its fabrication of works "that exceed the scope of those allowed by any license granted to it by any agreement." *Id*. at 4.

---

[7] The termination letter is dated May 9, 2019. The Estate alleges, however, that it gave notice of termination to plaintiffs on May 10, 2019. Counterclaims ¶ 218.

On May 29, 2019, the Estate filed its amended answer in this action, including the Counterclaims now at issue. On June 4, 2019, plaintiffs filed their motion to dismiss those Counterclaims, supported by a memorandum of law (Pl. Mem.) (Dkt. No. 55) and the Nikas Declaration. On June 18, 2019, the Estate filed its opposition brief (Estate Mem.) (Dkt. No. 61), and on June 25, 2019, plaintiffs filed their reply (Pl. Reply Mem.) (Dkt. No. 63). On August 14, 2019, I held oral argument on the motion. On September 11, 2019, the parties filed supplemental memoranda of law, *see* Estate Supp. Mem. (Dkt. No. 75), Pl. Supp. Mem. (Dkt. No. 76), to address issues that arose during oral argument.[8]

## II.  ANALYSIS

### A.  Legal Standards

#### 1.  Standard for Motion to Dismiss Pursuant to Rule 12(b)(6)

Fed. R. Civ. P. 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." If that "short and plain statement" fails to present "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," the deficient claims may be dismissed pursuant to Fed. R. Civ. P. 12(b)(6). *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 65 (2d Cir. 2012) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. If the plaintiff has not "nudged [his] claims across the line from

---

[8] In addition to *Morgan Art I* and this action, the Court is aware of the following matters, commenced in other jurisdictions after Indiana's death, which concern the rights to his works and legacy: *In re Estate of Robert Indiana*, No. 2018-0145(1) (Me. Probate Ct., Knox Co.); *Brannan v. McKenzie*, No. 01-19-0001-9789 (Am. Arb. Ass'n); and *Thomas v. Brannan*, No. CV-19-19 (Me. Super. Ct., Knox Co.). *See* Estate Supp. Mem. at 4; Joint Ltr. dated Jan. 6, 2020 (Dkt. No. 78) at 1 n.1.

conceivable to plausible, [the claims] must be dismissed." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

"A motion to dismiss a counterclaim for failure to state a claim is evaluated using the same standard as a motion to dismiss a complaint." *A.V.E.L.A.*, 131 F. Supp. 3d at 203. Thus, the court must "accept as true all factual statements alleged in the [counterclaim] and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). However, those factual allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The court may not credit "[t]hreadbare recitals of the elements of a cause of action," *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555), nor "unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Id.* at 678-79. "The pleading standard Rule 8 announces does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Geldzahler v. New York Med. Coll.,* 663 F. Supp. 2d 379, 385 (S.D.N.Y. 2009) (quoting *Iqbal*, 556 U.S. at 678).

In addition to the facts alleged in the challenged pleading itself, the court may consider any "written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *Sierra Club v. Con-Strux, LLC*, 911 F.3d 85, 88 (2d Cir. 2018) (quoting *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011)). Here, the Estate relies heavily upon the terms and effect of the Agreements, from which it quotes extensively throughout its pleadings, making them "integral" to its claims. *See Osby v. City of New York*, 2016 WL 4372233, at *3 (S.D.N.Y. Aug. 15, 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)) (a document is "integral to" a complaint if the plaintiff had "'actual notice' of the extraneous information" and

"'relied upon th[e] documents in framing the complaint.'"). Consequently, the Court may consider the content of the Agreements in determining plaintiffs' motion to dismiss, even though the Estate did not attach copies to its pleading. *See Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991)) ("'when a plaintiff chooses not to attach to the complaint or incorporate by reference a [document] upon which it solely relies and which is integral to the complaint,' the court may nevertheless take the document into consideration in deciding the defendant's motion to dismiss") (alteration in *Int'l Audiotext Network*).

When presented with an issue of contract interpretation at the motion to dismiss stage, a court must first resolve the threshold question of whether the contract is ambiguous. *Matter of Trusts Established under the Pooling & Servicing Agreements relating to the Wachovia Bank Commercial Mortg. Tr. Commercial Mortg. Pass-Through Certificates, Series 2007-C30*, 375 F. Supp. 3d 441, 447 (S.D.N.Y. 2019) (citation omitted). Under New York law, the meaning of an unambiguous contract "is a question of law that the Court may decide on a motion to dismiss." *Id.* (citing *Platinum-Montaur Life Scis. LLC v. Navidea Biopharmaceuticals, Inc.*, 2018 WL 5650006, at *5 (S.D.N.Y. Oct. 31, 2018)). "Where contract language is ambiguous," however, "the differing interpretations of the contract present a triable issue of fact" which may not be resolved on a motion to dismiss. *Golden Pac. Bancorp v. F.D.I.C.*, 273 F.3d 509, 515 (2d Cir. 2001) (quoting *Bank of Am. Nat. Tr. & Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir. 1985)).

### 2. Judicial Admissions and Judicial Estoppel

At oral argument and in their supplemental memoranda, each side raised the question whether the other side was barred, under principles governing judicial admissions and/or judicial

estoppel, from advancing certain of its arguments. *See* Tr. of Aug. 14, 2019 Hr'g (Tr.) (Dkt. No. 68) at 4:12-6:18, 54:19-55:17; Pl. Supp. Mem. at 1-6; Estate Supp. Mem. at 1-6.

"Judicial admissions 'are affirmative actions – factual affirmations or stipulations of some sort – that bind both the party making the admission and the court.'" *Amtrust N. Am., Inc. v. Safebuilt Ins. Servs., Inc.*, 2016 WL 6561548, at \*3 (S.D.N.Y. Nov. 3, 2016) (quoting *Banks v. Yokemick*, 214 F. Supp. 2d 401, 405 (S.D.N.Y. 2002)). Factual admissions in the pleadings – and even in briefs – may qualify as judicial admissions sufficient to bind the party who made them. *Amtrust N. Am.*, 2016 WL 6561548, at \*3 (citing *PPX Enterprises, Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 123 (2d Cir. 1984), and *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994)). However, judicial admissions must be "statements of fact rather than legal arguments made to a court." *New York State Nat. Org. for Women v. Terry*, 159 F.3d 86, 97 n.7 (2d Cir. 1998). A party's "legal theories" cannot constitute binding judicial admissions. *Okwedy v. New York*, 195 F. App'x 7, 9 (2d Cir. 2006). An interpretation of a contract, for example, "is not a judicial admission that precludes [a party] from asserting the legally correct interpretation of the contract." *Int'l Cards Co., Ltd. v. MasterCard Int'l Inc.*, 2017 WL 1133425, at \*5 (S.D.N.Y. Mar. 24, 2017), *aff'd*, 741 F. App'x 41 (2d Cir. 2018).

Judicial estoppel is an equitable doctrine that prevents a party from improperly taking inconsistent legal "positions" with respect to the same set of facts. The Supreme Court has described the doctrine as follows:

> Where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him. This rule, known as judicial estoppel, generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.

*New Hampshire v. Maine,* 532 U.S. 742, 749 (2001) (internal citations and quotation marks omitted). The rule is intended to "protect judicial integrity by avoiding the risk of inconsistent results in two proceedings," *Bates v. Long Island R. Co.*, 997 F.2d 1028, 1038 (2d Cir. 1993), and to prevent "improper use of judiciary machinery," and is therefore "an equitable doctrine invoked by a court at its discretion." *New Hampshire v. Maine*, 532 U.S. at 750 (citations omitted).

"[T]he circumstances under which judicial estoppel may appropriately be invoked are probably not reducible to any general formulation of principle." *Intellivision v. Microsoft Corp.*, 484 F. App'x 616, 619 (2d Cir. 2012) (citation omitted). "Nevertheless, in evaluating whether to apply the doctrine of judicial estoppel, courts generally look for the existence of three factors":

> (1) that a party's new position is "clearly inconsistent" with its earlier position, (2) that the party seeking to assert this new position previously persuaded a court to accept its earlier position, and (3) that the party "would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped."

*Id.* (quoting *New Hampshire v. Maine*, 532 U.S. at 750-51); *see also DeRosa v. Nat'l Envelope Corp.*, 595 F.3d 99, 103 (2d Cir. 2010) ("[t]ypically, judicial estoppel will apply if" these factors are present); *Stichting Ter Behartiging Van de Belangen Van Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 45 (2d Cir. 2005) (Judicial estoppel applies "in situations where a party both takes a position that is inconsistent with one taken in a prior proceeding, and has had that earlier position adopted by the tribunal to which it was advanced.") (subsequent history omitted).

### B.    Application of Standards

Plaintiffs move to dismiss the Estate's First Counterclaim, for declaratory and injunctive relief, on the grounds that (i) the plain language of the Agreements shows that they did not terminate at Indiana's death as a matter of law; (ii) the Estate is judicially estopped from arguing otherwise; and (iii) the Estate failed to plead facts sufficient to allege a material breach that could

have justified the Estate in terminating the Agreements on May 9 or 10, 2019. Pl. Mem. at 11-24; Pl. Reply Mem. at 2-14; Pl. Supp. Mem. at 1-5. They move to dismiss the Estate's Second, Third, and Fourth Counterclaims (for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and an equitable accounting) on the ground that there was no fiduciary relationship between Indiana and Salama-Caro as a matter of law. Pl. Mem. at 24-27; Pl. Reply Mem. at 14-15.

As explained in detail below, the April 1999 Agreement and the Sculpture Agreement did not automatically terminate at Indiana's death. The unambiguous language of the contracts shows that they were intended to survive that event and that they are not agency, consignment, or personal services agreements. Moreover, the Estate is judicially estopped from arguing to the contrary after pleading, in *Morgan Art I*, that the same contracts remained "valid and binding" as of September 18, 2018 (months after the artist's death), and on that basis seeking damages for past and ongoing breaches. The First Counterclaim must therefore be dismissed to the extent it seeks a declaration or injunction based on the allegation that these two contracts terminated automatically when Indiana died.

However, the Estate states a plausible claim (which it is not estopped from making) that the Catalogue Raisonné Agreement was a personal services contract that terminated at Indiana's death. In addition, the Estate adequately alleges that MAF materially breached the April 1999 Agreement and Sculpture Agreement so as to justify the Estate in terminating those contracts on May 9 or 10, 2019.

Finally, the Estate plausibly alleges that Salama-Caro had a fiduciary duty to Indiana, as his agent in the art market, and breached that duty when he acquired Indiana's art from MAF for free or at below-market prices, resold it at market prices, and retained the profits for himself, but has otherwise failed to allege an actionable breach of fiduciary duty. The Estate's Second, Third,

and Fourth Counterclaims – for breach of fiduciary duty, aiding and abetting breach of fiduciary duty, and equitable accounting – will therefore be dismissed in part.

### 1.     First Counterclaim – Termination of Agreements

The Estate's First Counterclaim – which seeks a declaratory judgment that the Agreements are terminated, and an injunction barring plaintiffs from marketing or selling works in Indiana's name – rests on its contention that the Agreements all terminated upon Indiana's death, because they were "agency and/or consignment agreements," Counterclaims ¶ 263, or "personal services agreements." *Id.* ¶ 264. In the alternative, the Estate asserts that it was entitled to terminate the April 1999 Agreement and the Sculpture Agreement (together with their amendments and modifications) on May 9 or 10, 2019, without penalty, because plaintiffs failed to furnish accountings and pay royalties as required, and fabricated works beyond those contractually authorized, thereby materially breaching those contracts. *Id.* ¶ 265 & Ex. A.

### a.     *Termination at Death – Agency/Consignment*

"Under New York law, a 'true' consignment is, essentially, an agency with a bailment." *United States v. Nektalov*, 440 F. Supp. 2d 287, 298 (S.D.N.Y. 2006), *aff'd sub nom. E.J.D. Diamond Mfr. v. United States*, 273 F. App'x 65 (2d Cir. 2008). *Accord Khaldei v. Kaspiev*, 135 F. Supp. 3d 70, 79 (S.D.N.Y. 2015); *Rahanian v. Ahdout,* 258 A.D.2d 156, 157, 694 N.Y.S.2d 44, 46 (1st Dep't 1999). Because the relationship is based on a bailment, rather than "a sale of goods," "the consignor retains ownership and sets the sales price." *Gem Diamond Co. of New York v. Klein*, 1995 WL 72382, at *3 (S.D.N.Y. Feb. 21, 1995) (citing *Manger v. Davis*, 619 P.2d 687, 691 (Utah 1980)). *Accord Nektalov*, 440 F. Supp. 2d at 298 n.8 (quoting *Manger*, 619 P.2d at 691) ("The consignor, as principal retains the ownership, may recall the goods, and sets the sales price."); *Rahanian*, 258 A.D.2d at 158-59, 694 N.Y.S.2d at 47 ("In a consignment sale, the [owner] delivers the merchandise to the merchant but retains the title to it. The merchant sells the goods basically

as the agent of the owner."); *Matter of Friedman*, 64 A.D.2d 70, 79, 407 N.Y.S.2d 999, 1004 (2d Dep't 1978) ("title never passes in a consignment").

At common law, a consignment contract, "with the accompanying principal-agent relationship," terminates upon the death of the principal. *Matter of Friedman*, 64 A.D.2d at 83, 407 N.Y.S.2d at 1007; *see also Mesbahi v. Blood*, 172 A.D.3d 1580, 1582, 100 N.Y.S.3d 134, 137 (3rd Dep't 2019) ("Under general agency principles, an agent's authority is revoked upon the death of the principal."); *Vrej Baghoomian, Inc. v Gallery*, 1988 WL 1606096 (N.Y. Surr. Ct. N.Y. Co. 1988) (holding that an oral agreement between Jean-Michel Basquiat and an art dealer was "a consignment arrangement which created a principal-agent relationship that terminated on Basquiat's death").

"In determining whether parties intend their transaction to be a consignment," the courts "look to certain indicia traditionally associated with the consignment relationship." *Nektalov*, 440 F. Supp. 2d at 298-99. Although no one factor is dispositive, courts frequently consider (1) whether the alleged consignor retains ownership of the property in the alleged consignee's possession, including the right to have that property returned on demand, *see id.*; *Gem Diamond,* 1995 WL 72382, at \*3; *In re Fine Diamonds, LLC*, 501 B.R. 159, 178 (Bankr. S.D.N.Y. 2013) (parties' joint intent "that title remain with Fine Diamonds" was "controlling"); *Rahanian,* 258 A.D.2d at 158-59, 694 N.Y.S.2d at 46-47; *Matter of Friedman*, 64 A.D.2d at 77-80, 407 N.Y.S.2d at 1003-05; (2) whether the alleged consignor retains any associated intellectual property rights, *Al Hirschfeld Found. v. Margo Feiden Galleries Ltd.*, 296 F. Supp. 3d 627, 631, 642 (S.D.N.Y. 2017) (agreement between foundation and art gallery providing that gallery was authorized to "sell and, in certain circumstances," reproduce an artist's work, but that foundation "retained . . . sole proprietorship of copyright, trademark, privacy, publicity and related rights in the Works," was one of consignment);

(3) whether the alleged consignor controls the sale price and terms, *Nektalov*, 440 F. Supp. 2d at 299; *Gem Diamond,* 1995 WL 72382, at *3; (4) whether the alleged consignee receives a "commission" rather than "the profits of the sale," *Nektalov*, 440 F. Supp. 2d at 299 (quoting *Gem Diamond,* 1995 WL 72382, at *3); *see also Italian Designer Imp. Outlet, Inc. v. New York Cent. Mut. Fire Ins. Co.*, 26 Misc. 3d 631, 637, 891 N.Y.S.2d 260, 266 (N.Y. Sup. Ct. Kings Co. 2009) (the "primary distinguishing factor" between a "true consignment" and a "sale or return" contract is "whether the 'consignee' is acting as the 'consignor's agent, compensated by a commission on the retail price set by the consignor, rather than a fully-independent merchant, compensated by the difference between the price charged by the consignor and the retail price set by the consignee"); and (5) whether the parties' relationship reflects "signs of an agency relationship," *Netkalov*, 440 F. Supp. 2d at 298-99 (citing *Rahanian,* 258 A.D.2d at 159, 694 N.Y.S.2d at 47); *see also Italian Designer Imp. Outlet*, 26 Misc. 3d at 637, 891 N.Y.S.2d at 266.[9] If the terms of the parties' agreement are ambiguous, the courts also consider (6) custom in the relevant industry. *See Nektalov*, 440 F. Supp. 2d at 293; *Matter of Friedman*, 64 A.D.2d at 80, 407 N.Y.S.2d at 1005; *Italian Designer Imp. Outlet*, 26 Misc. 3d at 638, 891 N.Y.S.2d at 266.

---

[9] This factor, although often separately stated, appears in some cases to be redundant of the first factor, which asks which party retains ownership of the property. *See*, *e.g*., *Nektalov*, 440 F. Supp. 2d at 299 n.11 (quoting *C. B. S. Bus. Equip. Corp. v. Underwood Corp.*, 240 F. Supp. 413, 419 (S.D.N.Y. 1964)) ("The principal determinative of an agency relationship as laid down by the courts is whether full title and dominion over the goods is in fact retained by the principal, and whether the agent is empowered by the agreement to deal with the goods in a manner inconsistent with the asserted retention of ownership of these goods by the principal."). Other cases, however, ask whether the alleged consignee served as the consignor's agent in the fiduciary sense. *See*, *e.g*., *Scher v. Stendhal Gallery, Inc.*, 117 A.D.3d 146, 158, 983 N.Y.S.2d 219, 228 (1st Dep't 2014) (where gallery acted as artist Scher's "agent and, hence, fiduciary" with regard to fabricating prints for exhibition and sale, but did not spell out which party would own the prints, they "must be deemed to be Scher's property").

In this case, the Court need not look beyond the unambiguous terms of the April 1999 Agreement and the Sculpture Agreement to conclude that the parties did not thereby intend to create a consignment relationship that would terminate at the artist's death. Both contracts are fundamentally different from the kinds of agreements found to be consignment agreements under New York law. Under the April 1999 Agreement, rather than deliver any tangible paintings, prints, or other artwork to MAF for sale, Indiana transferred and assigned to MAF, "in perpetuity," all of his "trademarks, copyrights, and other rights" in and to a substantial body of work that he had previously created (with the exception of the LOVE postage stamp, presumably because of a prior arrangement with the Postal Service), giving MAF the "exclusive" right to "reproduce, promote and sell the Images" as it saw fit, in return for a royalty calculated at 50% of MAF's net income from such sales. April 1999 Ag. at 1. Similarly, under the Sculpture Agreement, rather than deliver any tangible sculptures or other artworks to MAF, Indiana sold the "exclusive right, in perpetuity, to produce and fabricate" new reproductions of specified works that he had previously created, in return for a 20% royalty. This Court need not adopt plaintiffs' preferred labels[10] in order to conclude that neither of these contracts displays the "indicia traditionally associated with the consignment relationship." *Nektalov*, 440 F. Supp. 2d at 299.

Each contract expressly transfers title to the property (including intellectual property) that is its subject. Under the April 1999 Agreement, the artist transferred all of his intellectual property rights in and to the Images, including the right to sue for infringement. April 1999 Ag. at 1. Under the Sculpture Agreement, he not only conveyed the right to "produce and fabricate" new copies of the specified works; he expressly stated that "upon the commencement of fabrication of each

---

[10] Plaintiffs call the April 1999 Agreement an "agreement transferring intellectual property rights." Pl. Mem. at 13. They call the Sculpture Agreement a "fabrication agreement." *Id.*

Sculpture, title to such Sculpture shall pass from me to Morgan." Sculpture Ag. at 2. The parties' intent to pass title was confirmed by the Bills of Sale that Indiana executed, stating that – in return for $10 "and other good and valuable consideration" – he "bargained and sold" to MAF the art works "listed and described on the Invoices No. '1' through '12,'" all of his intellectual property rights in the Images, and all of the Sculptures that MAF had fabricated or would fabricate under the Sculpture Agreement. Nikas Decl. Exs. 4, 5. *Cf. Khaldei*, 135 F. Supp. 3d at 78-79 (deeming an agreement between a photographer's estate and art dealer a consignment where, among other things, the art dealer did not claim to own any specific photographs).[11] Moreover, there is no suggestion in either contract (or elsewhere in the parties' pleadings) that MAF had any obligation to "return" any of the Images or Sculptures it produced thereunder. *Cf. Matter of Friedman*, 64 A.D.2d at 77-78, 407 N.Y.S.2d at 1003-04 (art dealer's offer to return an artist's paintings was strong evidence of a consignment relationship). I therefore conclude that both the first and the second factors weigh heavily against the Estate's contention that these two contracts established a consignment relationship.

The third factor also weighs against the Estate's position, because Indiana gave MAF complete control over the price, terms, and conditions of any sales it made of the Images and Sculptures it produced. *See Gem Diamond*, 1995 WL 72382, at *3 ("A 'true consignment' is

---

[11] "Ownership of a copyright, or of any of the exclusive rights under a copyright, is distinct from ownership of any material object in which the work is embodied." 17 U.S.C. § 202. Apart from whatever works were listed on "Invoices No. '1' through '12,'" neither the April 1999 Agreement nor the related Bill of Sale expressly states which party would own the "material objects" that MAF created from the Images. However, since those objects were to be produced entirely by MAF – with no input or approval required from Indiana – there is no basis upon which to conclude that Indiana ever held title to them. *Cf. Wesselmann v. Int'l Images*, 172 Misc. 2d 247, 249-51, 657 N.Y.S.2d 284, 286-87 (N.Y. Sup. Ct. N.Y. Co. 1996) (artist "delivered" prints to art merchant, even though merchant arranged for production, when the artist approved and signed each finished print, as required under the parties' contract before they could be sold).

characterized by the fact that the consignor retains ownership and sets the sale price"). Although the April 1999 Agreement contemplated that MAF would engage in "review, discussion, and recommendation" concerning certain proposed projects with Indiana, it did not require MAF to defer to Indiana's views. To the contrary: after discussion, MAF had the right to "enter into an agreement with respect to each such project on such terms and conditions as Morgan shall determine." April 1999 Ag. at 1. Nor, as noted above, was Indiana required (or permitted) to approve the final form of any Image or Sculpture before MAF sold it. *Cf. Scher*, 117 A.D.3d at 150, 983 N.Y.S.2d at 222 (artist "approved and signed each numbered individual print to be sold" by consignee); *Wesselmann*, 172 Misc. 2d at 249-51, 657 N.Y.S.2d at 286-87 (artist approved and signed each finished print sold by consignee). To the contrary: in the Signature Agreement, Indiana expressly gave MAF the right to "inscribe or set forth my signature and the copyright date on all reproductions of each Image" authorized by the April 1999 Agreement. Signature Ag. at 1.

The fourth factor – whether the alleged consignee receives a "commission" rather than "the profits of the sale," *Nektalov*, 440 F. Supp. 2d at 299 – is, at best, neutral. Both contracts provided for MAF and Indiana to divide the net income realized from the sale of Images or Sculptures. However, MAF was entitled to most of the profits: 50% when it sold an Image and 80% when it sold a Sculpture. In their pleadings, the parties refer to the corresponding payments due to Indiana as "royalties," *see*, *e.g.*, FAC ¶ 3; Counterclaims ¶ 3; *Morgan Art I* Counterclaims ¶ 193 – a term commonly used in connection with intellectual property licenses rather than consignment contracts.

Finally, none of the language in the April 1999 Agreement or the Sculpture Agreement indicates that it was intended to create an agency relationship between Indiana and MAF, much less one that would terminate upon the death of the principal. The contracts permit – but do not

require – MAF to promote and sell Indiana's work. They give MAF – not the artist – the right to decide what to sell, to whom, and at what price. Although MAF claims that it has used the Agreements "to promote and revitalize Indiana's art career over the last three decades," FAC ¶ 3, nothing in the April 1999 Agreement or the Sculpture Agreement required it to so. Moreover, although both sides agree that *Salama-Caro* served as Indiana's "agent in the art market, and in that role represented Indiana personally," Counterclaims ¶¶ 232, 256, 275; *accord* FAC ¶¶ 45-47, the Estate does not allege that *MAF* served as the artist's agent or that *MAF* owed him a corresponding fiduciary duty.

Because the disputed contracts bear so few of the "indicia traditionally associated with the consignment relationship," *Nektalov*, 440 F. Supp. 2d at 298-99, I cannot simply ignore the parties' clear intention, expressed in both the April 1999 Agreement and the Sculpture Agreement, that their contractual rights and obligations outlive Robert Indiana and "be binding upon" and "inure to the benefit" of his Estate. April 1999 Ag. 2; Sculpture Ag. at 4; *see also id*. at 4 (MAF's "exclusive authority to fabricate the Sculptures shall continue in perpetuity without interruption or abatement *when I am no longer living*") (emphasis added).

In its brief, the Estate relies heavily on custom and practice in the art market, arguing that "'the normal relationship between artist and dealer' is one of consignment." Estate Mem. at 13 (quoting *Matter of Friedman*, 64 A.D.2d at 78, 407 N.Y.S.2d at 1004). The quoted language, however, was not the holding of the *Friedman* court; it was the opinion of one of three expert witnesses who testified in that case (more than 40 years ago) about a contract entered into in 1963 (more than 55 years ago) when the widow of painter Arnold Friedman entrusted 300 of his unsold paintings to art dealer Charles Egan for sale. *Matter of Friedman*, 64 A.D.2d at 74-75, 407

24

N.Y.S.2d at 1001-02. In the case at bar, the Counterclaims contain no allegations as to industry custom and practice at any time.

Moreover, the *Friedman* court admitted expert testimony (as well as other parol evidence concerning the contracting parties' intentions) only after finding the written contract ambiguous, 64 A.D.2d at 84, 407 N.Y.S.2d at 1007, and disregarding many of its provisions. Ultimately, the court was persuaded by the expert testimony and by testimony that the dealer twice offered to return the paintings, telling the widow's daughter: "Look. You can have the paintings and see what you can do." *Id.* 64 A.D.2d at 77-78, 407 N.Y.S.2d at 1003-04. Here, however, no party argues that either the April 1999 Agreement or the Sculpture Agreement is ambiguous. *See* Pl. Mem. at 10-13; Estate Mem. at 13-20.[12] *See Hester Indus., Inc. v. Tyson Foods, Inc.*, 1995 WL 113939, at *6 (N.D.N.Y. Jan. 30, 1995) ("Neither party has argued that the language of the settlement agreement is ambiguous with regard to this issue so the Court can determine the meaning of the settlement agreement as a matter of law."); *F. Garofalo Elec. Co. v. Hartford Fire Ins. Co.*, 799 F. Supp. 8, 10 n.1 (E.D.N.Y. 1992) ("Since the parties have not raised the issue of ambiguity, and the Court finds that none exists, all parol evidence in the affidavits has been ignored."); *Wilhelmina Artist Mgmt., LLC v. Knowles*, 8 Misc. 3d 1012(A), 801 N.Y.S.2d 782 (N.Y. Sup. Ct. N.Y. Co. 2005) (table; text at 2005 WL 1617178, at *6) ("Clear language does not become ambiguous just because the parties argue differing interpretations."). Consequently, *Matter of Friedman* is of no help to the Estate.

---

[12] In its brief, the Estate complains in general terms that "[t]here is no undisputed, integrated writing that memorializes all of the terms of the parties' agreements. Instead, there are numerous signed and unsigned writings, addressed to different parties, many of which are inconsistent with each other," requiring "further factual development." Estate Mem. at 11. Nowhere, however, does the Estate identify any specific inconsistency, within or between the two contracts that it contends to be consignment agreements. Nor does it provide details regarding any other ambiguities relevant to the instant motion.

Neither is § 12.01 of the New York Arts and Cultural Affairs Law (ACAL). That provision classifies certain relationships between artists and art merchants as "consignor/consignee relationships," with prescribed consequences, "[n]otwithstanding any custom, practice or usage of the trade, any provision of the uniform commercial code or any other law, statute, requirement or rule, or any agreement, note, memorandum or writing to the contrary." ACAL § 12.01(1). The statute provides, in pertinent part:

> Whenever an artist or craftsperson, or a successor in interest of such artist or craftsperson, delivers or causes to be delivered a work of fine art, craft or a print of such artist's or craftsperson's own creation to an art merchant for the purpose of exhibition and/or sale on a commission, fee or other basis of compensation, the delivery to and acceptance thereof by the art merchant establishes a consignor/consignee relationship as between such artist or craftsperson, or the successor in interest of such artist or craftsperson, and such art merchant with respect to the said work . . .

*Id.* § 12.01(1)(a). Once the consignor/consignee relationship is established:

> [S]uch consignee shall thereafter be deemed to be the agent of such consignor with respect to the said work;
>
> [S]uch work is trust property in the hands of the consignee for the benefit of the consignor; [and]
>
> [A]ny proceeds from the sale of such work are trust funds in the hands of the consignee for the benefit of the consignor.

*Id.* § 12.01(1)(a)(i)-(iii).

ACAL § 12.01(1) does not apply to the April 1999 Agreement or the Sculpture Agreement because Indiana never "deliver[ed] or cause[d] to be delivered" any actual work of art or "print of [his] own creation" to MAF for sale, as required in order to create a consignment relationship under that statute. Instead, as noted above, Indiana assigned, transferred, and/or granted MAF the copyright and other intellectual property rights necessary for MAF itself to manufacture and sell reproductions of works that the artist had previously created. *See* April 1999 Ag. at 1 (MAF could

26

"reproduce, promote and sell" certain Images that had already appeared in the specified catalogues); Sculpture Ag. at 1 (MAF could "fabricate" and sell reproductions of certain sculptures previously created by Indiana).[13]

Even if the Agreements were deemed to fall within the scope of § 12.01(1), they would not necessarily terminate upon the artist's death. Although "general agency principles" teach that "an agent's authority is revoked upon the death of the principal," *Mesbahi*, 172 A.D.3d at 1582, 100 N.Y.S.3d at 137, automatic termination is not mentioned in § 12.01(1) itself. Thus, in *Mesbahi*, the Appellate Division held that even though the parties' agreement fell within the scope of § 12.01(1), it survived the death of the principal where the "continuation provisions of the agreement certainly reflect[ed] the parties' intent to continue the consignment" after death. *Id*. Here, the parties' intent was equally clear. Consequently, the Estate cannot state a claim for declaratory or injunctive relief predicated on the theory that the April 1999 Agreement and the Sculpture Agreement were agency or consignment agreements that terminated automatically when Robert Indiana died.

### b.   *Termination at Death – Personal Services*

The default rule in New York is that, in the absence of any contrary indication, "the parties to a contract intend to bind, not only themselves, but their personal representatives." *Artists Rights Enf't Corp. v. Estate of King* (*King II*), 370 F. Supp. 3d 371, 381 (S.D.N.Y. 2019) (quoting *Buccini*

---

[13] In *Wesselmann*, a New York trial court found that § 12.01(1) applied where the artist delivered a "maquette of an image" created by him to a printer hired by the art merchant, who would then "pull" multiple prints for sale. 172 Misc. 2d at 249-51, 657 N.Y.S.2d at 286-87. As noted above, however, the artist in *Wesselmann* was required to approve and sign each finished print before it could be sold by the merchant. "This," the court explained, "constitutes delivery." 172 Misc. 2d at 251, 657 N.Y.S.2d at 287. Here, by contrast, Indiana was not required – or even permitted – to approve the individual Images and Sculptures that MAF created and sold. Instead, MAF had the right to "inscribe" Indiana's signature on the Images it reproduced. Signature Ag. at 1. Since nothing in the Agreements "constitutes delivery," § 12.01(1) does not apply.

*v. Paterno Const. Co.*, 253 N.Y. 256, 259, 170 N.E. 910 (1930)). However, this rule does not apply to personal services contracts. *King II*, 370 F. Supp. 3d at 381. Instead, "[i]t is the general rule that where a servant is employed to render personal services, such contract is terminated by the death of the servant." *Minevitch v. Puleo*, 9 A.D.2d 285, 287, 193 N.Y.S.2d 833, 835 (1st Dep't 1959). "Equally well settled is it in New York that '[t]he same reasoning which relieves the servant's estate relieves also the master's, for the relation constituted is personal on both sides and contemplates no substitution.'" *Id.* (citation omitted). *See also King II*, 370 F. Supp. 3d at 381 ("the New York courts have long held that a contract will terminate upon the death of either the master or the servant"). "The personal-services exception to the general rule that contracts survive death is based on the notion of impossibility – that it is impossible to effectuate the parties' intent where the performance contemplated is particular to the individuals involved." *Id.* at 382; *see also Artists Rights Enf't Corp. v. Estate of King* (*King I*), 224 F. Supp. 3d 231, 236 (S.D.N.Y. 2016) ("The central feature of a personal services contract is that the contract primarily entails the skill and labor of a particular individual.").

"In determining whether a contract is one for personal services, courts consider many factors, including: '[t]he importance of trust and confidence in the relation between the parties, the difficulty of judging the quality of the performance rendered and the length of time required for performance.'" *King I*, 224 F. Supp. 3d at 236 (quoting Restatement (Second) of Contracts § 367 cmt. b (Am. Law Inst. 1981)). "Among the parties that have been held to render what are personal services within the rule" are "actors, singers and athletes, and the rule applies generally to contracts of employment that create the intimate relation traditionally known as master and servant." Restatement (Second) of Contracts § 367 cmt. b.

The Estate maintains that the services provided by both Salama-Caro and MAF were "personal services," sufficient to render all of the parties' Agreements personal services contracts under New York law. Counterclaims ¶¶ 252-53; Estate Mem. at 18-20. The Court disagrees. With the exception of the Catalogue Raisonné Agreement, neither the contracts themselves nor the Estate's factual allegations about those contracts are sufficient to support its claim that the Agreements are personal service contracts under New York law.

The unambiguous language of the April 1999 Agreement and the Sculpture Agreement defeats any claim that they were for Salama-Caro's personal services. Both contracts expressly contemplated that someone other than Salama-Caro could – and in various circumstances would – act as MAF's "representative" in connection with the activities described therein, including the promotion and sale of Images and Sculptures. *See* April 1999 Ag. at 2 ("If Salama-Caro can no longer act as such representative or shall resign, his designated successor shall be appointed by Morgan and such successor shall act in his place and stead, and I shall be duly advised of such appointment."); Sculpture Ag. at 2 (same). Moreover, as the Estate concedes, MAF "would hire artisans to reproduce the works." Estate Mem. at 20.

Nor can the Estate plausibly claim that these two agreements required MAF's "personal" services. As plaintiffs note, *see* Pl. Reply Mem. at 10-11, both the April 1999 Agreement and the Sculpture Agreement were expressly made "binding" upon (and "inure to the benefit" of) MAF, Indiana, and their respective successors and assigns. *See* April 1999 Ag. at 2; Sculpture Ag. at 4. This language is inconsistent with the Estate's personal services theory. *See, e.g., Citibank, N.A. v. Nyland (CF8) Ltd.*, 692 F. Supp. 1488, 1491 (S.D.N.Y. 1987) (holding that management agreement at issue was "a personal service contract" which "is in no way binding upon successors or assigns"), *aff'd*, 878 F.2d 620 (2d Cir. 1989). Moreover, even assuming that MAF (an offshore

limited liability company) could qualify as an "individual" whose "skill and labor" could turn a contract into a personal services contract, *see King I*, 224 F. Supp. 3d at 236 ("The central feature of a personal services contract is that the contract primarily entails the skill and labor of a particular individual."), the Estate has not alleged what skill or labor MAF had – apart from the skill and labor of Salama-Caro and the artisans hired to fabricate the works – which could render the parties' agreements personal services contracts. Thus, since the April 1999 Agreement and the Sculpture Agreement did not require the personal services of Salama-Caro (or any other identified MAF representative), they cannot be deemed to have required the "personal services" of MAF.

In an effort to buttress its personal-services theory, the Estate points to its allegations that there "are no objective, quantitative metrics in the [agreements] which could measure the success or failure of performance by Morgan or Salama-Caro," that "the means and methods of performance under these agreements were delegated to Salama-Caro's discretion," and therefore that "any measure of the success or failure of those agreements was necessarily subjective." Counterclaims ¶¶ 252-53; *see also* Estate Mem. at 19-20. The lack of "objective" performance standards, however, is only one fact to be assessed when a court is required to make "the fact-specific determination of whether the contracted work can be completed by someone else." *King II*, 370 F. Supp. 3d at 382 (quoting Kirsten Rabe Smolensky, *Rights of the Dead*, 37 Hofstra L. Rev. 763, 777 n.65 (2009)). In this case, the express language of the April 1999 Agreement and the Sculpture Agreement – both of which permit MAF (acting through whomever or whatever happens to control the LLC at that time) to appoint a "successor" to Salama-Caro "to act in his place and stead," with no input from Indiana – is dispositive of that central question.

The Catalogue Raisonné Agreement presents a different question. It was made only with Salama-Caro and contains none of the language of the other agreements permitting the

appointment of a successor or making the contract binding upon heirs, successors, or assigns. *See* Catalogue Raisonné Ag. at 1 ("This is to confirm that we have agreed that you are responsible for the preparation of the Catalogue Raisonne of my complete oeuvre."). Against that backdrop, the Estate's allegations – that "[t]he promotion, production, exhibition, authentication, and cataloguing of artwork" and "the preparation of a catalogue raisonné [are] highly dependent upon the particular skill, knowledge, discretion, and judgment of the persons performing the work," Counterclaims ¶¶ 252, 254 – plausibly state a claim that the Catalogue Raisonné Agreement was a personal services contract that terminated at Indiana's death. Similarly, because personal services contracts without a fixed period are generally terminable "at will," *Morizio v. Roeder*, 58 Misc. 3d 1210(A), 94 N.Y.S.3d 539 (N.Y. Sup. Ct. Albany Co. 2018) (table; text at 2018 WL 411264, at *3); *People v. Komar*, 190 Misc. 255, 259, 71 N.Y.S.2d 660, 663 (N.Y. Sp. Sess. 1947) ("Considered as a contract for personal services, appellant could terminate it at will."), the First Counterclaim plausibly alleges that the Estate was entitled to terminate the Catalogue Raisonné Agreement on May 9 or 10, 2019.

### c.    *Judicial Estoppel*

Even assuming, *arguendo*, that the Estate could plausibly allege that the April 1999 Agreement or the Sculpture Agreement automatically terminated at Indiana's death, it is now judicially estopped from taking that position, having asserted inconsistent breach of contract claims, based on the same two contracts, in *Morgan Art I*. All of the factors distilled in *Intellivision*, 484 F. App'x at 619, are present in this case, making application of the doctrine appropriate.

First, the Estate took a "clearly inconsistent" position from the one it advances here when it pled in *Morgan Art I* – using the present tense – that both the April 1999 Agreement and the Sculpture Agreement are "valid and binding contract[s] between Morgan and Robert Indiana, now

the Estate," *Morgan Art I* Counterclaims ¶¶ 221, 226, notwithstanding the artist's death three months earlier. *See Intellivision*, 484 F. App'x at 619-20 (applying judicial estoppel where plaintiffs previously survived a motion to dismiss by alleging that Intellivision was the owner and assignor of the patent applications at issue, only to abandon that position at summary judgment and claim instead that Intellivision's principals owned and assigned the patent applications in their individual capacities).

Second, Judge Torres necessarily "accept[ed]" that position, *Intellivision*, 484 F. App'x at 619, when she ruled that the "portion of the Second Counterclaim that asserts a claim for breach of the Sculpture Agreement with respect to the Semi-Precious Stone Sculptures shall survive dismissal," *Morgan Art I* Order at 19, even though the Estate did not "allege the dates that the [Unauthorized] Semi-Precious Stone Sculptures were created and sold." *Id.* at 20.[14] Judge Torres accepted that position again when she dismissed the Estate's Third Counterclaim, for unjust

---

[14] In its supplemental memorandum, the Estate argues that it "may simultaneously maintain that the Agreements are binding on [MAF] with respect to payment and accounting obligations it owes for sales it has *already made*, and that [MAF's] rights to reproduce *new* works terminated on Indiana's death." Estate Supp. Mem. at 5 (emphasis in original). As a theoretical matter, the Estate may be correct. However, nothing about the actual breach of contract claims asserted in *Morgan Art I* suggests that they were limited to breaches occurring before the artist's death. To the contrary: as Judge Torres notes, *see Morgan Art I* Order at 15, the surviving portion of the Second Counterclaim is based upon the Estate's allegation that "[t]he Albright-Knox Art Gallery in Buffalo, New York, is *currently* showing an exhibition of Indiana's works entitled: 'Robert Indiana: A Sculpture Retrospective' that includes a number of Unauthorized Semi-Precious Stone LOVE Sculptures. The wall signs accompanying the works falsely state that Mr. Indiana authorized the creation of the sculptures when, in fact, he did not." *Morgan Art I* Counterclaims ¶ 199 (emphasis added). According to the gallery's website, the exhibit ran from June 16 to September 23, 2018, and the accompanying exhibition catalogue was edited by (among others) Simon Salama-Caro. *See Robert Indiana: A Sculpture Retrospective,* Albrght-Knox, https://www.albrightknox.org/art/exhibitions/robert-indiana-sculpture-retrospective (last visited Jan. 28, 2020). It thus appears that the surviving portion of the Second Counterclaim seeks damages for an alleged breach of the Sculpture Agreement that occurred after the artist's death.

enrichment, because "the Estate alleges the existence of a number of contracts between Plaintiff and Indiana, and does not allege that any are invalid . . . ." *Id*. at 21.

As the Estate correctly notes, "a court is not required to 'expressly assume a party's position in formulating its opinion or issue a final decision on the merits'" as a predicate for the application of judicial estoppel. Estate Supp. Mem. at 2 (quoting *Barnet v. Drawbridge Special Opps. Fund, LP*, 2014 WL 5334066, at *3 (S.D.N.Y. Oct. 17, 2014)); *see also Capmark Fin. Grp. Inc. v. Goldman Sachs Credit Partners L.P.*, 491 B.R. 335, 353 (Bankr. S.D.N.Y. 2013) ("It is enough that the court accept the accuracy of a party's representation and that the court 'might have' made a different decision had the party not taken that position."); *Jalee Consulting Grp., Inc. v. XenoOne, Inc.*, 908 F. Supp. 2d 387, 399-400 (S.D.N.Y. 2012) (collecting cases and noting that courts "have found adoption," for purposes of applying judicial estoppel, "in an order granting a party's motion to dismiss; in a grant of a temporary restraining order and preliminary injunction; and in an order denying a new trial") (internal citations omitted). Nor is there any requirement that the prior decision have been fully favorable to the party to be estopped. *See Barnet*, 2014 WL 5334066, at *3 (collecting cases); *Rapture Shipping, Ltd. v. Allround Fuel Trading B.V.*, 350 F. Supp. 2d 369, 372-74 (S.D.N.Y. 2004) (where plaintiff sought various remedies for breach of contract in the Rotterdam Court, and where that court "assumed" the existence of a contract "as an underlying premise of its decision," but dismissed plaintiff's claims in favor of arbitration, plaintiff was judicially estopped from denying the existence of the contractual relationship in its second suit).

Moreover, even after filing the Counterclaims now at issue in this action, the Estate *continued* to maintain an inconsistent position in *Morgan Art I* by filing its proposed SAAC, which alleges that MAF "breached" the April 1999 Agreement and the Sculpture Agreement by failing to provide any accountings to Indiana, or his Estate, in "2017, 2018, *or 2019 to date*." SAAC

¶¶ 256(c), 261(a) (emphasis added). It is difficult to understand how MAF could have contractual obligations to the Estate in 2019 if – as the Estate attempts to claim in this action – all of the relevant contracts terminated automatically on May 18, 2018.

On these facts, to allow the Estate to deny the continuing validity of the same contracts that it has affirmed – and upon which it sues – in *Morgan Art I* would provide an "unfair advantage" to the Estate and impose a corresponding "unfair detriment" on plaintiffs. *Intellivision*, 484 F. App'x at 619 (citation omitted). It would also "risk the possibility of creating the very situation judicial estoppel is meant to avoid – an inconsistent result that compromises the integrity of the judicial system." *Rapture Shipping*, 350 F. Supp. 2d at 374-75.

The Catalogue Raisonné Agreement, however, again presents a different question. The Estate never attempted to plead a claim for breach of that contract. Consequently, it is not judicially estopped from taking the position, in this action, that the Catalogue Raisonné Agreement terminated automatically at Indiana's death. *See also* Pl. Supp. Mem. at 1-4 (arguing judicial estoppel as to the April 1999 Agreement and the Sculpture Agreement only).

### d.    *Termination by Material Breach*

As an alternative to its automatic termination theory, the Estate alleges that it effectively terminated the April 1999 Agreement and the Sculpture Agreement (together with their amendments and modifications) on May 9 or 10, 2019, in response to material breaches by plaintiffs. The Estate identifies three allegedly material breaches: (i) MAF's reproduction of works outside the scope of the parties' agreements; (2) its persistent failure to provide itemized, periodic accountings; and (iii) its failure, since December 2017, to provide any royalties or accountings to the Estate at all. Counterclaims ¶¶ 207-08.

Under New York law, a party may terminate a contract when the other party "has committed a material breach." *Process Am., Inc. v. Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016). For a breach to be "material," it must "go to the root of the agreement between the parties." *Id.* (quoting *Septembertide Publ'g, B.V. v. Stein & Day, Inc.*, 884 F.2d 675, 678 (2d Cir. 1989); *accord Advanced Water Techs. Inc. v. Amiad U.S.A., Inc.*, 2019 WL 4805330, at *5 (S.D.N.Y. Sept. 30, 2019). *See also Metro. Nat. Bank v. Adelphi Acad.*, 23 Misc. 3d 1132(A), 886 N.Y.S.2d 68 (N.Y. Sup. Ct. Kings Co. 2009) (table; text at 2009 WL 1477998, at *4) ("for a breach to be material it must be so substantial that it defeats the object of the parties in making the contract; the breach must go to the root of the agreement between the parties").

The question of materiality is generally left to the fact finder. *Advanced Water Techs.*, 2019 WL 4805330, at *5 (collecting cases); *Cont'l Ins. Co. v. RLI Ins. Co.*, 161 A.D.2d 385, 387, 555 N.Y.S.2d 325, 327 (1st Dep't 1990). But "where the evidence concerning the materiality is clear and substantially uncontradicted . . . the question is a matter of law for the court to decide.'" *Wiljeff, LLC v. United Realty Mgmt. Corp.*, 82 A.D.3d 1616, 1617, 920 N.Y.S.2d 495, 497 (4th Dep't 2011) (quoting *Syracuse Orthopedic Specialists, P.C. v. Hootnick*, 42 A.D.3d 890, 892, 839 N.Y.S.2d 897, 900 (4th Dep't 2007)).

Plaintiffs argue, with some force, that MAF's alleged historical failure to provide regular, itemized accountings to Indiana cannot constitute a "material" breach where Indiana admittedly performed under the agreements "despite having received MAF's purportedly 'sketchy' account statements for *decades*." Pl. Reply Mem. at 14 (emphasis in the original). *See* Counterclaims ¶ 259 (Indiana received only "sketchy account statements" from MAF "over the years"); *id.* Ex. A, at 4 ("MAF has consistently failed to provide these required accountings to Indiana").

However, the Estate's allegations as to MAF's production and sale of LOVE sculptures outside the scope of the Sculpture Agreement, *see* Counterclaims ¶ 208, and its failure to provide the Estate any royalty payments at all since December 2017, despite having continued to "reproduce, promote and sell Indiana's work," *id.* ¶ 207, plausibly undergird its claim that it was entitled to terminate both contracts based on material breaches. *See Al Hirschfeld Found.*, 296 F. Supp. 3d at 643 (deeming an art gallery's unauthorized sales of artwork, beyond the scope of the parties' consignment agreement, to constitute "material breaches"); *Jordan v. Can You Imagine, Inc.*, 485 F. Supp. 2d 493, 504 (S.D.N.Y. 2007) (noting that a failure to tender payment is "generally deemed a material breach of a contract," but holding that genuine disputes of fact prevented the court from granting summary judgment on licensor's claim that licensee failed to pay royalties due under the parties' agreement) (citation omitted). MAF argues that its production of LOVE sculptures was not a breach at all, because the April 1999 Agreement gave it the right to "reproduce" the LOVE "Image" in "such forms and sizes" and "in such manner" as MAF "in its sole discretion shall determine." Pl. Mem. at 5, 21; Pl. Reply Mem. at 13 (quoting April 1999 Ag. at 1). The Estate counters that plaintiffs are misreading the April 1999 Agreement, which did not give MAF "the right to reproduce the images as sculptures," and ignoring the "more specific permissions" in the Sculpture Agreement, which "would have been superfluous" if MAF already had the right to fabricate sculptures based on the Images described in the earlier contract. Estate Mem. at 18.

At the motion to dismiss stage, the Estate has the better end of this argument. *See Galli v. Metz*, 973 F.2d 145, 149 (2d Cir. 1992) (quoting *Garza v. Marine Transport Lines, Inc.,* 861 F.2d 23, 27 (2d Cir. 1988)) ("Under New York law an interpretation of a contract that has 'the effect of rendering at least one clause superfluous or meaningless . . . is not preferred and will be avoided

36

if possible.'"). Moreover, the LOVE sculpture was (and is) one of Indiana's "iconic works." Counterclaims ¶ 221. Thus, by alleging that that MAF and Salama-Caro fabricated and sold versions of that sculpture beyond the "colors, dimensions and edition sizes" authorized by the artist, *id*. ¶ 242, *see also* Sculpture Ag. at 1, the Estate plausibly alleges materiality as well as breach.

Even if the allegedly unauthorized production and sale of LOVE sculptures presented a closer question, the materiality of MAF's alleged failure to pay any royalties since December 2017 does not. The royalties (50% "of the net income" under the April 1999 Agreement and 20% under the Sculpture Agreement) were the only significant financial consideration to which Indiana was entitled in return for his broad grants of rights to MAF. The Estate alleges that MAF "has not sent any payments to Indiana or the Estate since December 2017," Counterclaims ¶ 207, a fact plaintiffs conceded at oral argument. *See* Tr. at 33:14-34:22 (acknowledging that MAF had made no royalty payments to Indiana or the Estate since 2017, when it made a payment with respect to calendar year 2016). MAF's failure or refusal to pay royalties at all plainly goes to "the root" of the parties' agreements.[15]

---

[15] Plaintiffs argue, in their motion papers, that MAF was entitled to impose a "halt on payments" because the Estate "repudiated" the Agreements (that is, accused MAF of breaching them) "before MAF's next annual accounting and payment was to be provided." Pl. Mem. at 23. The anticipatory repudiation of a contract may indeed relieve the counterparty "of its obligations of future performance." *In re Food Mgmt. Grp., LLC*, 425 F. App'x 54, 55 (2d Cir. 2011). It does not, however, relieve that counterparty of its obligation to pay for benefits received during the life of the contract. Nor, of course, does one party's attempted repudiation permit the counterparty to retain its contractual rights while disavowing its corresponding contractual obligations. *See E. Coast Res., LLC v. Town of Hempstead*, 707 F. Supp. 2d 401, 415 (E.D.N.Y. 2010) ("[T]he nonbreaching party, by electing to continue receiving benefits pursuant to the agreement, cannot then refuse to perform his or her part of the bargain.") (citation omitted).

Plaintiffs' motion to dismiss the Estate's First Counterclaim will therefore be granted in part, as to the Estate's claim that the April 1999 Agreement and Sculpture Agreement automatically terminated at Indiana's death, and otherwise denied.[16]

### 2.      Second Counterclaim – Breach of Fiduciary Duty

In its Second Counterclaim, the Estate alleges that Salama-Caro owed fiduciary duties to Indiana as his "agent with respect to promotion and sale of Indiana's art," Counterclaims ¶ 275, including "duties of good faith and undivided loyalty," *id*. ¶ 276, and that he breached those duties in four primary ways:

First, taking advantage of the artist's "age, isolation, and financial difficulties," Counterclaims ¶ 234, Salama-Caro "persuaded" and "induced" him to execute the Agreements at issue in this action "without the benefit of counsel's advice." *Id*. ¶¶ 205, 234-54, 278(a)-(b). The Agreements were "unconscionably lopsided," *id*. ¶¶ 205, 278(a), in that the artist received no "definite" consideration for the rights he signed away, only a promise that MAF would pay him a "small fraction" of its "substantial profits." *Id*. ¶¶ 206, 234-54.

Second, once the Agreements were executed, Salama-Caro took advantage of his "double-agent" status to divert the benefits of the Agreements from Indiana to himself, thereby further

---

[16] The parties briefly discuss the question whether a perpetual term is enforceable under New York law, and if not, whether the April 1999 Agreement and the Sculpture Agreement are thereby rendered terminable at will. Pl. Mem. at 19-20; Estate Mem. at 17-18; Pl. Reply Mem. at 11-12. In light of the Court's conclusion that the Estate plausibly alleges that it terminated those agreements on other grounds, the Court need not reach that question. The parties may return to it on a fuller record if and when they file summary judgment motions. Similarly, the Estate makes a passing reference to the Copyright Act, 17 U.S.C. § 203(a), which allows termination of a copyright grant by the estate of an author under certain circumstances. Estate Mem. at 21. Under § 203(a), however, the estate's termination rights arise no earlier than thirty-five years after either the "date of execution of the grant" or the "publication of the work under the grant," whichever is earlier. The statute therefore does not appear to be relevant to the parties' dispute at this time. Moreover, it requires a series of procedural steps, including the service of notice at a prescribed time and "various other formalities," *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 32 (2d Cir. 2015), none of which the Estate claims to have accomplished.

reducing the artist's "small fraction" of the profits. Counterclaims ¶¶ 256-57. He did this, according to the Estate, by purchasing Robert Indiana artworks from MAF (either personally or through one of the New York LLCs) at "below-market prices" (in some instances acquiring them "for free"), and then reselling the works "on the art market for the highest price they could command." *Id*. ¶¶ 210-211, 257-59, 278(c)-(d). Since Indiana only received royalties on MAF's sales – not any later resales by Salama-Caro or entities he controlled – these transactions directly benefited Salama-Caro at the expense of his principal. *Id*.

Third, Salama-Caro and the New York LLCs "burnish[ed] their reputations in the art market" by "loaning and donating some of the Indiana works to museums and galleries for exhibition." Counterclaims ¶¶ 212, 278(e).

Fourth, Salama-Caro worked on the Robert Indiana catalogue raisonné for the purpose of "authenticating and legitimizing" the works he resold to third parties, and (through two of the New York LLCs) operated a website "using Robert Indiana's name and works" without additional compensation to the artist. Counterclaims ¶¶ 213, 278(f)-(g).

### a.    *Existence of Fiduciary Duty*

"To state a breach of fiduciary duty claim under New York law, a plaintiff must plead: '(i) the existence of a fiduciary duty; (ii) a knowing breach of that duty; and (iii) damages resulting therefrom.'" *Spinelli v. Nat'l Football League*, 903 F.3d 185, 207 (2d Cir. 2018) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011)); *see also McSpedon v. Levine*, 158 A.D.3d 618, 621, 72 N.Y.S.3d 97, 101 (2d Dep't 2018) ("In order to establish a breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct[.]").

"A fiduciary relationship exists under New York law when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Spinelli*, 903 F.3d at 207 (quoting *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 599 (2d Cir. 1991)); *see also Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) ("[A] fiduciary duty exists where one assumes control and responsibility over another, or where one has a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking."). The relationship between an agent and his principal is generally fiduciary in character. *Samba Enterprises, LLC v. iMesh, Inc.*, 2009 WL 705537, at *7 (S.D.N.Y. Mar. 19, 2009), *aff'd sub nom. Samba Enterprises, Ltd. v. iMesh, Inc.*, 390 F. App'x 55 (2d Cir. 2010); *see also Abercrombie*, 438 F. Supp. 2d at 274 (quoting *Wilson-Rich v. Don Aux Assocs., Inc.,* 524 F. Supp. 1226, 1234 (S.D.N.Y. 1981) ("Examples of fiduciary relationships include the relationships between trustee and beneficiary, guardian and ward, agent and principal, and attorney and client."). As Judge Chin explained in *Samba Enterprises*, "[a]gency" is "a fiduciary relationship which results from the manifestation of consent of one person to allow another to act on his or her behalf and subject to his or her control, and consent by the other so to act." 2009 WL 705537, at *7 (quoting *Maurillo v. Park Slope U-Haul,* 194 A.D.2d 142, 146, 606 N.Y.S.2d 243, 246 (2d Dep't 1993)). Thus, where an artist designates another his "exclusive agent," and relies on the agent to act on his behalf in the art world, the agent becomes his fiduciary with respect to the matters so entrusted to him. *See*, *e.g*., *Scher*, 117 A.D.3d at 158, 983 N.Y.S.2d at 228 ("when the Gallery commissioned the printer to produce the prints, paid the printer for the prints, and took delivery of the prints, it did so as Scher's agent and, hence, fiduciary").

In determining whether one party owes a fiduciary duty to another, the courts focus on the substance of their relationship, not the labels they use. Even the terms "principal" and "agent" may

be disregarded if, in substance, the parties' contract established "a conventional business relationship" at arms' length, including "routine licensing and royalties rights and obligations." *Surge Licensing, Inc. v. Copyright Promotions Ltd.*, 258 A.D.2d 257, 258, 685 N.Y.S.2d 175, 176 (1st Dep't 1999); *see also World Wrestling Entm't, Inc. v. Jakks Pac., Inc.*, 530 F. Supp. 2d 486, 504 (S.D.N.Y. 2007) (quoting *Ne. Gen. Corp. v. Wellington Adver., Inc.*, 82 N.Y.2d 158, 163, 604 N.Y.S.2d 1, 4 (1993)) ("[T]he dispositive issue of fiduciary-like duty or no such duty is determined not by the nomenclature 'finder' or 'broker' or even 'agent,' but instead by the services agreed to under the contract between the parties."), *aff'd*, 328 F. App'x 695 (2d Cir. 2009).

Conversely, if the "overall purpose" of the parties' agreement is to engage one party to act on the other's behalf, as agent, general contractual language purporting to "preclude[] the existence of an agency relationship" may be disregarded. *Samba Enterprises*, 2009 WL 705537, at *7-8 (where purpose of agreement was "to engage Samba to act on iMesh's behalf" and where Samba held itself out as iMesh's "agent" to third parties, "Samba was iMesh's agent," and "owed iMesh fiduciary duties under New York law, notwithstanding clause in contract reciting that it was "not intended to create a 'partnership, franchise, joint venture, *agency,* or employment relationship.'"); *see also Veleron Holding, B.V. v. Morgan Stanley*, 117 F. Supp. 3d 404, 451-52 (S.D.N.Y. 2015) (where substance of parties' relationship was that of agent to principal, it was "of little consequence that the [contract] declares Morgan Stanley to be 'acting as an independent contractor'"). "It is the character and circumstances surrounding the relationship that determine the duty of the agent." *Impax Media, Inc. v. Ne. Advert. Corp.*, 2018 WL 3962841, at *7 (S.D.N.Y. Aug. 17, 2018).

Because "[t]he existence of a fiduciary duty normally depends on the facts of a particular relationship," a claim for breach of fiduciary duty "usually is not subject to dismissal under Rule 12(b)(6)." *Abercrombie*, 438 F. Supp. 2d at 274; *accord Neogenix Oncology, Inc. v. Gordon*, 133

41

F. Supp. 3d 539, 554 (E.D.N.Y. 2015); *Better Benefits, Inc. v. Protective Life Ins. Co.,* 2004 WL 633730, at *3 (S.D.N.Y. Mar. 30, 2004). "However, absent an allegation of a special relationship, mere assertions of 'trust and confidence' are insufficient to support a claim of a fiduciary relationship." *Abercrombie*, 438 F. Supp. 2d at 274.

Here, the Estate alleges that Salama-Caro owed a fiduciary duty to Robert Indiana because he "acted as Indiana's agent in the art market, and in that role represented Indiana personally." Counterclaims ¶¶ 232, 256, 275. Salama-Caro first became Indiana's agent in the "mid-1990s," *id.* ¶ 232, or "approximately 1995," *id.* ¶¶ 256, 275– at which point the artist was in his mid-60s and already "living in seclusion" on Vinalhaven, *id.* ¶ 205 – and remained his agent until the artist's death. Counterclaims ¶¶ 232, 256, 275. During this lengthy period Salama-Caro held himself out as Indiana's "exclusive agent," worldwide, for purposes of selling his artworks. *Id.* ¶ 256. The relationship between Indiana and Salama-Caro was a "relationship of trust and confidence," imposing fiduciary duties of good faith and undivided loyalty upon Salama-Caro. *Id.* ¶ 275-76. Among other things, Salama-Caro was required to "act for or to give advice for the benefit of Indiana upon matters within the scope of their relationship." *Id.* ¶ 277.

Plaintiffs call these allegations "conclusory." Pl. Mem. at 24. In response, the Estate points out that "Salama-Caro has admitted he was Indiana's agent," Estate Mem. at 22, and argues that his concessions – in the form of specific factual allegations made in the FAC – constitute binding judicial admissions sufficient to establish the existence of a fiduciary relationship between Indiana as principal and Salama-Caro as his exclusive agent in the art market. Estate Supp. Mem. at 3-4.[17] The Court agrees.

---

[17] According to the Estate, Salama-Caro also "acknowledged that he always acted as Indiana's agent" when he testified in the Maine Probate Court concerning Indiana's will. Estate Mem. at 5

In their own pleading, plaintiffs do not merely admit that Salama-Caro was Indiana's "agent in the art market." FAC ¶¶ 45-46. They also describe "the character and circumstances surrounding the relationship," *Impax Media*, 2018 WL 3962841, at *7, beginning in the "early 1990s," when Salama-Caro presented the artist with "career-changing plans," and Indiana "eagerly agreed" and "asked Salama-Caro to represent him." *Id.* ¶ 33. Those "career-changing plans" included, but were not limited to, the business arrangements embodied in the April 1999 Agreement and the Sculpture Agreement. *Id*. ¶ 34.

> Plaintiffs also acknowledge the Salama-Caro's relationship with Indiana grew over time:

> In recognition of Salama-Caro's dedicated and successful work on his behalf, Indiana also authorized Salama-Caro to act as his agent in the art market, and often referred to Salama-Caro as such. For example, in September 2000, Indiana confirmed to Salama-Caro in writing that Salama-Caro was Indiana's "exclusive agent" and had Indiana's "full authority to represent [him] in the search for a gallery in New York and to deal on all matters regarding an exhibition at such gallery."

FAC ¶ 45. As Indiana's "agent in the art market," Salama-Caro assumed "even broader responsibility for preserving Indiana's legacy and market." *Id.* ¶ 58. As part of that "broader responsibility," Salama-Caro undertook to establish a website under the domain name robertindiana.com, *id*. ¶ 60; "to represent [Indiana] in the search for a gallery in New York and to deal on all matters regarding an exhibition at such gallery," *id*. Ex. I; to pursue strong sale prices for Indiana's works, *id*. Ex. N (May 20, 2001 email from Salama-Caro to Indiana stating, in part, "The wood at Christie's sold for **$424,000**. I hope you are happy with my work.") (emphasis in the original); and to prepare Indiana's art for museum exhibitions. *Id*. (reporting on preparations underway for a show at the Taipei Museum). Additionally, Indiana entrusted Salama-Caro to

---

n.1; *see also* Estate Supp. Mem. at 4-5. The Estate concedes, however, that this testimony does not have judicial estoppel effect ("because the Maine Probate Court has not adopted it") and does not constitute a judicial admission ("because it was made in a separate proceeding"). *Id*. Consequently, I do not rely on Salama-Caro's Probate Court testimony in determining the pending motion.

"authenticate my works whenever necessary." *Id*. Ex. O (August 7, 2003 letter from Indiana "[t]o whom it may concern" authorizing Salama-Caro to do so).

These admissions are factual, were made in this action, and are binding on plaintiffs. *PPX Enterprises*, 746 F.2d at 123. They are also sufficient, at the pleading stage, to defeat plaintiffs' contention that the Estate cannot establish the existence of an actionable fiduciary duty running from Salama-Caro to Indiana.

Plaintiffs next contend that, regardless of any general fiduciary duty Salama-Caro may have owed as Indiana's agent, he did not owe any such duties "in connection with the April 1999 Agreement and the Sculpture Agreement" because both of them recited that he was "acting on behalf of and as a representative of Morgan." Pl. Mem. at 24-25 (quoting April 1999 Ag. at 1-2; Sculpture Ag. at 2). Plaintiffs' reliance on that phrase is misplaced. The language used (which does not even include the words "agent" or "fiduciary") is a far cry from the "express disclaimer[] of fiduciary duty" given effect in *Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 326 (S.D.N.Y. 2011) and other cases cited by plaintiffs.[18] In context, the statement that Salama-Caro would act for MAF appears to this Court to signify merely that he – as opposed to some other MAF employee or "advisor" – would be the individual reviewing and discussing projects with Indiana (under the

---

[18] In *Valentini*, which involved the issuance of notes under complex written agreements, the parties' Initial Purchaser Representations stated that "CFSC is not acting as fiduciary for" the purchaser. 837 F. Supp. 2d at 326. This was "sufficiently explicit" to require the dismissal of plaintiff's breach of fiduciary duty claims as to notes governed by the IPRs. *Id*. However, the court refused to dismiss plaintiff's breach of fiduciary duty claims as to notes governed by the Structured Notes Master Agreement, even though the buyer "assumed sole responsibility for determining the note to be a suitable investment," because the SNMA contained "no express disclaimers of fiduciary duty nor does it disclaim the general duties brokers in New York law must fulfill[.]" *Id. See also Seippel v. Jenkens & Gilchrist, P.C.*, 341 F. Supp. 2d 363, 381 n.135 (S.D.N.Y. 2004) (breach of fiduciary duty claim against Deutsche Bank Defendants dismissed where each challenged transaction was governed by an agreement explicitly stating that Deutsche Bank "is not acting as a fiduciary or adviser to it in respect of this Transaction"), *amended on reconsideration on other grounds*, 2004 WL 2403911 (S.D.N.Y. Oct. 26, 2004).

April 1999 Agreement) and otherwise carrying out MAF's contractual responsibilities. Significantly, the next sentence in each agreement clarifies that if Salama-Caro "can no longer act as such representative," or resigns, MAF will appoint a "successor to act in his place and stead." April 1999 Ag. at 1-2; Sculpture Ag. at 2.

Moreover, as plaintiffs acknowledge, Salama-Caro's duties as Indiana's "agent in the art market" were "even broader" than whatever duties he was required to attend to on MAF's behalf under the April 1999 Agreement and the Sculpture Agreement. FAC ¶ 58. Salama-Caro personally undertook "responsibility for preserving Indiana's legacy and market," *id.*, including by nurturing his reputation, representing him in connection with gallery and museum exhibitions, authenticating his artworks, and working to ensure that they sold well at auction. *Id.* ¶¶ 58, 60, Ex. I. Ex. N, Ex. O. Consequently, while none of the language in the April 1999 Agreement or the Sculpture Agreement *created* an agency relationship between Indiana and MAF (*see supra* at § II(B)(1)(a)), it is equally clear that nothing in those contracts *disclaimed* whatever personal fiduciary duties Salama-Caro had – or subsequently acquired – as Indiana's agent in the art market. Nor are those duties limited by the four corners of the Agreements that Indiana signed with MAF.[19] Rather, they

---

[19] Even where the alleged fiduciary is the same person or entity that entered into a non-fiduciary contract with the plaintiff, "a cause of action for breach of fiduciary duty may survive, for pleading purposes," where the parties "created a relationship of higher trust than would arise from" the agreement alone. *EBC I, Inc. v. Goldman, Sachs & Co.*, 5 N.Y.3d 11, 20, 799 N.Y.S.2d 170, 175 (2005); *see also N. Shore Bottling Co. v. C. Schmidt & Sons, Inc.*, 22 N.Y.2d 171, 179, 292 N.Y.S.2d 86, 92 (1968) ("a contracting party may be charged with a separate tort liability arising from a breach of a duty distinct from, or in addition to, the breach of contract"); *Regan v. Conway*, 768 F. Supp. 2d 401, 411 (E.D.N.Y. 2011) ("Even if the parties are involved in a contractual relationship, there can be a separate and distinct fiduciary relationship. A contractual relationship and a fiduciary relationship can co-exist at the same time and between the same parties."); *Esbin & Alter, LLP v. Zappier*, 2009 WL 10696347, at *4 (S.D.N.Y. Apr. 3, 2009) ("plaintiff has sufficiently pled the existence of a fiduciary duty on the part of Zappier, separate and distinct from his contractual duties"), *report and recommendation approved*, 2009 WL 10696348 (S.D.N.Y. Sept. 29, 2009).

must be determined by "the character and circumstances surrounding the relationship." *Impax Media*, 2018 WL 3962841, at *7. Here, the pleadings adequately allege circumstances giving rise to a relationship of trust and confidence between Indiana as principal and Salama-Caro as his exclusive agent, with responsibility for preserving the artist's legacy as well as the market for his art.

### b.   *Breach and Damages*

"Under New York law an agent owes its principal fiduciary duties of good faith and loyalty." *Ross v. FSG PrivatAir, Inc.*, 2004 WL 1837366, at *7 (S.D.N.Y. Aug. 17, 2004) (citing *Six West Retail Acquisition, Inc. v. Sony Theatre Management Corp.,* 2004 WL 691680, at *19 (S.D.N.Y. Mar 31, 2004)). *See also Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466, 541 N.Y.S.2d 746, 748 (1989) ("[I]t is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect."). "The duties of good faith and loyalty require a fiduciary to avoid self-dealing." *Barbagallo v. Marcum LLP*, 2012 WL 1664238, at *10 (E.D.N.Y. May 11, 2012). Moreover, a fiduciary's duty of loyalty "is a sensitive and 'inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty." *Birnbaum*, 73 N.Y.2d at 466, 541 N.Y.S.2d at 748 (quoting *Matter of Ryan*, 291 N.Y. 376, 407, 52 N.E.2d 909, 923 (1943)); *see also In re Cohen*, 422 B.R. 350, 368 (E.D.N.Y. 2010) ("Whether as a joint adventurer or an agent, Cohen and Metropolitan owed Appellee a fiduciary duty not to engage in self-dealing.").

The Estate alleges that Salama-Caro and/or the New York LLCs under his control, "purchase[d] Indiana's works from Morgan, and/or receive[d] such works from Morgan for free, thereby preventing those works from being sold for the highest possible price and depressing the amounts due and owing to Indiana under the Agreements." Counterclaims ¶ 278(c). It further

alleges that Salama-Caro, and/or the New York LLCs, resold some of those works "at market value," retaining the profits for Salama-Caro's benefit without paying any portion to the artist. *Id.* ¶ 278(d). These allegations, the truth of which is assumed for present purposes, describe "blatant self-dealing" in violation of Salama-Caro's fiduciary duties to Indiana. *See In re Cohen*, 422 B.R. at 367-68 (Cohen and Metropolitan engaged in prohibited self-dealing when, after agreeing to split the profits from certain real estate sales with Truehold, they instead sold the properties to themselves and retained the profits); *Estate of Rothko*, 84 Misc. 2d 830, 838, 379 N.Y.S.2d 923, 935 (N.Y. Surr. Ct. N.Y. Co. 1975) (executor of painter's estate engaged in prohibited self-dealing by selling paintings to gallery in which he had an interest), *decree modified on other grounds sub nom. Will of Rothko*, 56 A.D.2d 499, 392 N.Y.S.2d 870 (1977), *aff'd sub nom. Matter of Rothko's Estate*, 43 N.Y.2d 305, 372 N.E.2d 291 (1977).

As to this portion of the Estate's fiduciary duty claim, Salama-Caro does not contend that the conduct alleged is consistent with an agent's general duties of loyalty and good faith. Rather, he argues that it was "expressly permitted" by the April 1999 Agreement and the Sculpture Agreement, which allowed MAF to sell Images and Sculptures "at any price in its sole discretion." Pl. Mem. at 26-27. But the Second Counterclaim does not run against MAF; it runs against Salama-Caro, who was Indiana's "exclusive agent" and accepted "responsibility for preserving Indiana's legacy and market." FAC ¶¶ 45, 58. Thus, even if the language to which plaintiffs point insulated MAF from liability for *selling* Images and Sculptures to Salama-Caro at below-market prices,[20] it

---

[20] In *Morgan Art I*, the Estate's proposed SAAC alleges, among other things, that each and every one of MAF's sales of Robert Indiana Sculptures since 1990 has been to Shearbrook (US), LLC (Shearbrook), which is controlled by Salama-Caro. SAAC ¶ 215. The Estate further alleges that in some instances Shearbrook resold the same piece the next day, at a substantially higher price, either at auction to MAF itself or to a third-party art gallery. *Id.* ¶¶ 216-27. Based on these allegations, the Estate asserts a claim against MAF for breach of the covenant of good faith and

would not insulate Salama-Caro – Indiana's agent – from liability for *purchasing* them cheap, and reselling them at market prices, so as to divert the resulting profits from Indiana to himself. To the extent the Second Counterclaim is based on Salama-Caro's alleged self-dealing, therefore, it survives plaintiffs' motion to dismiss.

The remainder of the Second Counterclaim fares less well. The Estate's allegations as to the "lopsided" nature of the April 1999 Agreement and the Sculpture Agreement are insufficient to render Salama-Caro's "facilitation" of those Agreements, in and of itself, a breach of his fiduciary duty. The Estate does not describe what other or better terms Salama-Caro could or should have obtained for Indiana in 1999. To the contrary: all of the financial harm alleged in the Counterclaims appears to flow from MAF's breach of those Agreements (which it has affirmed and sued upon in *Morgan Art I*), or from Salama-Caro's diversion of contractual benefits that should have flowed to Indiana under those Agreements.

Under New York law, the elements of a claim for breach of fiduciary duty include "damages directly caused by the defendant's misconduct," *Palmetto Partners, L.P. v. AJW Qualified Partners, LLC*, 83 A.D.3d 804, 807, 921 N.Y.S.2d 260, 264 (2d Dep't 2011) (affirming dismissal of claim for breach of fiduciary duty where, although defendant arguably had and breached a fiduciary duty, "plaintiffs suffered no damages"); *Margrabe v. Sexter & Warmflash, P.C.*, 353 F. App'x 547, 549 (2d Cir. 2009) (same; plaintiff failed to allege "damages that were directly caused by the [defendant's] alleged misconduct"), at least where the parties' fiduciary relationship arose "based on the facts and circumstances of [their] relationship, rather than as a matter of law." *Fed. Ins. Co. v. Mertz*, 2016 WL 164618, at *3 (S.D.N.Y. Jan. 12, 2016). Thus, the

---

fair dealing, alleging that it engaged in the self-dealing transactions "in bad faith, in order to deprive Indiana of his rights and benefits under those [A]greements." SAAC ¶ 270.

Estate cannot maintain such a claim based on the mere existence of the Agreements. *See Sea Trade Mar. Corp. v. Coutsodontis*, 744 F. App'x 721, 725 (2d Cir. 2018) ("[T]o succeed on his breach of fiduciary duty claim, Peters had to prove damages regardless of the relief ultimately sought."); c*f. Johnson v. Nextel Commc'ns*, 660 F.3d at 141-42 (appellants "plausibly alleged injury in the difference between what they received" under the contract they signed with the law firm LMB, which then bargained away their rights in return for financial rewards from Nextel, "and what they would have received if represented by unconflicted counsel").

Nor may the Estate pursue a claim for breach of fiduciary duty based on its allegations that Salama-Caro and the New York LLCs "burnish[ed] their reputations in the art market" by "loaning and donating some of the Indiana works to museums and galleries for exhibition," Counterclaims ¶¶ 212, 278(e), "creating a catalogue raisonné," *id.* ¶ 278(f), or "causing" two of the New York LLCs to operate the website at robertindiana.com. *Id.* ¶ 278(g). Donating artworks to museums and galleries for exhibition, creating a catalog raisonné, and operating a website under the artist's name were not inherently inconsistent with Salama-Caro's duties as Indiana's "agent in the art market," including his duty to "preserv[e] Indiana's legacy and market." FAC ¶ 58. Nor is it inherently violative of an agent's fiduciary duty to "burnish his reputation" along with that of the artist he represents. Moreover, Indiana gave Salama-Caro express authority to prepare the catalogue raisonné in 2006. Catalogue Raisonné Ag. at 1. The allegation that Salama-Caro undertook that task for an improper purpose – "authenticating and legitimizing the works" he acquired from MAF and sold to third parties for personal profit, Counterclaims ¶ 278(f) – does not save the claim where there is no allegation that the works were not "authentic" or "legitimate," and where, in any event, there is no indication in the pleadings that the catalogue raisonné came to fruition prior to the artist's death or caused any actual harm to Indiana or the Estate. Similarly,

nothing in the Counterclaims suggests that the contents of the website run counter to Indiana's best interests or that the artist has been damaged thereby.[21]

Plaintiffs' motion to dismiss the Second Counterclaim will therefore be denied as to the allegations that Salama-Caro engaged in self-dealing by acquiring Robert Indiana artworks from MAF at no cost or at below-market prices and thereby diverting profits from Indiana to himself, and otherwise granted.

### 3. Third and Fourth Counterclaims – Aiding and Abetting, Equitable Accounting

The Third and Fourth Counterclaims are derivative of the Second Counterclaim. The Third seeks to impose liability on MAF and the New York LLCs for aiding and abetting Salama-Caro's breach of fiduciary duty. Counterclaims ¶¶ 284-92. The Fourth demands an equitable accounting from MAF and Salama-Caro. *Id.* ¶¶ 293-96.

"[U]nder New York law, the elements "of a claim for aiding and abetting a breach of fiduciary duty are: (1) 'a breach by a fiduciary of obligations to another,' (2) 'that the defendant knowingly induced or participated in the breach,' and (3) 'that plaintiff suffered damage as a result of the breach.'" *In re Platinum-Beechwood Litig.*, 400 F. Supp. 3d 2, 5 (S.D.N.Y. 2019) (quoting *In re Sharp Int'l Corp.*, 403 F.3d 43, 49 (2d Cir. 2005)).

Plaintiffs' only challenge to the Estate's aiding and abetting claim is that it fails to allege "an underlying breach of fiduciary duty by Simon Salama-Caro." Pl. Mem. at 27. As explained above, the Estate has plausibly alleged the existence and breach of a fiduciary duty between Salama-Caro and Indiana, as well as resulting damages, at least to the extent that the claim is based

---

[21] To the extent the Estate alleges that either the catalogue raisonné or the website furthered Salama-Caro's alleged scheme to resell works he had purchased from MAF and retain the profits, the resulting damages would appear to be entirely duplicative of the Estate's damages arising directly from those underlying purchases and resales.

on the self-dealing allegations discussed above. The Estate's Third Counterclaim will survive plaintiffs' motion to dismiss to the same extent.

Plaintiffs challenge the Fourth Counterclaim on the additional ground that the Estate "does not demonstrate that it has no 'adequate remedy at law' – a required element of the claim under New York law." Pl. Mem. at 27 (citing *Soley v. Wasserman*, 639 F. App'x 670, 674 (2d Cir. 2016)). As the Estate notes, however, recent cases in New York hold that a fiduciary relationship creates "an absolute right to an accounting notwithstanding the existence of an adequate remedy at law." Estate Mem. at 25 (quoting *Webster v. Forest Hills Care Ctr.*, *LLC*, 164 A.D.3d 1499, 1501, 84 N.Y.S.3d 501, 503 (2d Dep't 2018)). *See also Mullin v. WL Ross & Co. LLC*, 173 A.D.3d 520, 522, 105 N.Y.S.3d 382, 384 (1st Dep't 2019) ("[T]he mere existence of a fiduciary relationship otherwise gives rise to a claim for an accounting. This right, as distinguished from a claim for an accounting in which there is no fiduciary relationship, does not require a showing that there is no adequate remedy at law. It is automatic and springs from the fiduciary relationship itself.") (citations omitted).

In either event, it is not obvious to the Court that the Estate has an adequate remedy at law "with respect to all money and property transferred to or from [MAF], Salama-Caro," or the New York LLCs, "in connection with all their purchases, sales or transfers of works produced pursuant to the Agreements," Counterclaims ¶ 296, since its breach of fiduciary duty claim runs only against Salama-Caro. Therefore, the Fourth Counterclaim will also survive the motion to dismiss to the extent it is based on the Estate's self-dealing allegations summarized in ¶¶ 278(c) and (d).

## III.   CONCLUSION

For the reasons set forth above, plaintiffs' motion (Dkt. No. 54) to dismiss the Estate's Counterclaims is GRANTED IN PART and DENIED IN PART. The First Counterclaim is

DISMISSED WITH PREJUDICE to the extent it is predicated on the Estate's allegations that the April 1999 Agreement and the Sculpture Agreement terminated automatically at Indiana's death. The Second, Third, and Fourth Counterclaims are DISMISSED to the extent they arise from the Estate's allegations that Salama-Caro breached a fiduciary duty to Indiana in connection with negotiation and execution of the April 1999 Agreement and the Sculpture Agreement, the donation or loan of Indiana artworks to museums or galleries for reputational purposes, the preparation of a catalogue raisonné of Indiana's art, or the operation of the robertindiana.com website. In all other respects the motion is DENIED.

Dated: New York, New York
      January 28, 2020                           **SO ORDERED.**

_____
**BARBARA MOSES**
**United States Magistrate Judge**