**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MORGAN ART FOUNDATION LTD., SIMON SALAMA-CARO, SHEARBROOK (US), LLC, FIGURE 5 ART LLC, AND RI CATALOGUE RAISONNÉ LLC, <br>                         Plaintiffs, <br>     -against- <br> JAMES W. BRANNAN as Personal Representative of the Estate of Robert Indiana, <br>                         Defendant. | **Case No.  1:18-cv-08231-AT-BCM** <br><br> [Related Case No. <br>     1:18-cv-04438-AT-BCM] |
| JAMES W. BRANNAN as Personal Representative of the Estate of Robert Indiana, <br>                     Counter-Claimant, <br>     -against- <br> MORGAN ART FOUNDATION LTD., FIGURE 5 ART LLC, SHEARBROOK (US), LLC, RI CATALOGUE RAISONNÉ LLC, and SIMON SALAMA-CARO, <br>                     Counterclaim Defendants. | **MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR SANCTIONS** |

<br><br>

**VENABLE LLP**
1270 Avenue of the Americas
New York NY 10012
Tel: 212.307.5500

## TABLE OF CONTENTS

**TABLE OF AUTHORITIES** ............................................................................................ ii

**PRELIMINARY STATEMENT** ..................................................................................... 1

**STATEMENT OF THE FACTS** ..................................................................................... 5

        Indiana's Dispute with Morgan Art .............................................................. 6

        Brannan's Appointment as Personal Representative .................................. 6

        The Estate's Review of Indiana's Files ........................................................ 8

        Indiana's Email Practices ............................................................................. 10

**ARGUMENT** ................................................................................................................ 11

    I.      THE RULE 37(E) ANALYSIS ................................................................ 11

    II.     THERE IS NO EVIDENCE THAT ANY ESI WAS DESTROYED
            DURING A PERIOD OF TIME WHEN IT SHOULD HAVE BEEN
            PRESERVED .......................................................................................... 12

           A.    The Uncontroverted Facts Establish That There
                 Was No Relevant ESI in Indiana's Email Account When
                 Preservation Obligations Arose. .................................................... 13

           B.    The MAF Parties' Interpretations of the FTI Report are
                 Unfounded ....................................................................................... 14

    III.    THE ESTATE TOOK REASONABLE STEPS TO PRESERVE ESI. .... 15

    IV.   THE MAF PARTIES HAVE SHOWN NO PREJUDICE; NO
            REMEDIAL MEASURES OR SANCTIONS ARE APPROPRIATE ...... 19

    V.     THE MAF PARTIES HAVE NOT PROVEN BY CLEAR
            AND CONVINCING EVIDENCE THAT THE ESTATE
            HAS ACTED WITH THE INTENT TO DEPRIVE THEM
            OF INFORMATION. ............................................................................... 21

    VI.   AN EVIDENTIARY HEARING IS NOT NECESSARY TO
            DECIDE THIS MOTION, AND THE ESTATE SHOULD
            BE AWARDED REASONABLE ATTORNEYS' FEES AND
            EXPENSES ............................................................................................ 22

**CONCLUSION** ............................................................................................................ 24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Huebner v. Midland Credit Mgmt., Inc.*,
   897 F.3d 42 (2d Cir. 2018)..................................................................................23

*Karsch v. Blink Health Ltd.*,
   1:17-cv-3880-VM-BCM, 2019 WL 2708125 (S.D.N.Y. Jun. 20, 2019)..............11, 12, 21, 22

*Leidig v. Buzzfeed, Inc.*,
   No. 16-cv-0542-VMG-WG, 2017 WL 6512353 (S.D.N.Y. Dec. 19, 2017) ..........................15

*Moody v. CSX Transportation, Inc.*,
   271 F. Supp. 3d 410 (W.D.N.Y. 2017) ..................................................................21

*Ottoson v. SMBC Leasing & Fin.*,
   268 F. Supp. 3d 570 (S.D.N.Y. 2017).....................................................................21

*Roanseier v. Mariani*,
   718 F.3d 64 (2d Cir. 2013)...................................................................................23

*Sosa v. Carnival Corp.*,
   No. 18-20957-CIV, 2018 WL 6335178 (S.D. Fla. Dec. 4, 2018)...........................................15

*Ungar v. City of New York*,
   329 F.R.D. 8 (E.D.N.Y. 2018) ...............................................................................22

**Statutes**

28 U.S.C. § 1927.................................................................................................23

**Rules**

Federal Rule of Civil Procedure 37(e) .......................................................2, 11, 15, 21

James W. Brannan, as Personal Representative of the Estate of Robert Indiana (the "Estate"), respectfully submits this memorandum of law in opposition to the motion for sanctions filed January 29, 2020 (the "Motion") by Morgan Art Foundation Limited ("Morgan Art"), Simon Salama-Caro, Shearbrook (US), LLC, Figure 5 Art LLC, and RI Catalogue Raisonne LLC (together, the "MAF Parties").

## PRELIMINARY STATEMENT

On this Motion, the MAF Parties seek the harshest form of sanctions available, based on nothing but recklessly false accusations of spoliation and an inconclusive forensic report.

The Motion is built upon on speculative assertions that (a) Robert Indiana sent emails relevant to issues in this case, (b) those messages existed in his email account at the time a preservation obligation arose in connection with this lawsuit, and (c) those messages were deleted during the litigation hold period.  All of these assertions are false, as demonstrated by the declarations submitted under penalty of perjury that accompany this opposition.  By their own choice, the MAF Parties filed this Motion without first conducting a basic factual investigation into Indiana's email practices.  The MAF Parties did not bother to take a single deposition of a person with knowledge of those practices before filing the Motion, even though this Court specifically gave them the opportunity to do so.  The MAF Parties apparently did not even conduct a meaningful review of their own document production.

Had the MAF Parties investigated relevant facts before filing the Motion, they would have learned that no spoliation occurred.  As Indiana's longtime personal assistant and archivist Melissa Hamilton attests, Indiana never personally used his email account.  Instead, Hamilton and Indiana's other personal assistants managed his email account for him.  For decades, Indiana's assistants printed his emails, read them to him, kept paper copies of the important ones,

1

*and then routinely deleted all of the messages in his email account*.  Indiana certainly never sent emails himself, and he rarely asked his assistants to send emails for him.  Thus, by February 28, 2018—the date by which the MAF Parties assert a litigation hold should have been in place— any relevant emails in Indiana's account had already been contemporaneously deleted.

These facts demonstrate that the MAF Parties' self-serving interpretation of the FTI Report is baseless.  FTI determined that certain emails found in Jamie Thomas's email account did not also exist in Robert Indiana's email account.  But FTI was not able to establish when any those emails were deleted, or by whom—and as it turns out, those deletions occurred before any preservation obligations were in place.  Nothing in the FTI Report suggests that a single document relevant to this litigation was destroyed at a time when it should have been preserved.

Moreover, Indiana's emails were deleted from the online account, but were not "lost" within the meaning or Rule 37(e).  As Hamilton attests, paper copies of important emails were routinely kept.  Those paper copies have been painstakingly collected and preserved by the Estate, reviewed for responsiveness, and produced, subject to appropriate relevance and privilege objections.  The Estate is not aware of a single piece of evidence that has been lost, let alone intentionally spoliated.  The MAF Parties have fallen well short of their threshold burden under Rule 37(e) to show that electronic records that should have been preserved were lost and cannot be replaced through other discovery.

While the Court need not examine the remaining Rule 37(e) elements, they also weigh heavily against granting the Motion.  First, the Estate has taken careful steps to protect and preserve Indiana's property and records.  These efforts are documented in declarations from Brannan, Brannan's paralegal Adelina Garay, and the Estate's former counsel in this litigation, Dennis Tracey.  Similarly, Indiana's former power of attorney Jamie Thomas and his wife,

Yvonne Thomas, have submitted declarations describing the steps they took to preserve Indiana's documents and turn them over to Brannan after Indiana died. These efforts were reasonable under the circumstances and sufficient to preserve then-existing documents.

Second, the MAF Parties have no evidence of prejudice. The MAF Parties' speculation that Robert Indiana "may" have sent emails concerning his business dealings with Morgan Art and Simon Salama-Caro is not credible. As Hamilton attests, Indiana never sent emails, and rarely asked his assistants to send emails on his behalf. Indeed, the Motion does not put before the Court a single email that the MAF Parties ever received from Indiana's email account. Certainly, if the MAF Parties had received emails of significance from Indiana over the years, those would appear in the MAF Parties' document productions. To date, the MAF Parties have produced more than 58,000 pages of documents, among which the Estate has found only one email from Indiana's account—and the MAF parties assert that the author of that email was Thomas. There is no evidence that Indiana ever sent emails about his business dealings with Morgan Art or the Salama-Caros; but if he had done so, and the email was of any significance, it would routinely have been kept by Indiana's staff and would have been among the paper documents collected, reviewed, and produced by the Estate.

Third, the extreme remedies requested in the Motion—adverse inferences, dismissal of claims, and default judgment—are reserved for rare cases where the movant establishes, by clear and convincing evidence, the willful destruction of evidence by the party being sanctioned, with the clear intent to deprive the movant of the use of that evidence in the litigation. Nothing remotely like that has happened here.

In addition, the Court should deny the MAF Parties' request for a factual hearing. When the Court granted the MAF Parties' request to file a discovery sanctions motion, the Court

3

ordered that the motion should be "supported by properly authenticated evidence."  The Court also gave the MAF Parties the option to file the motion by January 29, 2020, or to wait until the completion of all fact discovery, including depositions.  The Court's order then stated: "The MAF Parties are advised that if they choose to file their motion now, the Court does not intend to delay briefing or decision on that motion to accommodate discovery, nor to permit the MAF Parties to renew or supplement their motion at a later date."  The MAF Parties elected to pursue their Motion based entirely on the FTI Report, without first taking any testimony and without submitting any supporting witness declarations.  As a result, the factual record the MAF Parties have created to support their Motion is woefully inadequate.  The MAF Parties' request to examine Brannan, Thomas, Tracey, and others at a factual hearing is, on its face, a fishing expedition designed to supplement the Motion in contravention of this Court's order.  A factual hearing would only waste more of the Court's time and the Estate's resources on this baseless Motion.  The MAF Parties chose to proceed on the basis of the trifling amount of evidence they have placed in the record, and they should be bound by that decision.

Finally, the MAF Parties should face consequences for filing this Motion without first taking basic foundational discovery.  Given the severity of the sanctions requested, the Estate has been forced to expend substantial time and resources to oppose this Motion.  The Court should exercise its discretion to award the Estate its reasonable attorneys' fees incurred in connection with mounting this opposition to the MAF Parties' baseless Motion, and require the MAF Parties to pay the full cost of the FTI engagement.

## STATEMENT OF THE FACTS

Robert Indiana was a famous American artist who lived the majority of his life on the island of Vinalhaven, Maine, roughly 15 miles off the coast of Maine.  Vinalhaven is a community of about 1,000 people and is primarily accessible by a 75-minute ferry ride from Rockland, Maine.  Brannan Decl. ¶ 4[1].  On Vinalhaven, Indiana lived in a historic building known as the "Star of Hope"; that formerly housed a fraternal organization called the Independent Order of Odd Fellows.  *Id.*  On May 19, 2018, Indiana died at home in the Star of Hope, at the age of 89.  *Id.* ¶ 3.  On May 25, 2018, James Brannan was appointed as Personal Representative of Robert Indiana's estate (the "Estate").  *Id.*

Brannan is an attorney.  *Id.* ¶ 1.  He first met Indiana in 1979.  *Id.* ¶ 4.  Indiana had engaged Brannan from time to time on various legal matters.  *Id.* ¶ 5.  In 2016, Indiana asked Brannan to counsel him regarding estate planning matters, including the preparation of his Last Will and Testament (the "Will").  *Id.* ¶ 7.  Indiana also asked Brannan to prepare documents to appoint Vinalhaven resident Jamie Thomas as Indiana's Power of Attorney.  *Id.*  Indiana executed the Will and Power of Attorney documents on May 7, 2016.  *Id.* ¶ 9.  Thomas served as Indiana's power of attorney until Indiana's death two years later.  *Id.* ¶ 10.

---

[1] As used in this brief, "Brannan Decl." refers to the accompanying Declaration of James W. Brannan dated February 28, 2020; "Garay Decl." refers to the accompanying Declaration of Adelina Garay dated March 2, 2020; "Hamilton Decl." refers to the accompanying Declaration of Melissa Hamilton dated February 28, 2020; "Tracey Decl." refers to the accompanying Declaration of Dennis Tracey dated March 3, 2020; and "Vazquez Decl." refers to the accompanying Declaration of John C. Vazquez dated March 4, 2020.  In addition, "J. Thomas Decl." refers to the Declaration of Jamie Thomas dated March 4, 2020 (Dkt 4438, ECF No. 229), and "Y. Thomas Decl." refers to the Declaration of Yvonne Thomas dated March 4, 2020 (Dkt 4438, ECF No. 230).  "Robinson Decl." refers to the Declaration of Webster Robinson, dated May 30, 2018, attached as Exhibit 4 to the Declaration of Luke Nikas in Support of Plaintiffs' Motion, dated January 29, 2020 (Dkt. 4438, ECF No. 214-4).

**A.  Indiana's Dispute with Morgan Art**

Following his appointment as Indiana's power of attorney, Thomas undertook to investigate and pursue Indiana's concerns that Morgan Art owed him significant sums of money from Morgan Art's sale of certain works of art.  J. Thomas Decl. ¶ 18.

On or around February 28, 2018, Thomas's attorney, John Frumer, sent a cease-and-desist letter to Morgan Art, Simon Salama-Caro, Shearbrook (US) LLC, and others.  *Id*. ¶ 20.  The letter stated, among other things, that Morgan Art and the others had breached their agreements with Indiana, and that they should all cease and desist from acting as purported representatives of Indiana.  Recognizing that litigation with these entities was reasonably likely, Frumer instructed Thomas to preserve all documents that might be relevant to that dispute.  *Id*. ¶ 21.  Frumer also sent a "litigation hold" email to Brannan, which stated that Thomas had been advised that it was "imperative that he continues to save, and not destroy, all of Bob's documents, files, letters, etc., whether originals, copies, hardcopy or electronic (computer or otherwise)" and further adding that "certain of Bob's documents may be at [Brannan's] office" and that the "'litigation hold' applie[d] to such documents as well …."  Brannan Decl. Ex. A.

On May 18, 2018, Morgan Art filed this lawsuit against Indiana, Thomas, Michael McKenzie, and American Image Art.  The very next day, Robert Indiana died.  *Id.* ¶ 3.

**B.  Brannan's Appointment as Personal Representative**

On May 24, 2018, Brannan filed papers with the Probate Court in Knox County, Maine, seeking appointment as the Personal Representative of Indiana's Estate, pursuant to the terms of Indiana's Will.  *Id.*  The Probate Court confirmed Brannan's appointment the next day.  *Id.*  Even before his appointment was formally approved, Brannan began communicating with Thomas (as the former Power of Attorney) and taking other steps to secure Indiana's valuable artwork, his historic home, and his records and other papers.  *Id.* ¶ 13.

Brannan knew from prior visits that Indiana kept artwork worth many millions of dollars at the Star of Hope, as well as at another property called the "Schoolhouse."  *Id.* ¶ 14.  Brannan also knew that the Star of Hope contained extensive paper files, archives, and loose papers belonging to Indiana; and that the Star of Hope was old building in need of substantial repairs, and without property insurance or sprinklers.  *Id.*  Brannan also knew that there had been water leaks and other problems at the Star of Hope.  *Id.*

Brannan arranged to travel to Vinalhaven to visit the Star of Hope on May 26, 2018.  *Id.* ¶ 17.  Before this visit, Brannan asked Thomas to provide him with a list of any information he would need to access or secure Indiana's property, such as bank and utility account access information.  *Id.*  Brannan also requested that Thomas give him any important documents related to Thomas's service as Indiana's Power of Attorney.  *Id.*  Brannan also engaged Bruce Gamage, an appraiser; Peter Whitney of Whitney Art Works, a fine art transportation and storage service; and Kevin Lipson, an attorney then with Hogan Lovells LLP and now with Venable LLP.  *Id.* ¶ 18. All three accompanied Brannan on his May 26 trip to Vinalhaven.  *Id.*

May 26, 2018 was the first time Brannan had been inside the Star of Hope since Indiana executed his Will.  *Id.*  Brannan had understood from Thomas that the Star of Hope needed repair work, and he now saw with his own eyes that the house was in a state of disrepair and disorder.  *Id.* ¶¶ 19.  A hole in the roof had caused extensive water damage, mold, and mildew in portions of the house.  *Id*.  Water had damaged some of Indiana's effects, including some of his papers, artwork, and personal library.  *Id.*  Throughout the house, there were piles of papers that needed to be protected and sorted.  *Id.*  It was apparent to Brannan that maintaining the physical security of Indiana's home and property should be his top priority.  *Id.* ¶ 20.

During 2017, Thomas had arranged to have the Pinkerton Agency provide 24-hour security at the Star of Hope.  *Id.* ¶ 16.  Brannan continued this security arrangement, and extended it to include the Schoolhouse.  *Id.*; Tracey Decl. ¶ 7.  He also changed the locks. Brannan Decl. ¶ 6.  Brannan then arranged for the valuable contents of the Star of Hope— including thousands of pages of records that might be relevant to the litigation—to be placed in a secure, dry storage facility.  *Id*. ¶ 23.

The months-long cleanup and preservation of the contents of the Star of Hope was overseen by Gamage and Whitney.  *Id.*  Brannan informed them of the ongoing litigation and the need to preserve, and bring to Brannan's attention, any information they located pertaining to the parties in the litigation.  *Id.*  The Estate's counsel at Hogan Lovells arranged for a forensic document collection service to physically collect and copy the hard copy documents, and to maintain a chain of custody for those records throughout the collection process.  Tracey Decl. ¶ 8.  Hogan Lovells also retained an e-discovery vendor to image Indiana's computer and maintain the electronic and hard copy documents on an e-discovery platform, and also confirmed that Thomas was preserving all electronic documents.  *Id*. ¶¶ 8,14. Based on these and other efforts, the Estate's counsel believed that all electronic data belonging to Indiana was being preserved and was secure.  *Id*. ¶ 15.

In July 2018, Brannan hired Adelina Garay as a paralegal to assist him in the administration of the Estate.  Brannan Decl. ¶ 25.  One of Garay's first tasks was to review and evaluate Indiana's paper records.  *Id.*  A primary goal of this effort was to gather information that might be relevant to this litigation.  Garay Decl. ¶ 6.

### C.  The Estate's Review of Indiana's Files

Garay did not know Indiana, and was not familiar with any of the parties to the lawsuit filed against him.  *Id.* ¶ 4. The Star of Hope contained thousands of unorganized pieces of paper

that Garay undertook to review.  *Id.* ¶ 7.  During this review she saw printouts of hundreds of emails sent to the email address robertoddfellow@aol.com, spanning from around 2003 to 2016. *Id.* ¶ 8.  Garay noticed that there were very few printouts of replies or responses.  *Id.*  Without knowing anything about Indiana's email practices at that time, Garay theorized that the printed emails she was reviewing might not include all the emails that had gone through the account.  *Id.* During the week of August 20, 2018, Garay tried to access the robertoddfellow@aol.com email account, but she could not locate the password in the information that had been provided by Thomas and Frumer.  *Id.* ¶ 9.

During this same time frame, Dennis Tracey of Hogan Lovells was communicating with Frumer about the turnover to the Estate of documents and information—particularly electronic documents—in Thomas's custody.  Tracey Decl. ¶¶ 9-12.  Frumer stated that Thomas had one laptop that he used both for his personal business and for Indiana's business during his tenure as power of attorney.  *Id.* ¶ 13.  Frumer asserted that these commingled records would need to be reviewed to determine which records belonged now to the Estate, and that the Estate was responsible to pay for attorney time and costs associated with this review.  *Id.*  Throughout these discussions, Tracey repeatedly asked for—and received—Frumer's oral and written assurances that documents were being preserved in the interim.  *Id.* ¶ 14.

Garay informed Tracey on August 28, 2018 that the Estate did not have the password to the robertoddfellow AOL account, and asked Tracey to obtain it from Frumer.  *Id.* ¶ 16.  Frumer provided the password to Tracey on August 29, 2018.  *Id.* ¶ 18. Garay signed in to the account on August 30, 2018, and found approximately 400 emails in the inbox, almost all of which were spam.  *Id.* ¶ 19; Garay Decl. ¶ 10.  Garay reported this to Tracey, who in turn informed Frumer that that the password to the AOL account he had provided was correct, but that when the Estate

accessed the account it appeared that virtually all of the contents had been deleted.  Tracey Decl.

¶ 19.  Frumer replied on August 30, 2018 that Thomas had not deleted anything from the AOL

Account.  *Id.* ¶ 21.

### D.  Indiana's Email Practices

The reason that Garay did not see emails in the AOL account in 2018 is that they were

contemporaneously deleted.  The Estate has learned from Melissa Hamilton, Indiana's longtime

archivist and personal assistant, that Indiana never personally used email, and likely did not even

know how to send an email himself.  Hamilton Decl. ¶¶ 7, 18.  Instead, Indiana relied on

Hamilton and other personal assistants of his to print his emails and read them to him.  *Id.* ¶ 13.

The emails were then deleted from the account on a regular basis, as a means of keeping track of

which emails Indiana had seen.  *Id.* ¶ 16.  If there was a reason to maintain a record of the email,

the paper copy was kept, not the electronic message.  *Id.*  Hamilton and another assistant,

Webster Robinson, were primarily responsible for managing Indiana's email, but there were

several others who were often at the Star of Hope and had access to the email account.  *Id.* ¶ 11.

Indiana did not send his own emails, and rarely directed anyone else to send one for him.

*Id.* ¶ 18. In those rare instances, the assistants were directed to reply to incoming emails, mostly

from people who were asking to visit him.  *Id.* ¶ 19.

The practice of routine deletion of Indiana's emails continued until at least 2016 when

Hamilton left Indiana's employ, and likely much longer, as Robinson remained in Indiana's

employ until early February 2018—just weeks before the MAF Parties allege a preservation

obligation arose in connection with this case.  *See* Robinson Decl. ¶ 17.[2]  Hamilton attests that,

---

[2] Contemporaneous emails sent by Thomas confirm that Robinson was continuing to delete
emails from Indiana's email account.  *See* J. Thomas Decl. ¶ 17, 19, and Exs. E & F.

by the time she left Indiana's employ, she saw a significant decline in the number of substantive emails sent to Indiana's AOL account.  *Id.* at 17.

Thus, by the time any obligation to preserve documents arose in anticipation of this litigation, the electronic copies of any relevant documents had already been deleted, and Indiana's paper copies were the only records of those communications in the Estate's possession, custody or control.

## **ARGUMENT**

## I.       **THE RULE 37(E) ANALYSIS**

A motion seeking sanctions for the alleged failure to preserve email or electronically stored information ("ESI") is governed by Federal Rule of Civil Procedure 37(e).  *Karsch v. Blink Health Ltd.*, 1:17-cv-3880-VM-BCM, 2019 WL 2708125 at *13 (S.D.N.Y. Jun. 20, 2019).  Rule 37(e) provides that if ESI that a party had an obligation to preserve has been lost "because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced through additional discovery," the court:

> (1) upon finding prejudice to another party from loss of the information, may order measures no greater than necessary to cure the prejudice; or
> (2) only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation may:
>> (A) presume that the lost information was unfavorable to the party;
>> (B) instruct the jury that it may or must presume the information was unfavorable to the party; or
>> (C) dismiss the action or enter a default judgment.

Fed. R. Civ. P. 37(e).  Rule 37(e) requires a three-step inquiry.  The first step is to "decide if the rule applies at all—that is, if a party failed to take 'reasonable steps' to preserve electronically stored information that should have been preserved in the anticipation or conduct of litigation." *Karsch*, 2019 WL 2708125 at *13 (quoting *Coan v. Dunne*, 2019 WL 1620412, at *6 (D. Conn. Apr. 16, 2019)).  To satisfy this step, the movant must first demonstrate that the other party "had

an obligation to preserve the evidence at the time it was destroyed." *Id.* at *18. "The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigations." *Id.* (citation omitted). Thus, there is no obligation to preserve ESI before a litigation has commenced or is reasonably anticipated. *Id.* "Once the obligation to preserve relevant ESI attaches, the party in possession of that ESI must [then] take 'reasonable steps' to preserve it." *Id.* at *19 (citing Fed. R. Civ. P. 37(e)).

Only if the Court first finds that the preservation obligation had attached to certain ESI, and that reasonable steps were not taken to preserve it, does the Court then proceed with the second step of the analysis. *Id.* at *13 (citing *Coan*, 2019 WL 1620412, at *6). The second step is to "decide if there has been prejudice to another party from loss of the information, in which case the Court may order measures no greater than necessary to cure the prejudice." *Id.* (quotations omitted). If that step is satisfied, the third step is to consider whether the party against whom sanctions are sought "acted with the intent to deprive another party of the information's use in the litigation," in which case harsher sanctions may be imposed. *Id.* (quotations omitted).

## II.      THERE IS NO EVIDENCE THAT ANY ESI WAS DESTROYED DURING A PERIOD OF TIME WHEN IT SHOULD HAVE BEEN PRESERVED.

The Rule 37(e) inquiry starts with an examination of whether the ESI at issue in the spoliation motion existed at the time preservation obligations arose. *Id.* at *18. Here, the uncontroverted evidence shows that the hypothetical ESI the MAF Parties speculate should have been found in Indiana's email account either never existed, or was deleted in the ordinary course long before this litigation was anticipated.

### A. The Uncontroverted Facts Establish That There Was No Relevant ESI in Indiana's Email Account When Preservation Obligations Arose.

The MAF Parties contend that an obligation to preserve ESI arose on or about February 28, 2018, when Thomas and Frumer sent them a cease and desist letter.  Motion at 2.  Critically, the emails in Indiana's account were deleted before that date, pursuant to the routine practices of Indiana's personal assistants.  As Melissa Hamilton attests, Indiana never personally used email, and relied on his personal assistants to manage and operate his email account.  Hamilton Decl. ¶¶ 7–9.  They printed his emails for him, read them to him, kept the paper copies in many instances, and routinely deleted the messages from his email account on a daily basis.  *Id.*  ¶¶ 13, 14, 16.  Indiana never personally sent an email, and rarely directed his assistants to send one for him.  *Id.* ¶ 18.  The few emails he had them send were typically in response to requests to visit him.  *Id.* ¶ 19.  By summer of 2016, Hamilton also observed a significant decrease in the number of substantive emails to Indiana's account.  *Id.* ¶ 17.  Robinson confirms these procedures.  *See* Robinson Decl. ¶ 8.

Thomas also confirms that the practice of routine email deletion continued after Hamilton's time working for Indiana ended.  *See* J. Thomas Decl. ¶ 19.  Thomas attests that Robinson routinely deleted emails to prevent them from "clog[ging] up the system."  *Id.* ¶ 11.  These facts are dispositive of the MAF Parties motion.  No preservation obligation could have attached to emails that were routinely deleted from the AOL account long before document preservation obligations arose in connection with this litigation.

Further, the Motion record shows that the information in Indiana's email account was not lost:  when Indiana died, the Star of Hope was full to overflowing with binders, files, loose piles, and boxes of papers records, which included the emails that had been printed from Indiana's account over the years.  Brannan Decl. ¶¶ 14, 19; Garay Decl. ¶ 7; Hamilton Decl. ¶¶ 13, 14, 16.

The Estate collected, preserved and reviewed all these paper documents and, where appropriate, has produced them in discovery.  Brannan Decl. ¶¶ 23–27; Garay Decl. ¶¶ 5, 6.

### B.  The MAF Parties' Interpretations of the FTI Report Are Unfounded.

The attestations of Hamilton, Robinson and Thomas help to explain the inconclusive findings in the FTI Report.  FTI found that Indiana's email account contained about 1,400 emails that were dated between December 21, 2016 and May 14, 2019 (the date that FTI collected the emails).  FTI Report at 8.  FTI found that certain emails were deleted from Indiana's account after being forwarded to Thomas's email, but could only say that the most recent of those deletions "took place between February 6, 2017 and May 2019 when FTI downloaded the Indiana mailbox."  *Id.*  This is entirely consistent with Hamilton's, Robinson's and Thomas's statements that emails were routinely printed out and showed to Indiana before being deleted.  Thomas also periodically forwarded Indiana's emails to his own email account as a means of preserving them.  The FTI Report contains no evidence that any emails relevant to this litigation were deleted—or even still existed—at a time when there was obligation to preserve them.  Thomas Decl. ¶¶ 13–14.

In their Motion, the Morgan Parties argue that a bar graph from the FTI report proves that Thomas "deleted hundreds, if not thousands, of emails that Indiana received before he died."  Motion, p. 15.  This conclusion is wrong.  What the FTI data actually reflects is the routine deletion of emails in the ordinary course by Robinson, Hamilton, and others—a practice which stopped in February 2018, when Robinson's employment ended, as illustrated below:



## III. THE ESTATE TOOK REASONABLE STEPS TO PRESERVE ESI.

The Rule 37(e) inquiry ends with the uncontroverted evidence that any relevant ESI in Indiana's email account was deleted well before preservation obligations attached. And, in any event, no sanctions should be imposed here because the MAF Parties have not met their burden to show that the Estate failed to take reasonable steps to preserve ESI. *See Sosa v. Carnival Corp.*, No. 18-20957-CIV, 2018 WL 6335178, at *16–17 (S.D. Fla. Dec. 4, 2018).

The MAF Parties take issue with only one aspect of the Estate's considerable document preservation efforts. They argue that the Estate should have acted more quickly to gain access to Indiana's online email account. But Rule 37(e) "does not call for perfection" in preservation efforts, and "recognizes that 'reasonable steps' to preserve suffice." Fed. R. Civ P. 37(e), advisory committee notes. *See also Leidig v. Buzzfeed, Inc.*, No. 16-cv-0542-VMG-WG, 2017 WL 6512353, at *10 (S.D.N.Y. Dec. 19, 2017) (holding that "reasonable steps" is equivalent to a negligence standard) (citing *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 129 (2d Cir. 2017). Here, given the substantial challenges the

Estate faced in collecting, preserving and assessing all of Indiana's property, its actions were more than reasonable.

The Estate acted diligently to preserve potential evidence related to this case, both physical and electronic. As of May 25, 2018, the day Brannan was appointed Personal Representative of the Estate, he knew that the Star of Hope was under 24-hour guard, and he immediately took steps to extend this security to include the Schoolhouse. Brannan Decl. ¶¶ 3, 13, 16. He also arranged for the locks at the Star of Hope and Schoolhouse to be changed. *Id*. ¶ 16. This was a critical first step to ensure the physical security of the documents within those buildings, as well as Indiana's computer at the Star of Hope.

Brannan also knew at that time that Thomas, as Indiana's power of attorney, likely possessed records and electronic information belonging to the Estate, and that Thomas had been counseled by his attorney to preserve information in his possession that might pertain to litigation between Indiana (now the Estate) and Morgan Art or the Salama-Caros. *Id*. ¶¶ 10-12. Brannan had no reason to believe that Thomas was not following that instruction. Moreover, Thomas's attorney repeatedly assured the Estate's counsel "that all records"—including ESI— were "being preserved." *Id.* ¶¶ 13, 14.

The Estate was facing a far greater and more urgent evidence preservation task: collecting, preserving, organizing and reviewing the massive amount of paper stored in boxes, files, binders and loose piles throughout the Star of Hope. *Id.* ¶¶ 20, 23, 24. Unlike electronic documents in an email account, Indiana's paper records—as well as his other assets—were at risk of physical damage and destruction, and had to be attended to immediately. *Id*. ¶¶ 19, 20.

On July 2, 2018, Brannan hired Adelina Garay to organize, review and analyze the thousands of paper records found in Indiana's home. *Id*. ¶ 5. In a short period of time, by late

16

August 2018—and months before any discovery requests were served in this case—Garay had organized and reviewed enough of Indiana's paper printouts of emails to theorize that his account might contain replies to the emails she had seen.  She was unaware that Indiana's practice was not to send emails, and so she sought to look for sent emails in Indiana's AOL account.  *Id.* ¶¶ 9, 10.  Garay asked Tracey to request the AOL password from Thomas.  *Id.*  Tracey made this request to Thomas's attorney on August 28, 2019, the login information was provided on August 29, and Garay accessed the account on August 30.  *Id.* ¶¶ 17, 18. Tracey Decl. Ex. E.

The request for the password was not belated, in fact it came quite early in the process of sifting through Indiana's mountains of personal effects.  In fact, if anyone from the Estate had accessed the AOL account before Garay organized and reviewed the printed emails, they would not have had the context to appreciate that the older emails Garay had seen were not there.  In sum, given the magnitude and difficulty of organizing Indiana's effects, a project that continued until late 2018, the timing of the Estate's initial attempt to gain access to Indiana's AOL account was more than reasonable—particularly because the Estate had already secured the premises and obtained representations from Thomas's counsel that ESI in Thomas's control was being preserved.

Once the Estate gained access to the AOL account on August 28, 2018, and the account did not include "the hundreds of emails that [Garay] had reviewed in paper," Garay Decl. ¶ 10, the Estate's litigation counsel sought to find out what occurred with those emails.  It "appeared that virtually all of the [emails] had been deleted" from the AOL account at some point in time.  Tracey Decl. ¶¶ 16, 19.  The Estate did not know "when any emails had been deleted, why, or by

whom"—and in particular, did not know whether any emails had been deleted at a time when they should have been preserved.  *Id*. ¶ 20.

The natural starting point for this inquiry was Thomas, as he was the last person known to the Estate to have custody of the account.  *Id.* ¶¶ 20, 21.  Tracey immediately communicated with Thomas's counsel, who informed him that Thomas had not deleted any emails.  Id. ¶ 21. The Estate's litigation counsel also took immediate steps to investigate whether AOL might be able to recover any deleted emails.  AOL's polices, available online, state that "if a member deletes any e-mail, that e-mail is automatically deleted after 24 hours from the AOL system."  *Id*. ¶ 25.  As a result, the Estate's counsel determined that AOL would not be able to recover any deleted emails, as more than 24 hours passed.  *Id*.  This understanding was later confirmed by a representative of Oath, the company that operates AOL, who stated: "If a current active use cannot access any given email message, then it doesn't exist on Oath's AOL email servers. Oath does not archive or keep records of deleted AOL emails."  *Id*. Ex. G.

The Estate has no evidence to contradict Thomas' representation that he had not deleted emails from Indiana's account during a time when they should have been preserved.  Instead, as recounted above, factual investigation has revealed that those emails were deleted routinely from Indiana's AOL account by his personal assistants, long before any preservation obligations arose. The Estate has also learned that Indiana preserved his emails and other records in paper rather than electronic form, and those documents have been reviewed for production.

The MAF Parties' arguments that the Estate delayed in informing them about the email account, and engaged in a "cover up" are meritless.  *See* Motion at 16-17.  As detailed in the Brannan, Garay, and Tracey Declarations, the Estate has never had any evidence that any spoliation occurred—not in August 2018 when it gained access to Indiana's email account, and

not at any other time.  At most, the Estate had questions about what had happened to the emails in Indiana's AOL account, which it investigated further.  *See* Tracey Decl. ¶ 29.  There was no legal or ethical obligation to disclose anything to the MAF Parties at this time, and it would have been irresponsible to accuse Thomas—or anyone else—of litigation misconduct without sufficient supporting facts.

The MAF Parties' argument that the Estate should have volunteered that emails were destroyed in response to an instruction in their document requests is meritless.  *See* Motion at 6. The Estate did not know of any specific, responsive document that had been destroyed, let alone when or why it was destroyed.  As a result, there was thus nothing to disclose.

Accordingly, the Estate's preservation efforts were more than reasonable, further requiring that the Motion be denied.

## IV.      THE MAF PARTIES HAVE SHOWN NO PREJUDICE; NO REMEDIAL MEASURES OR SANCTIONS ARE APPROPRIATE.

As Hamilton has explained, Indiana did not send emails as a matter of course, and thus it is extremely unlikely that any would contain his "living knowledge and wishes" concerning matters relevant to this action.  *See* Motion at 1; s*ee also* pp. 12-14, above.  The Hamilton Declaration refutes the MAF Parties' speculative theory that Indiana "may" have sent emails over the years revealing his own understanding of his agreements and business dealings with the MAF Parties.  *See* Hamilton Decl. ¶¶ 7, 8.

The MAF Parties certainly know that, despite what they argue in the Motion, Indiana never sent any emails of consequence to the issues in this case.  The MAF Parties were instructed by this Court to support their Motion with authenticated evidence, *see* Jan. 15, 2020 Order (Dkt. 4438, ECF No. 210), and yet they did not submit a single email from their files that was sent from Indiana's account.  On this factual record, the Motion's suggestion that Indiana was

19

sending emails revealing his personal views on his business dealings with the MAF Parties is absurd.

Moreover, assuming for the moment that Indiana had sent emails to any of the parties in this case on relevant topics, those emails would exist in the receiving parties' records as well. The MAF Parties' own document production is damning evidence that no such emails were ever sent.  Among more than 58,000 pages that the MAF Parties have produced in this action, there is only one email sent from Indiana's account—and the MAF Parties have alleged that this email was authored by Thomas, not Indiana.  First Am. Compl. ¶ 85 (Dkt. 4438, ECF No. 47).

The Motion attaches an email that Salama-Caro sent *to* Indiana in 2001, as an example of the evidence that was supposedly destroyed.  *See* Nikas Decl. Ex. 14.  But again, the MAF Parties are wrong.  That document was among the many hundreds of paper records collected from the Star of Hope, and preserved.  *See* Vazquez Aff. Ex. A.  The Estate did not produce this document because it is not responsive to any of the MAF Parties' requests for production.  *See Id*. Exs. B-E.

The other parties in this action have also substantially completed their document productions.  Michael McKenzie and American Image Art have produced hundreds of emails in discovery in this action, and Thomas has produced more than 4,000.  The Estate has produced 7,300 pages of documents from Indiana's files, including emails and other correspondence received from Morgan Art, members of the Salama-Caro family, and Michael McKenzie.  In total, well more than 100,000 pages of documents have been exchanged in party and non-party discovery in this action.  To the extent that Indiana ever departed from his standard practices and sent an email concerning matters at issue in this case, it would almost certainly appear in one of

these productions.  There is simply no proof that any documents have been lost, nor any

indication of prejudice to the MAF Parties.

**V.      THE MAF PARTIES HAVE NOT PROVEN BY CLEAR AND
         CONVINCING EVIDENCE THAT THE ESTATE HAS ACTED
         WITH THE INTENT TO DEPRIVE THEM OF INFORMATION.**

There is no possibility of sanctions here because the MAF Parties have not satisfied either

of the first two steps of the Rule 37(e) analysis.  In any event, the drastic sanctions they seek may

not be imposed, because there is no evidence that the Estate or Thomas "acted with the intent to

deprive another party of the information's use in the litigation."  Fed. R. Civ. P. 37(e), advisory

committee notes.

The movant must establish that intent by clear and convincing evidence.  *Karsch*, 2019

WL2708125, at *21.  Only then may the Court: "(A) presume that the lost information was

unfavorable to the party; (B) instruct the jury that it may or must presume the information was

unfavorable; or (C) dismiss the action or enter a default judgment."  Fed. R. Civ. P. 37(e)(2).[3]

Here there is not a shred of evidence that the Estate or anyone acting at its direction

deleted any emails at any time.  The MAF Parties' mere assertion that the Estate should have

moved more quickly to gain possession and control of the AOL account does not amount to

intent to destroy documents.

The very cases that the MAF Parties cite confirm that severe sanctions are not available

here.  In *Ottoson v. SMBC Leasing & Fin.,* 268 F. Supp. 3d 570 (S.D.N.Y. 2017), a party deleted

her own email communications with witnesses about statements to be given in the litigation; and

---

[3] This is precisely the drastic relief sought in the Motion.  The Motion seeks entry of default
judgment on all the MAF Parties' claims and the dismissal of all the Estate's counterclaims in
both actions; and, alternatively, imposition of an adverse inference broadly precluding the Estate
from challenging the MAF Parties' assertions about what Indiana knew regarding matters at
issue in these actions.  Motion at 21-22.  None of this relief is available or appropriate here.

in *Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 428 (W.D.N.Y. 2017), a defendant overwrote the data on the "black box" recorder from a train involved in an accident without ensuring that it been preserved, then deleted and recycled the laptop that had been used to extract the data. In contrast, in *Ungar v. City of New York*, 329 F.R.D. 8, 14 (E.D.N.Y. 2018), no intent was found where a party failed to stop the automatic deletion of a security camera video; and in *Karsch*, 2019 WL 2708125, at *21, this Court found the defendants had *not* met their burden to prove intent where the plaintiff took down and replaced its email server within a month of threatening suit, and its counsel lost an important witness's cellphone and two computers (and made several false representations to the court about that). The MAF Parties come nowhere close to establishing intent here.

## VI. AN EVIDENTIARY HEARING IS NOT NECESSARY TO DECIDE THIS MOTION, AND THE ESTATE SHOULD BE AWARDED REASONABLE ATTORNEYS' FEES AND EXPENSES.

The MAF Parties and their counsel proceeded in bad faith by filing this Motion before conducting any investigation to determine what Robert Indiana's email practices were. Had they done so, they would have learned, among other things, that Indiana never sent emails, and that emails were routinely deleted from his AOL account by his assistants well before any preservation obligation arose in this action. *See, e.g.,* Hamilton Decl. ¶¶ 7, 13-16; J. Thomas Decl. ¶¶ 10, 11, 17, 19. They also would have learned that most of those emails were kept in paper form, Hamilton Decl. ¶¶ 14-15, and were reviewed for production in this action. And, as the MAF Parties know from their own experience with Indiana, he did not send or reply to emails, and only rarely asked his assistants to do so on his behalf. *See, e.g., id.* ¶¶ 5-8

The MAF Parties' decision to file this motion now is particularly unreasonable because the Court gave them the opportunity to complete fact discovery before filing any motion. *See* Jan. 15, 2020 Order (Dkt. 4438, ECF No. 210). Instead, the MAF Parties filed this motion

prematurely, with a deliberate indifference to the facts.

The request for a factual hearing is improper and should be denied.  Not only did the Court give the MAF Parties the opportunity to complete fact discovery before filing this Motion, the Court also instructed them to submit their supporting factual evidence in properly authenticated form with the Motion, and stated that they would not have an opportunity to supplement the Motion later.  *See* Jan. 15, 2020 Order (Dkt. 4438, ECF No. 210).  By requesting a factual hearing to examine Brannan, Thomas, Tracey and others, the MAF Parties are trying to supplement their Motion's inadequate factual record by asking questions of adverse witnesses whom they did not bother to depose first.  This is nothing more than a fishing expedition.  The MAF Parties should be stuck with the scant factual record they submitted with the Motion.

Finally, the MAF Parties and their counsel should be sanctioned for making very serious allegations on this Motion without investigating them first.  The Court has inherent power to sanction parties and counsel for bad-faith motion practice, and statutory power to sanction counsel "who so multiplies the proceedings in any case unreasonably and vexatiously."  28 U.S.C. § 1927; *see also Huebner v. Midland Credit Mgmt., Inc.*, 897 F.3d 42, 55 (2d Cir. 2018) (28 U.S.C. § 1927 "imposes an obligation on attorneys throughout the entire litigation to avoid dilatory tactics, and provides courts with a cudgel to use, in their discretion, 'to deter unnecessary delays in litigation.'"); *Roanseier v. Mariani*, 718 F.3d 64, 68 (2d Cir. 2013).

By filing the Motion before conducting a factual investigation into the spoliation allegations, the MAF Parties have unreasonably taxed the time and resources of the Court, the Estate, and Jamie Thomas.  The Estate should be awarded its reasonable attorneys' fees and costs incurred in opposition to the Motion, and the entire cost of the FTI Report should be borne by the MAF Parties.

## <u>CONCLUSION</u>

The Motion should be denied, without a factual hearing, the Court should award the

Estate its reasonable attorneys' fees incurred to oppose this Motion and order the MAF Parties to

bear the full cost of the FTI Report.

Dated: New York, New York
      March 4, 2020

VENABLE LLP

By:    /s/ Jessie F. Beeber

    Edward P. Boyle
    Jessie F. Beeber
    Kan M. Nawaday
    John C. Vazquez
1270 Avenue of the Americas
New York, New York 10020
Telephone: (212) 307-5500

*Attorneys for James W. Brannan as Personal Representative of the Estate of Robert Indiana*