UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MORGAN ART FOUNDATION LIMITED,<br><br>PLAINTIFF,<br><br>-AGAINST-<br><br>MICHAEL MCKENZIE, AMERICAN IMAGE ART, JAMIE THOMAS, AND JAMES W. BRANNAN AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ROBERT INDIANA,<br><br>DEFENDANTS. | Case No. 1:18-cv-04438-AT-BCM |
| MORGAN ART FOUNDATION LIMITED, SIMON SALAMA-CARO, SHEARBROOK (US), LLC, FIGURE 5 ART LLC, AND RI CATALOGUE RAISONNÉ LLC,<br><br>PLAINTIFFS,<br><br>-AGAINST-<br><br>JAMES W. BRANNAN AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ROBERT INDIANA,<br><br>DEFENDANT. | Case No. 1:18-cv-08231-AT-BCM |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS AGAINST DEFENDANTS JAMIE THOMAS AND JAMES W. BRANNAN AS PERSONAL REPRESENTATIVE OF THE ESTATE OF ROBERT INDIANA**

Dated: March 18, 2020

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Luke Nikas
Maaren A. Shah
Ryan Rakower
51 Madison Avenue, 22nd Floor
New York, NY 10010
Tel: (212) 849-7000
Fax: (212) 849-7100
lukenikas@quinnemanuel.com
maarenshah@quinnemanuel.com
ryanrakower@quinnemanuel.com

*Attorneys for Plaintiffs*

-i-

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ................................................................................................................ ii

ARGUMENT ......................................................................................................................................1

I.   ROBERT INDIANA'S EMAILS WERE DELETED, TO PLAINTIFFS' SEVERE PREJUDICE..............1

II.  THOMAS INTENTIONALLY DELETED INDIANA'S EMAILS........................................................4

III. THE DELETION OCCURRED AFTER THOMAS'S PRESERVATION OBLIGATION AROSE ............6

IV.  THE ESTATE IS CULPABLE FOR THE SPOLIATION AND ENSUING COVER-UP ........................7

V.   SEVERE SANCTIONS AGAINST THOMAS AND THE ESTATE ARE WARRANTED ......................8

CONCLUSION..................................................................................................................................10

# TABLE OF AUTHORITIES

*Page*

**Cases**

*Arista Records LLC v. Usenet.com, Inc.*,
   608 F. Supp. 2d 409 (S.D.N.Y. 2009) .......................................................................................9

*Brown Jordan Int'l, Inc. v. Carmicle*,
   2016 WL 815827 (S.D. Fla. Mar. 2, 2016) ................................................................................9

*CAT3, LLC v. Black Lineage, Inc.*,
   164 F. Supp. 3d 488 (S.D.N.Y. 2016) .......................................................................................6

*DeCastro v. Kavadia*,
   309 F.R.D. 167 (S.D.N.Y. 2015) ..............................................................................................9

*Gutman v. Klein*,
   2008 WL 4682208 (E.D.N.Y. Oct. 15, 2008) ...........................................................................9

*Karsch v. Blink Health Ltd.*,
   2019 WL 2708125 (S.D.N.Y. June 20, 2019) ..........................................................................9

*Moody v. CSX Transportation, Inc.*,
   271 F. Supp. 3d 410 (W.D.N.Y. 2017) .....................................................................................9

*Ottoson v. SMBC Leasing & Fin., Inc.*,
   268 F. Supp. 3d 570 (S.D.N.Y. 2017) .......................................................................................6

*S. New England Tel. Co. v. Glob. NAPs Inc.*,
   624 F.3d 123 (2d Cir. 2010) .....................................................................................................9

*Ungar v. City of New York*,
   329 F.R.D. 8 (E.D.N.Y. 2018) ..................................................................................................9

**Statutory Authorities**

N.Y. Comp. Codes R. & Regs. Tit. 22, § 1200.0 ............................................................................8

**Rules and Regulations**

Fed R. Civ. P. 37(e)(2) ....................................................................................................................9

**ARGUMENT**

**I.   ROBERT INDIANA'S EMAILS WERE DELETED, TO PLAINTIFFS' SEVERE PREJUDICE**

If there is one thing that Plaintiffs, Thomas, and the Estate agree on, it is that nearly all of Robert Indiana's emails were deleted. When the Estate accessed Indiana's inbox at the end of August 2018—more than three months after Brannan became personal representative (Estate Br. (ECF No. 231)[1] 5)—Indiana's inbox contained only "approximately 400 emails, almost all of which were spam" (Garay Decl. (ECF No. 233) ¶ 10). In fact, at that time, Indiana's inbox had only *15 emails* that were not spam, and only *five* sent messages. (*Id.*) Although Thomas relies on the fact that FTI did not find "wiping software or mass deletions *occurring on the system*" (Report (ECF No. 214-11) 8, 23 (emphasis added); Thomas Br. (ECF No. 227) 10), it is indisputable that mass quantities of Indiana's emails were intentionally deleted—manually or otherwise.

The Estate and Thomas each argue that Plaintiffs were nevertheless unharmed by the deletion. (*See* Estate Br. 2; Thomas Br. 12.) This argument does not excuse their spoliation or rescue them from the sanctions that should follow. And, in any event, they are wrong.

*First*, the Estate says no evidence was "lost" because "paper copies of important emails were routinely kept." (Estate Br. 2, 10.) But the limited hard copies produced by the Estate do not cure the prejudice caused by the mass deletion. The Estate admits that it only has hard copy emails *through 2016*. (Estate Br. 9; *see also* Garay Decl. ¶ 8.) Yet FTI found that emails from 2017 through May 2018 were deleted—for which *no* hardcopy exists. (*See* Report 9, 24.) That period is critical to this case, because, among other reasons, it's when Brannan and Thomas formalized their joint scheme to rob Morgan of its rights to *LOVE* and line their own pockets.[2]

---

[1]   "ECF No." refers to docket entries in *Morgan Art Foundation Ltd. v. McKenzie, et al.*, No. 18-cv-4438.
[2]   In mid-2017, Brannan met with Simon and Marc Salama-Caro, and Michael Komanecky of the Farnsworth Museum. Brannan told Simon that he and MAF had done great work for Indiana, that Indiana viewed Simon as a friend, and that Brannan looked forward to working with MAF. (*See* Exh. 1 (contemporaneous notes of meeting).) Brannan's mentality soon changed when he saw the opportunity to profit from Indiana's death. By the end of 2017,

Even for emails created before 2017, the Estate's position that "[i]f there was a reason to maintain a record of the email, the paper copy was kept" (Estate Br. 10) is meaningless. This self-serving conclusion requires accepting the absurd assumptions that *no* reason existed to retain *any* emails from 2017 onward, that the people printing Indiana's emails knew what would be important in this case, and that we can trust that Thomas printed and saved all emails that relate to this matter and demonstrate his misconduct.³ There are also specific reasons to doubt the Estate's assertion that all "important" emails were printed. (Estate Br. 2.) For example, an email produced by Thomas that Indiana received in November 2016, which attached photographs of artworks that infringed MAF's rights (*see* ECF No. 214-13 at 784; *see also* Am. Compl. (ECF No. 47) at 35), was not produced by the Estate. While we can never know the full extent of the deletion, it is clear that "important" emails were deleted without being preserved in hard copy.

*Second*, Thomas tries to downplay FTI's conclusion that, at minimum, 341 emails were deleted from Indiana's account. This "is a non-issue," says Thomas, because those emails still exist in Thomas's Gmail account. (Thomas Br. 11-12.) Thomas's statement is both false and misleading. It is false because FTI uncovered at least 135 emails that were not in Indiana's or Thomas's mailbox as of May 2019, but that existed in some form on Indiana's computer or Thomas's laptop. (*See* Report 9.) Yet most of these emails are not "intact"; instead, they are

---

Brannan and Thomas had reached an agreement to foment litigation and steal and sell the rights to *LOVE*—a conspiracy they alluded to in the minutes of a meeting they conducted for Star of Hope Foundation, which is the sole beneficiary of the Estate and was Brannan's and Thomas's intended vehicle for funneling Indiana's assets to Thomas (through his lifetime appointment as Executive Director) and to Brannan (as the foundation's lawyer and board member). (*See* Exh. 2 (minutes stating, "[i]f there is litigation . . . we may want to be the defendant because we will be selling the Love rights" and "John [Frumer, Thomas's lawyer] has the Morgan letter ready to go and has given a copy to Jim").)

³ Thomas might claim that no such emails exist, because he did not engage in any wrongdoing or put problematic statements in writing. But we know that is false. (*See* Exh. 3 at 1188 (Thomas texting McKenzie about creating a new Indiana work that Indiana had nothing to do with: "I am going to send you a pic of a new idea I just came up with just give me a minute to draw it out. . . . I just sent it in a picture and email."); *see id.* at 1193-94 ("It's not a question about what people want it's what we can do without getting in trouble. . . . John knows what he's doing if it can be done he'll do it[.] Bob has signed the things that does not make it easy to just do whatever we want. . . . Best case scenario we can be done with [MAF].").)

evidenced only by "[f]older metadata details" or "[i]ndividual snippet[s]" "that do not render like emails." (*Id.* 9, 12–13.) Thomas completely destroyed emails that will never be recovered.

Thomas's response is also misleading: FTI was able to determine that deletion occurred only because those emails still existed in Thomas's account (or because an unreadable fragment still existed). But if an email that Thomas did not send or receive was deleted from Indiana's account, FTI could not identify this deletion through its "email analysis," because the email would not exist in Thomas's inbox or Indiana's account. Moreover, if Thomas had sent or received an email that he subsequently deleted from *both* his and Indiana's accounts, then FTI would not have been able to identify the deletion unless a forwarded or replied-to copy of the email still existed in one of the accounts or fragments of the deleted email were still present on Indiana's or Thomas's computers. Thus, in addition to the known deletions, substantially more emails may have been deleted than FTI was able to identify through its analysis.

Further, Thomas did delete a significant number of emails from both accounts. In addition to the email fragments that prove Thomas's permanent deletions, FTI found definitively that at least 35 unique emails were deleted from both Indiana's AOL account and Thomas's Gmail account, which proves that Thomas specifically coordinated deletions between the accounts. (*See* Report 6.) Thomas claims that this, too, is a "non-issue" because "the forwarded or replied to copy of these messages still exists in Thomas' mailbox." (Thomas Br. 13 (quoting Report 7) (emphasis omitted).) Aside from ignoring his unlawful efforts to delete relevant evidence, Thomas again misses the point. The only way FTI could ascertain that these emails were deleted was through the existence of forwarded or replied-to copies. Had the forwarded or replied-to copies been deleted as well, or had the underlying emails not been forwarded or replied to, FTI would not have uncovered the deletion. There could be hundreds or thousands more deleted emails.

In short, FTI conclusively found that hundreds of Indiana's emails were deleted, that some

-3-

emails were permanently deleted, and that the *same emails* were deleted from *both* Indiana's and Thomas's accounts on several occasions. The full extent of the deletion is unknowable, but the evidence indicates it was massive. And contrary to the Estate's and Thomas's arguments, their production of certain Indiana emails that were not deleted from Thomas's account and limited hard copies of emails created before 2016 does not come close to remedying the damage done.

## II. THOMAS INTENTIONALLY DELETED INDIANA'S EMAILS

The Estate admits the "natural starting point for th[e] inquiry" into who deleted the emails is Thomas. (Estate Br. 18.) Thomas is the natural ending point for the inquiry as well.

*First*, FTI found at least 35 unique emails that were deleted from *both* Indiana's email account *and* Thomas's email account. (*See* Report 6.) If someone other than Thomas deleted these emails from Indiana's account, it would mean that Thomas *by pure coincidence* deleted the *same 35 emails* from his own account. The chances of that are nonexistent. Thomas deleted the emails from both accounts, and the coordination required to delete the same emails from each of the accounts makes clear that the deletion was intentional.[4]

*Second*, Thomas admits that he accessed Indiana's AOL account from his personal laptop on numerous occasions, including after Indiana died. (*See* Report 15-16; Thomas Br. 18; *see also* ECF No. 145 at 3.) Thomas offers no explanation for doing so.

*Third*, Thomas has shown that he's willing to delete evidence and lie about it under oath. In a sworn declaration dated February 26, 2019, Thomas stated unequivocally that "I have not deleted any documents related to Robert Indiana." (ECF No. 145-8 ¶ 8.) FTI found smoking-gun evidence that this statement is false: several email fragments show permanent deletion, Indiana's

---

[4] Thomas says that if he were "on some crusade to delete emails, then it stands to reason that he would have deleted the" replied to copies of these 35 emails that still existed in his mailbox. (Thomas Br. 16.) Thomas *was* on a crusade to delete evidence, and it's clear he simply overlooked these emails: he cleared his browser history the day before the vendor came to image his computer, he initially lied under oath about whether he deleted emails, and FTI concluded that Thomas successfully deleted several emails. (*See* Report 5, 6, 8, 14; *see also* ECF No. 145-8 ¶ 8.)

-4-

email account was virtually empty during a time when Thomas had exclusive access, and at least 37 emails from Indiana's account were specifically targeted and deleted from Thomas's Gmail account. (*See* Report 6, 8.) Nobody could have engaged in this spoliation but Thomas. Caught red-handed, Thomas now concedes that he lied under oath, stating that he "may have deleted Mr. Indiana's emails," but insists he "did not intentionally delete any *relevant* emails." (Thomas Br. 18 (emphasis added).) But even that limited concession is dishonest: a document Thomas offers in *his own defense* shows Thomas offering to delete substantive emails discussing MAF, artwork to which MAF owns rights, and Simon Salama-Caro. (*See* ECF No. 229-2 at 967 ("Unfortunately, Melissa has access to his email. I can delete it. . . .").) And even when faced with FTI's damning finding that Thomas erased his Google Chrome browsing history just *one day* before his laptop was imaged in connection with this litigation, Thomas offers only an equivocal denial that "I don't *remember* deleting my browser history." (Thomas Decl. (ECF No. 229) ¶ 22 (emphasis added)).[5]

*Finally*, Thomas's and the Estate's efforts to blame someone other than Thomas are unavailing. They simply cannot counter the above evidence showing Thomas's clear, coordinated deletion of evidence. Moreover, while Indiana's former assistant, Webster Robinson, once had access to Indiana's email account, Thomas at some point (no later than 2017) "changed the password so that only [Thomas] could access" Indiana's account; afterwards, Robinson no longer had access. (ECF No. 214-4 ¶¶ 8–9.) Nothing in FTI's Report suggests Robinson accessed Indiana's email account after 2017. Moreover, the Estate admits that Robinson left Indiana's employ in "*early* February 2018," and provides no basis to conclude that Robinson even had access to Indiana's account at that time. (Estate Br. 10 (emphasis added).) Nor does this theory explain

---

[5] Just a year ago, Thomas also swore that he "continued to be careful to print out emails of import and forward them to his own account." (ECF No. 145-8 ¶ 4.) Thomas now admits that "[g]oing through Bob's emails and printing and storing some of them was not part of what I generally did for Bob." (Thomas Decl. ¶ 11.)

away the deletions that occurred after February 2018.  (*E.g.,* Report 24.)

The Estate's thesis that the emails were deleted as part of routine deletions by Indiana's assistants is also baseless.[6]  The Estate's theory is based on a statement by Indiana's former assistant Melissa Hamilton, who left Indiana's employ in 2016 and never visited Indiana after July 18, 2017.  (Hamilton Decl. (ECF No. 234) ¶ 3.)  Hamilton has zero firsthand knowledge about how Indiana's emails were deleted in 2017 and early 2018, whether emails relevant to this case were printed and saved, or who is responsible for the fact that Indiana's inbox contained only 51 received emails *total* from 2017.  (Report 24.)  Moreover, Hamilton "do[es] not recall" whether the assistants "routinely deleted messages in the AOL Account sent box," even though she admits that Indiana did ask his assistants to send emails on his behalf.  (Hamilton Decl. ¶¶ 18, 20.)  Yet Indiana's sent folder contained only *five* emails as of late August 2018 (Garay Decl. ¶ 10), and FTI discovered that at least *58 sent messages* had been deleted from Indiana's mailbox (Report 9).

There is no evidence to support any "alternative theor[y]" of how the emails went missing.  *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 500 (S.D.N.Y. 2016).  Only one person had the motive, means, and opportunity to delete Indiana's emails:  Thomas.

### III. THE DELETION OCCURRED AFTER THOMAS'S PRESERVATION OBLIGATION AROSE

Thomas deleted Indiana's emails after he was in a position to "reasonably anticipate[] litigation."  *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 579 (S.D.N.Y. 2017).  Thomas does not contest that his obligation to preserve evidence arose no later than February 28, 2018.  (*See* Thomas Decl. ¶ 21.)[7]  Contrary to the Estate's claim that "FTI was not able to establish

---

[6]   This thesis is also inconsistent with the Estate's representations in a meet and confer about the deletion.  The Estate's counsel specifically stated, in no uncertain terms, that Thomas deleted the emails from Indiana's account.  It was not until the Estate saw its own exposure for the deletion that it changed its story.  (Nikas Decl. ¶ 15.)

[7]   The preservation date clearly extends back to 2017, although it is unnecessary to reach back further given FTI's conclusion that Thomas deleted messages in 2018.  (*See* Exh. 2 (meeting minutes from December 2017 reflecting a conspiracy by Brannan and Thomas to litigate and steal the rights to *LOVE*); *see also* Report 9, 25–26 (emails were deleted on or after April 9, 2018 and May 10, 2018).)

when any of th[e] emails were deleted" (Estate Br. 2), FTI found that emails were deleted after April 9, 2018, and after May 10, 2018.  (Report 9 (deleted messages were "forwarded or replied to between February 6, 2017 and April 9, 2018" and "the emails had to have existed on the dates the messages were forwarded or replied to"), 25–26 (stating "FTI cannot say when these messages were deleted from Mr. Thomas' mailbox except that they were deleted on or after the sent dates below" and listing an email from Indiana's account that was sent May 10, 2018).)

The graph on page 24 of the Report also reflects that when FTI accessed Indiana's inbox in May 2019, Indiana's account contained several received messages dated after his death in May 2018, but very few from before that date.  (Report 24.)  It is implausible that Indiana only received 23 emails in February 2018, while he was still alive, but received 71 emails in February 2019, after he had been dead for nine months.  (*Id.*)  It is equally unbelievable that Indiana received 33 emails in April 2018—the month before he died—but received three times as many emails in April 2019.  (*Id.*)  Emails from early 2018 must have been mass deleted after this lawsuit was filed.

### IV. THE ESTATE IS CULPABLE FOR THE SPOLIATION AND ENSUING COVER-UP

Brannan was required to preserve evidence upon becoming personal representative on May 25, 2018.  Yet Brannan violated his obligation and attempted to cover up his dereliction of duty.

The Estate says it "believed that all electronic data was being preserved and was secure," but the evidence shows that this supposed "belie[f]" was contrary to the facts and based on nothing more than blind faith.  (Estate Br. 8.)  Despite knowing that robertoddfellow@aol.com was Indiana's email address (Brannan Decl. (ECF No. 232) ¶ 5), the Estate did not even "decide[]" to "try to access [Indiana's] email account" until "the week of August 20, 2018"—three months after Indiana died (Garay Decl. ¶ 9).  It was not until then that the Estate realized it could not access the account.  (*See* ECF No. 147 at 2.)  Before then, the Estate did nothing to secure the account.  In fact, the Estate had previously asked Thomas's counsel to confirm he was preserving Indiana's

documents, yet Thomas's counsel never confirmed he was preserving the evidence.  (*See* ECF No. 214-5 at Atts. 9, 10.)  Despite that shockingly deficient response, the Estate did nothing.

Even after discovering that Indiana's inbox was effectively empty, the Estate did nothing more than "google[] AOL" and its retention policies.  (ECF No. 165 at 22:7-19; Estate Br. 18.)  Meanwhile, the Estate concealed the spoliation for over *four months*—notwithstanding numerous opportunities for the Estate to disclose the destruction and its counsel's ethical obligation to do so.  *See* N.Y. Comp. Codes R. & Regs. Tit. 22, § 1200.0, rule 3.3 & cmt.  For example, even though MAF's document requests required the Estate to disclose whether documents had been destroyed or were missing (ECF No. 214-6 at 6), and even though the Estate never objected to this instruction (ECF No. 214-8), the Estate did not disclose the deletion in its responses or in meet and confers about document discovery (*see id.*).  To justify its lack of candor, the Estate now claims it "did not know of any specific, responsive document that had been destroyed." (Estate Br. 19.)  This is a time for the Estate to accept responsibility and request mercy—not make up ridiculous excuses.  The Estate knew that an *entire repository of documents* had been destroyed, and that Indiana's email had a disturbing "filter" set up to automatically delete all emails with the subject "IMPORTANT DOCUMENT."  (Garay Decl. ¶ 12; ECF No. 233-2.)  The Estate knew that responsive documents must have been deleted; its concealment of the deletion is inexcusable.

V.     **SEVERE SANCTIONS AGAINST THOMAS AND THE ESTATE ARE WARRANTED**

The evidence shows that Thomas intentionally deleted hundreds, if not thousands, of Indiana's emails after his obligation to preserve evidence arose.  There is no plausible explanation for this behavior other than to obtain an advantage in litigation.  *See Brown Jordan Int'l, Inc. v. Carmicle*, 2016 WL 815827, at *35-36 (S.D. Fla. Mar. 2, 2016).  Because Thomas "acted with the intent to deprive another party" of electronic information, the only appropriate remedy is to enter a default judgment against Thomas.  Fed R. Civ. P. 37(e)(2); *see also S. New England Tel. Co. v.*

*Glob. NAPs Inc.*, 624 F.3d 123, 147–48 (2d Cir. 2010); *Gutman v. Klein*, 2008 WL 4682208, at *12 (E.D.N.Y. Oct. 15, 2008). The same goes for the Estate, whose "conscious dereliction of [its] known duty to preserve" Indiana's emails is "sufficient to find that the [Estate] 'acted with the intent to deprive another party of the information's use' under Rule 37(e)(2)." *Ungar v. City of New York*, 329 F.R.D. 8, 13 (E.D.N.Y. 2018). The Estate's "repeated failure" to come forward and disclose the deletion for *over four months* "despite its ongoing and affirmative Rule 11 and Rule 26 obligations . . . is so stunningly derelict as to evince intentionality" and warrants "the imposition of severe sanctions," *Moody v. CSX Transportation, Inc.*, 271 F. Supp. 3d 410, 432 (W.D.N.Y. 2017). The Court should enter case-terminating sanctions against the Estate as well.[8]

As a last-ditch effort to avoid accountability for their misconduct, the Estate and Thomas argue that Indiana's emails would not have contained relevant evidence. (*See* Estate Br. 19-21; Thomas Br. 21-22.) This is not the legal standard. Courts do not require an aggrieved party to prove that deleted emails contained important information. *Karsch v. Blink Health Ltd.*, 2019 WL 2708125, at *20 (S.D.N.Y. June 20, 2019) ("[D]efendants need not establish that 'a smoking gun email' . . . was . . . destroyed."); *see also Arista Records LLC v. Usenet.com, Inc.*, 608 F. Supp. 2d 409, 439 (S.D.N.Y. 2009) (the fact that evidence was "destroyed in bad faith . . . *alone* is sufficient to support an inference that the missing evidence would have been favorable to [Plaintiffs], and thus relevant" (emphasis added)). We can never know what was in the deleted emails—because they were *deleted*. The question is whether "the existing evidence plausibly 'suggests' that the spoliated ESI could support [Plaintiffs'] case." *Karsch*, 2019 WL 2708125, at *21.

Plaintiffs easily meet that standard: the evidence shows that Indiana used his email account to communicate about central issues in this case. (*See* Plaintiffs' Opening Br. 19-20 (citing ECF

---

[8] At minimum, the Court should enter an adverse inference instruction against the Estate and Thomas. *See DeCastro v. Kavadia*, 309 F.R.D. 167, 183–84 (S.D.N.Y. 2015).

-9-

Nos. 214-13 & 214-14).) It is both incorrect and irrelevant that Indiana did not send and receive scores of emails or that Plaintiffs have the emails Indiana sent to them (*see* Estate Br. 19-21; Thomas Br. 21-22). It is clear that Plaintiffs would *not* have any emails that Indiana sent to or received from other individuals, and it is clear that Indiana sent and received emails highly relevant to this case. (*See* ECF No. 214-13 at 784; Am. Compl. ¶¶ 85-89, 104; Hamilton Decl. ¶ 18). To Plaintiffs' severe prejudice, all of these emails are gone, and Thomas and the Estate must be held responsible.[9]

## CONCLUSION

For the above reasons, and for the reasons set forth in Plaintiffs' opening brief, Plaintiffs respectfully request the relief set forth on pages 21 through 22 of their opening brief, including that the Court hold a hearing at which Plaintiffs now expect to call the following witnesses: (1) Thomas, (2) Brannan, (3) Daniel Roffman, (4) Dennis Tracey, (5) Kevin Lipson, (6) Yvonne Thomas, (7) Melissa Hamilton, (8) Adelina Gray, and (9) John Frumer.[10]

---

[9] In an effort to distract from its misconduct, the Estate claims that Plaintiffs should be sanctioned for "making very serious allegations on this Motion without investigating them first." (Estate Br. 23.) Before bringing this motion, Plaintiffs asked the Estate to disclose everything it knew about the destruction of Indiana's emails, the Estate told Plaintiffs that "upon becoming power of attorney, [] Thomas changed the password" to Indiana's account and "restricted account access *solely to himself*" (ECF No. 214-2 at 1 (emphasis added)), and the Estate first told Plaintiffs that it *would likely join a motion against Thomas* (ECF No. 214 ¶ 15; *see also* Tracey Decl. (ECF No. 235) ¶ 29 (not denying this account)). The Estate also ignores that it did nothing to preserve evidence, it wrongfully concealed the spoliation, and FTI confirmed the spoliation. The Estate's request for sanctions is frivolous and reinforces that sanctions are necessary to remedy the prejudice and send a message that spoliation will be taken seriously.

[10] Thomas and the Estate argue that no live hearing is necessary. (Estate Br. 3-4, 22-23; Thomas 22.) The Court has more than enough evidence to sanction the Estate and Thomas now. But live testimony is contemplated by the Court's Order (ECF No. 210), and the Estate's and Thomas's submissions provide even more evidence of misconduct, including more instances of Thomas's perjury and the Estate's dilatory conduct (*e.g.*, Yvonne Thomas Decl. (ECF No. 230) ¶ 9), that should be elicited in a live hearing. Although the Court should disregard the Estate's and Thomas's legally insufficient efforts to create factual disputes, such as Hamilton's meaningless declaration, Plaintiffs are entitled to cross examine the declarants if the Court intends to consider their testimony.

Dated: March 18, 2020
      New York, New York

                                         Respectfully submitted,

                                         QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                         By:  */s/ Luke Nikas*_____
                                                Luke Nikas
                                                Maaren A. Shah
                                                Ryan Rakower
                                                51 Madison Avenue, 22nd Floor
                                                New York, NY 10010
                                                Telephone:  (212) 849-7000
                                                Email:  lukenikas@quinnemanuel.com

                                                *Attorneys for Plaintiffs*